UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

*In re* MOTION TO QUASH SUBPOENAS TO NON-PARTIES

_____

VLADIMIR JEANTY,

                                        Plaintiff,

                                                            6:22-CV-0319
v.                                                          (BKS/TWD)

DAVID BAGLEY, ESQ.,

                                        Defendant.

_____

APPEARANCES:                                      OF COUNSEL

VLADIMIR JEANTY
*Plaintiff, pro se*
P.O. Box 921173
Arverne, New York 11692

CITY OF UTICA - CORPORATION COUNSEL          DAVID A. LONGERETTA, ESQ.
*Attorneys for non-parties City of Utica, Sciortino,*
*Oren, and Selimovic*
1 Kennedy Plaza, 2nd Floor
Utica, New York 13502

LIPES MATHIAS, LLP                                LAURA L. SPRING, ESQ.
*Attorneys for Defendant Bagley*
507 Plum Street – Suite 310
Syracuse, New York 13204

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## DECISION AND ORDER

Currently before the Court is the City of Utica's ("City") Motion to Quash filed on behalf

of former parties including the City and three of its employees, Melissa Sciortino ("Sciortino"),

Zachary Oren ("Oren"), and Edin Selimovic ("Selimovic") (collectively "movants").  Dkt. No.

93.  While it is somewhat unclear as to whether the motion (Dkt. No. 93) is submitted on behalf

of the City as well as its employees (Sciortino, Oren, and Selimovic), the Court construes the

motion as being made on behalf of the City and the individual employees.  *Compare* Dkt. No. 93

at 1[1] (Notice of Motion to Quash subpoenas served on Oren, Sciortino, and Selimovic) *with* Dkt.

No. 93-1 at 1 (Memorandum in support of Motion to Quash submitted by the City "on behalf of

itself and its employees").  Since the four subpoenas at issue directed to the City and the three

employees are almost identical in the information sought, the Court construes the Motion to

Quash (Dkt. No. 93) to include all four subpoenas.

The motion seeks to quash *pro se* Plaintiff Vladimir Jeanty's ("Plaintiff" or "Jeanty")

non-party subpoenas pursuant to Federal Rule of Civil Procedure 45(d)(3)(A).  Dkt. No. 93.

Movants argue the subpoenas at issue are (1) defective because they were not served with the

required fees; (2) they are unduly burdensome in requesting irrelevant, voluminous information

not proportional to the needs of the case; and (3) they seek privileged information.  Dkt. No. 93-

2.  Plaintiff responded to the motion.  Dkt. No. 96.  For the reasons discussed below, the Motion

to Quash is granted.

## I.       RELEVANT BACKGROUND AND THE CURRENT DISPUTE

Plaintiff brought this action against various Defendants including the non-party movants

under 42 U.S.C. § 1983 for violations of the First and Fourteenth Amendments arising out of the

Defendants' alleged failure to provide photographs sought in a New York Freedom of

Information Law ("FOIL") request made by Plaintiff as related to a previous action brought by

---

[1] Page numbers in citations to documents identified by docket number refer to the page number
inserted by the Court's electronic filing system, CM/ECF, maintained by the Clerk's Office.
Paragraph numbers are used where documents identified by the CM/ECF docket number contain
consecutively numbered paragraphs.

Jeanty against various City police officers and officials arising out of his arrest in October of 2009 (the "2016 Action"). *See generally* Dkt. No. 32 (amended complaint).[2] All Defendants moved to dismiss the amended complaint, and the motions were granted entirely, except the motion of Defendant David Bagley ("Bagley"), an attorney for a City employee in the 2016 Action, which was granted in part. Dkt. No. 69. Thus, the only remaining cause of action is a First Amendment retaliation claim against Bagley who, along with former parties Oren and William Borrill ("Borrill"), both attorneys for the City, allegedly directed non-party Sciortino not to respond to Plaintiff's FOIL request relating to various photographs. *Id.* at 17, 28; *see also* Dkt. No. 32 at ¶ 48.

Discovery ensued after all Defendants except Bagley were dismissed from this case. During discovery, Plaintiff served the disputed subpoenas on non-parties Sciortino, Oren, Selimovic, and the City seeking a broad range of documents regarding communications between various non-parties and between non-parties and Bagley. *See* Dkt. No. 92. The subpoenas also seek production of all electronic information from computer hard drives, including usernames and passwords, for Bagley and non-parties, and for their work and personal devices, including cell phones, for time periods going back as far as 2009. *See id.* As noted, the information sought by the subpoenas generally relates to FOIL requests for photographs and also a Joint Defense Agreement ("JDA") related to Bagley's representation of one of the City Defendants in the 2016 Action. *Id.*

It is unclear from Plaintiff's response to the present motion if the subpoenas were properly served as Plaintiff has not provided proofs of service. *See* Dkt. No. 96; *see also generally* Docket. Nevertheless, the Court assumes the subject subpoenas were served properly

---

[2] *See also generally* Dkt. No. 69 for an overview of the claims and the underlying events.

as the movants do not raise the issue of service in their Motion to Quash.  Moreover, it appears

the motion was timely filed since it was filed before the return date of the subpoenas.  *See* Dkt.

No. 92 (subpoenas with return date of October 30, 2023) and Dkt. No. 93 (Motion to Quash filed

October 13, 2023).  As previously stated, the movants argue the subpoenas are defective, unduly

burdensome and not proportional to the needs of the case, and the information sought is

irrelevant and privileged.  Dkt. No. 93-2.  In response, Plaintiff submits discovery demands

served on Bagley in this action, Bagley's responses to those demands, and other information

related to the 2016 Action.  Dkt. No. 96.  Plaintiff does not submit a Memorandum of Law or

any argument explaining why such documents are relevant to the subpoenas at issue, nor does

Plaintiff address any of the movants' arguments supporting their motion.  *See id.*

## II.    LEGAL STANDARDS

Federal Rule of Civil Procedure 45 allows a party to serve a subpoena for production of

documents on a non-party.  Fed. R. Civ. P. 45(a)(1).  The non-party may move to quash or

modify a subpoena as follows:

> (A) When Required.  On timely motion, the court for the district
> where compliance is required must quash or modify a subpoena
> that:
> (i) fails to allow a reasonable time to comply;
> (ii) requires a person to comply beyond the geographical limits
> specified in Rule 45(c);
> (iii) requires disclosure of privileged or other protected matter, if
> no exception or waiver applies; or
> (iv) subjects a person to undue burden.

Fed. R. Civ. P. 45(d)(3)(A); *see also Orlando v. The Kraft Heinz Co.*, No. 3:22-CV-01636, 2024

WL 552779, at *2 (D. Conn. Feb. 9, 2024) ("The non-party may object, and may move to quash,

if the subpoena "(1) 'fails to allow a reasonable time to comply'; (2) requires a non-party to

travel beyond certain geographical limits; (3) requires disclosure of privileged materials; (4) subjects a person to 'undue burden' . . . . ") (citation omitted).

"To determine whether a subpoena imposes an undue burden, courts weigh the burden to the subpoenaed party against the value of the information to the serving party by considering factors such as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed." *Trooper 1 v. New York State Police*, No. 22-CV-893, 2024 WL 165159, at *5 (E.D.N.Y. Jan. 16, 2024) (citing *Citizens Union v. Att'y Gen. of New York*, 269 F. Supp. 3d 124, 138 (S.D.N.Y. 2017) (citations omitted)); *see also Henry v. Bristol Hosp., Inc.*, No. 13-CV-826, 2020 WL 1158464, at *1 (D. Conn. Mar. 10, 2020) ("[C]ourts give special weight to the burden on non-parties of producing documents to parties involved in litigation."). Determinations of issues of "undue burden" are committed to the sound discretion of the trial court. *See In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 68-70 (2d Cir. 2003); *see also Herbert v. Lando*, 441 U.S. 153, 177 (1979) ("[T]he district courts should not neglect their power to restrict discovery" under Fed. R. Civ. P. 26(c) and "should not hesitate to exercise appropriate control over the discovery process.").

Even if the discovery sought by Plaintiff was found to be relevant, this Court must still weigh Plaintiff's right to obtain that discovery against the burden imposed on the party from whom the discovery is sought. *See Warnke v. CVS Corp.*, 265 F.R.D. 64, 69 (E.D.N.Y. 2010) (citing *Mirkin v. Winston Res., LLC*, No. 07 Civ. 02734, 2008 WL 4861840, at *1 (S.D.N.Y. Nov. 10, 2008)). "Because the trial court is in the best position to weigh[ ] fairly the competing needs and interest of parties affected by discovery, Rule 26 confers broad discretion to weigh discovery matters." *Id.* (citations and internal punctuation omitted). Moreover, a court may

5

issue an order "to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense . . . ." *Id.* (citing Fed. R. Civ. P. 26(c)).

Further, as relevant here to the movants' argument that the subpoenas seek privileged information, the "'common interest' doctrine, erroneously called 'common interest privilege' or 'joint defense privilege,' is an exception to the general rule that voluntary disclosure of confidential, privileged material to a third party waives any applicable privilege," *Sokol v. Wyeth, Inc.*, No. 07 Civ. 8442, 2008 WL 3166662, at *5 (S.D.N.Y. Aug. 4, 2008) (citation omitted). "It serves to protect the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel." *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989). It exists "to protect the free flow of information from client to attorney . . . whenever multiple clients share a common interest about a legal matter." *Id.* at 243-44. The doctrine "is not an independent source of privilege or confidentiality" so that "[i]f a communication is not protected by the attorney-client privilege or the attorney work-product doctrine, the common interest doctrine does not apply." *Sokol*, 2008 WL 3166662, at *5 (citations omitted); *see also HSH Nordbank AG New York Branch v. Swerdlow*, 259 F.R.D. 64, 71 (S.D.N.Y. 2009).

The general requirements and the purpose of the attorney-client privilege are well established. "The attorney-client privilege forbids an attorney from disclosing confidential communications that pass in the course of professional employment from client to lawyer. 'The relationship of attorney and client, a communication by the client relating to the subject matter upon which professional advice is sought, and the confidentiality of the expression for which protection is claimed, all must be established in order for the privilege to attach.'" *Carter v.*

*Cornell University*, 173 F.R.D. 92, 94 (S.D.N.Y. 1997) (quoting *Schwimmer*, 892 F.2d at 243).

"The privilege is intended to encourage clients to be forthcoming and candid with their attorneys

so that the attorney is sufficiently well-informed to provide sound legal advice." *Id.* (citing

*Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981); *United States v. Adlman*, 68 F.3d 1495,

1499 (2d Cir. 1995)).

"The work-product doctrine, codified for the federal courts in Fed. R. Civ. P. 26(b)(3), is

intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories

and strategy with an eye toward litigation, free from unnecessary intrusion by his adversaries."

*United States v. Adlman*, 134 F.3d 1194, 1196 (2d Cir. 1998) (citing *Hickman v. Taylor*, 329

U.S. 495, 510-11 (1947)) (internal quotation marks omitted).  Rule 26(b)(3) states that, subject to

limited exceptions: "a party may not discover documents and tangible things that are prepared in

anticipation of litigation or for trial by or for another party or its representative (including the

other party's attorney, consultant, surety, indemnitor, insurer, or agent)."  Fed. R. Civ. P.

26(b)(3)(A).

## III.   DISCUSSION

### A.      Scope of the Subpoenas

As recounted above, the subpoenas at issue seek a broad range of documents regarding

communications between various non-parties, most of whom are attorneys, and between non-

parties and Bagley; all electronic information such as computer hard drives, including usernames

and passwords, for Bagley and the non-parties; and information from all of the City's attorneys

and employees' work and personal computing devices including cell phones for time periods

going back as far as 2009.  *See* Dkt. No. 92.

### B.    Required Subpoena Fees

Initially, the movants argue the subpoenas are defective because they were not served with the required fees.  Dkt. No. 93-2 at 6.  However, the subpoenas at issue did not seek testimony of any witnesses, which is the only part of subpoenas to which the fees relate.  Fed. R. Civ. P. 45(b)(1); *see also First City, Texas-Houston, N.A. v. Rafidain Bank*, 197 F.R.D. 250, 255, n.6 (S.D.N.Y. 2000).  Thus, the lack of payment of fees is not a basis to quash the subpoenas.

### C.    Burdensomeness and Proportionality of Subpoenaed Information

Next, the movants argue the subpoenas are unduly burdensome and not proportional to the needs of the case.  Dkt. No. 93-2 at 6-7.  The Court agrees.  The subpoenas as written seek an expansive amount of information, including documents, text messages, emails, data from computer hard drives, and cell phone data and records, including information that dates back to 2009 and forward to the time the subpoenas were served.  Dkt. No. 92.  "A party . . . responsible for issuing subpoenas must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena.  The Court . . . must enforce this duty and impose an appropriate sanction . . . on a party . . . who fails to comply."  Fed. R. Civ. P. 45(d)(1).

In response to the Motion to Quash, Plaintiff has provided absolutely no explanation of how the vast amount of information sought from former parties is relevant to the sole remaining claim of retaliation against Bagley.  *See* Dkt. No. 96.  Further, Plaintiff has made no effort to limit the information sought since the motion was filed, nor has he provided any particularity to describe the documents sought and how they relate to the remaining claim.  Accordingly, the Court finds the subpoenas impose an undue burden on the movants since Plaintiff has made no effort to show the value of the information to the remaining claim or the need for the documents. In considering the breadth of the documents and information requested, the time period covered

by them, and Plaintiff's failure to show any relevance to the documents or provide particularity

with which the documents are described, the Court concludes the burden imposed on the non-

party movants to respond to the subpoenas is a substantial and undue burden. *See Trooper 1*,

2024 WL 165159, at *5 (citation omitted).  However, the Court declines to sanction Plaintiff in

view of his *pro se* status but may consider sanctions if such overly broad and burdensome

subpoenas are served in the future.  Fed. R. Civ. P. 45(d)(1).

### D.      Common Interest Doctrine, Attorney-Client Privilege, and Attorney Work Product

Much of the information sought by the subpoenas at issue pertains to (1) documents,

emails, text messages, and computers that belong to non-parties Oren, Borrill, and Charles

Brown, and Defendant Bagley, all of whom acted as attorneys for the City or for City employees

during the period at issue concerning the 2016 Action; (2) information pertaining to

communications between these attorneys and employees of the City, Sciortino and Selimovic, at

the time of the 2016 Action; and (3) communications between these attorneys concerning the

JDA, and the JDA itself, related to Bagley's defense of one of the City defendants in the 2016

Action.  *See* Dkt. No. 92 at 4-7, 23-25, 37-38, 54-55.  The movants argue the subpoenaed

information is privileged because it seeks communications between attorneys defending the City

and its employees in the 2016 Action, and between the attorneys and their clients who were City

employees during the 2016 Action.  Dkt. No. 93-2 at 7-10.  Thus, the information sought by the

subpoenas involves confidential communications between lawyers and their clients during the

course of legal representation related to the 2016 Action.

Plaintiff has made no showing that there has been any waiver of attorney-client

relationships here, or that the subpoenaed information is not work-product, or that the common

interest doctrine should not apply.  The movants were defending the City or its employees in the

2016 Action when the documents and information sought were generated, and the City employees who were not parties to the 2016 Action were responding to requests by the attorneys involved in defending the 2016 Action.  The subpoenaed documents and information clearly were generated to defend the City and its employees who were parties to the 2016 Action. Moreover, a party may not discover information that is prepared "in anticipation of litigation or for trial by or for another party or its representative . . . unless they are otherwise discoverable under Rule 26(b)(1); and . . . the party shows that it has a substantial need for the materials . . . and cannot, without undue hardship, obtain their substantial equivalent by other means."  Fed. R. Civ. P. 26(b)(3)(A)(i), (ii).

For these reasons, the Court finds the attorney-client privilege and work-product privilege apply to the information sought by the subject subpoenas.  The Court also finds the common interest doctrine applies since the City, the non-party City attorneys and employees, and Bagley all shared a common interest to defend the City and its employees in the 2016 Action.

In sum, Plaintiff has not shown the relevancy of the information sought to the remaining claim of retaliation against defendant Bagley; he has not shown the information is discoverable and not privileged; and he has not shown any substantial need for the materials to prepare his case.  Accordingly, the Court finds the subpoenas should also be quashed because they seek information privileged from discovery.

## IV.   CONCLUSION

For the reasons stated above, the Court finds the records Plaintiff seeks are overly burdensome, not relevant, and not proportional to the needs of the case.  The Court also finds the documents sought are privileged.  Therefore, the Court grants the movants' Motion to Quash.

**WHEREFORE**, it is

**ORDERED** that the motion (Dkt. No. 93) of non-parties City of Utica, Zachary Oren, Melissa Sciortino, and Edin Selimovic for an Order to quash *pro se* Plaintiff's subpoenas (Dkt. No. 92), is hereby **GRANTED** without prejudice; and it is further

**ORDERED** that no costs or sanctions are awarded to the non-party movants; and it is further

**ORDERED** that the Clerk is directed to serve this Decision and Order on the parties and the non-party movants in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: September 20, 2024
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

2024 WL 552779
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Justin ORLANDO, Plaintiff,
v.
The KRAFT HEINZ COMPANY, Defendant.

Civil No. 3:22-CV-01636 (JCH)
|
Signed February 9, 2024

**Attorneys and Law Firms**

Amanda Maria DeMatteis, Joshua R. Goodbaum, Stephen J. Fitzgerald, Garrison Levin-Epstein Fitzgerald & Pirrotti PC, New Haven, CT, for Plaintiff.

Kelly Marie Cardin, Nicole S. Mule, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Stamford, CT, for Defendant.

## RULING AND ORDER ON
## MOTION TO QUASH [ECF No. 82]

Thomas O. Farrish, United States Magistrate Judge

**\*1** The Plaintiff, Justin Orlando, brings the present action against his former employer, The Kraft Heinz Company ("Kraft Heinz"), alleging retaliation and discrimination under Section 31-51q of the Connecticut General Statutes. Before the Court is the Plaintiff's motion to quash a subpoena that Kraft Heinz served on his previous employer, Pepperidge Farms, requesting five classes of employment records. (ECF No. 82.) For the reasons set forth below, the motion will be granted in part and denied in part. The subpoena will be ordered modified as to two classes of records, and quashed as to the remaining three.

## I. BACKGROUND

The Plaintiff worked as a sales executive for Kraft Heinz beginning in 2020. (Am. Compl., ECF No. 17, ¶ 1; *see also* ECF No. 89, at 10.) In 2022 the company learned that he had once attended a Halloween party dressed as the fictional detective Rico Tubbs from the 1980s television show, *Miami Vice*. As part of his costume, the Plaintiff had "change[d] the complexion of his skin" to match that of the African American actor who had portrayed Detective Tubbs, Philip Michael Thomas. (Am. Compl., ECF No. 17, ¶¶ 1, 22.) The parties

evidently dispute whether to characterize this "change" as mere "makeup," or as "blackface" (*cf. id.* ¶¶ 1, 23), but in any event, Kraft Heinz investigated the affair. (*Id.* ¶ 2; *see also* Def.'s Ans. & Aff. Defenses, ECF No. 22, ¶ 2.) Upon completion of its investigation the company terminated the Plaintiff's employment, allegedly because he was "unwilling to acknowledge and take ownership of the inappropriateness and offensiveness of his conduct that was contrary to [Kraft Heinz's] leadership principles and violative of its Code of Conduct." (*Id.*)

The Plaintiff filed this lawsuit alleging that his termination violated Section 31-51q of the Connecticut General Statutes, a law that extends certain First Amendment protections into private workplaces. (Compl., ECF No. 1, ¶ 40.) He then amended his complaint, and Kraft Heinz answered that complaint and asserted several affirmative defenses. (Def.'s Ans. & Aff. Defenses, ECF No. 22.) Its fifth affirmative defense alleged that "Plaintiff's claims are barred in whole or in part by the doctrine of after-acquired evidence." (*Id.* at 6.)

In part to develop this after-acquired evidence defense, Kraft Heinz prepared a subpoena for service upon the Plaintiff's prior employer, Pepperidge Farm. (ECF No. 82-2.) The subpoena seeks, among other things, "[c]opies of applications for employment"; "[d]ocuments that identify Plaintiff's position(s) and ... duties"; "[d]ocuments ... reflecting the reasons why Plaintiff no longer works for Pepperidge Farm"; "[d]ocuments ... evidencing any stock awards ... including [when he] sold or cashed them out"; and "[d]ocuments ... to determine [the] components of Plaintiff's gross pay ... for 2018, 2019 and 2020." (*Id.*) The relevance that Kraft Heinz claims to observe in these documents will be discussed below.

The Plaintiff moved to quash the subpoena (ECF No. 82), and Kraft Heinz filed an opposition. (ECF No. 89.) The Court allowed reply and sur-reply briefs. (ECF Nos. 90-1, 95-1.) Neither party requested oral argument, and the motion is therefore ripe for decision.

## II. DISCUSSION

### A. Relevant Legal Principles

#### *1. A party's standing to move to quash*
#### *a subpoena served on a non-party*

**\*2** Federal Rule of Civil Procedure 45 allows a party to serve a subpoena for production of documents on a non-party. Fed.

R. Civ. P. 45(a)(1). The non-party may object, and may move to quash, if the subpoena "(1) 'fails to allow a reasonable time to comply'; (2) requires a non-party to travel beyond certain geographical limits; (3) requires disclosure of privileged materials; (4) subjects a person to 'undue burden'; (5) requires disclosure of 'a trade secret or other confidential research, development, or commercial information'; or (6) requires disclosure of certain expert opinions." *Strike 3 Holdings, LLC v. Doe*, No. 3:19-cv-115 (JBA) (RMS), 2019 WL 2066963, at *2 (D. Conn. May 10, 2019). A motion to quash is not an all-or-nothing proposition; the Court may not only grant or deny such a motion, but it may also order the subpoena modified if appropriate. *See* Fed. R. Civ. P. 45(d)(3); *Dapkus v. Arthur J. Gallagher Serv. Co., LLC*, No. 3:19-cv-1583 (KAD) (TOF), 2021 WL 83479, at *7-8 (D. Conn. Jan. 11, 2021) (declining to quash subpoena in its entirety but ordering it modified to address privacy objection).

In some instances, a party may not object to a subpoena served on a non-party. As the Second Circuit has explained, "[i]n the absence of a claim of privilege a party usually does not have standing to object to a subpoena directed to a non-party witness." *Langford v. Chrysler Motors Corp.*, 513 F.2d 1121, 1126 (2d Cir. 1975). For example, a party "lacks standing to challenge ... nonparty subpoenas on the basis of burden." *A & R Auto Body Specialty & Collison Works, Inc. v. Progressive Cas. Ins. Co.*, No. 3:07-cv-929 (WWE) (HBF), 2013 WL 6511934, at *2 (D. Conn. Dec. 12, 2013). This is because "[t]he burden of complying with the subpoena will fall on the non-party" rather than the party. *Strike 3 Holdings, LLC v. Doe*, No. 3:18-cv-1561 (VLB) (RMS), 2019 WL 1620414, at *4 (D. Conn. Apr. 16, 2019).

In other instances, the party may properly object. As a leading case explains, parties can object if the subpoenaed information implicates their "personal privacy right[s]" or "privilege[s]." *Jacobs v. Conn. Cmty. Tech. Colleges*, 258 F.R.D. 192, 195 (D. Conn. 2009). In that case, the court recognized the plaintiff's standing to move to quash subpoenas served on his mental health care providers, because he "clearly ha[d] a personal privacy right and privilege with respect to the information contained in his psychiatric and mental health records." *Id.* Similarly, courts have recognized that bank account holders have standing to move to quash subpoenas served on their banks, because of their "personal privacy rights" in their financial records. *E.g., Chazin v. Lieberman*, 129 F.R.D. 97, 98 (S.D.N.Y. 1990).

Importantly for this case, courts have recognized parties' standing to move to quash subpoenas served on their employers or former employers. In *Chamberlain v. Farmington Savings Bank*, for example, Judge Smith held that a plaintiff could move to quash subpoenas served on his former employers because he "clearly ha[d] a personal right with respect to information contained in his employment records." No. 3:06-cv-1437 (CFD) (TPS), 2007 WL 2786421, at *1 (D. Conn. Sept. 25, 2007); *see also Bernstein v. Mafcote*, No. 3:12-cv-311 (WWE) (HBF), 2014 WL 3579494, at *2 n.3 (D. Conn. July 21, 2014). Similarly, in *Warnke v. CBS Corp.* the court recognized the plaintiff's standing to challenge subpoenas served on his employers because he had "a legitimate privacy interest" in the information that would be revealed. 265 F.R.D. 64, 66 (E.D.N.Y. 2010).

### 2. Relevance

The information sought by a non-party subpoena must be relevant to the case. As Judge Garcia recently observed, "[a] subpoena issued to a non-party pursuant to Rule 45 is subject to Rule 26(b)(1)'s overriding relevance requirement, which provides that information is generally discoverable if it is relevant to any party's claim or defense, proportional to the needs of the case, and not privileged." *Berkelhammer v. Voya Institutional Plan Servs., LLC*, No. 3:22-mc-99 (MEG), 2023 WL 5042526, at *2 (D. Conn. Aug. 8, 2023). Judge Garfinkel put it even more succinctly: "Rule 45 subpoenas are subject to the relevance requirements set forth in Rule 26(b)." *Crespo v. Beauton*, No. 15-cv-412 (WWE) (WIG), 2016 WL 259637, at *2 (D. Conn. Jan. 21, 2016); *accord Doe v. Wesleyan Univ.*, No. 3:19-cv-1519 (JBA) (TOF), 2021 WL 2525427, at *2 (D. Conn. June 21, 2021); *Main St. Am. Assur. Co. v. Savalle*, No. 3:18-cv-2073 (JCH) (SALM), 2021 WL 1399685, at *1 (D. Conn. Apr. 14, 2021).

**\*3** Information sought by a non-party subpoena is "relevant" if it makes a material fact more or less likely to be true. "While the Federal Rules of Civil Procedure do not define 'relevant,' the operative definition can be found in Rule 401 of the Federal Rules of Evidence." *Gaynor v. City of Meriden*, No. 3:17-cv-1103 (CSH), 2019 WL 2537669, at *2 (D. Conn. June 20, 2019). Under that rule, "[i]nformation is 'relevant' if it '(a) has any tendency to make a fact more or less probable than it would be without the evidence, and (b) the fact is of consequence in determining the action.' " *Conservation L. Found. v. Shell Oil Co.*, No. 3:21-cv-933 (JAM) (TOF), 2023 WL 5434760, at *10 (D. Conn. Aug. 22, 2023); *see also*

*Huseby, LLC v. Bailey*, No. 3:20-cv-167 (JBA) (TOF), 2021 WL 3206776, at *6 (D. Conn. July 29, 2021).

The concept of relevance is broadly construed at the discovery stage. "In part because the concept of relevance is not limited by considerations of evidentiary admissibility at the discovery stage, *see* Fed. R. Civ. P. 26(b)(1), 'it is well established that relevance for purposes of discovery is broader in scope than relevance for the purpose of the trial itself.' " *Conservation L. Found.*, 2023 WL 5434760, at *10 (quoting *Vaigasi v. Solow Mgmt. Corp.*, No. 11-cv-5088 (RMB) (HBP), 2016 WL 616386, at *11 (S.D.N.Y. Feb. 16, 2016)). Put differently, relevance is "an extremely broad concept" during the discovery phase of the case. *Martino v. Nationstar Mortg. LLC*, No. 3:17-cv-1326 (KAD), 2019 WL 2238030, at *1 (D. Conn. May 23, 2019).

When disputes arise, the party that served the subpoena bears the burden of showing the relevance of the requested information. As Judge Merriam put it, "[t]he party issuing the subpoena must demonstrate that the information sought is relevant and material to the allegations and claims at issue in the proceedings." *Torcasio v. New Canaan Bd. of Educ.*, No. 3:15-cv-53 (AWT) (SALM), 2016 WL 312102, at *2 (D. Conn. Jan. 26, 2016) (quoting *Libaire v. Kaplan*, 760 F. Supp. 2d 288, 291 (E.D.N.Y. 2011)). Yet once the requesting party makes this demonstration, the burden shifts to the opposing party to show why the discovery should be denied. *Libaire*, 760 F. Supp. 2d at 291 ("Once the party issuing the subpoena has demonstrated the relevance of the requested documents, the party seeking to quash the subpoena bears the burden of demonstrating that the subpoena is overbroad, duplicative, or unduly burdensome."); *accord Doe*, 2021 WL 2525427, at *2 ("Wesleyan having demonstrated the relevance of the" subpoenaed information, "the burden shifts to the plaintiff to justify curtailing discovery.") (citation and quotation marks omitted); *cf. Cole v. Towers Perrin Forster & Crosby*, 256 F.R.D. 79, 80 (D. Conn. 2009) (holding, in the context of Rules 33 and 34, that "[t]he party resisting discovery bears the burden of showing why discovery should be denied").

### 3. After-acquired evidence

The Supreme Court has recognized an after-acquired evidence defense in employment cases. In *McKennon v. Nashville Banner Publishing Co.*, a newspaper fired an employee and later conceded that it did so because of her age, in violation of the Age Discrimination in Employment Act. 513 U.S. 352, 355 (1995). During the discovery phase of the case, however, it learned that she had "copied several confidential documents bearing upon the company's financial condition." *Id.* The newspaper contended that it would have fired the employee if it had learned of the copying during her term of employment, and the Supreme Court was therefore called upon to consider whether an employee "is barred from all relief when, after her discharge, the employer discovers evidence of wrongdoing that, in any event, would have led to the employee's termination on lawful and legitimate grounds." *Id.* at 354. The Court held that such an employer could not "be required to ignore the information," but could instead use it to limit the relief the employee could obtain, so long as the "wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." *Id.* at 362-63; *see also Chamberlain*, 2007 WL 2786421, at *2 (stating that the after-acquired evidence defense "provides that an employee's relief can be limited by evidence of wrong-doing discovered after his or her termination that would have provided a legitimate basis for such termination").

**4 Yet in the very same case, the Court noted the possibility that the defense could be used as a vehicle for discovery abuse. "The concern that employers might as a routine matter undertake extensive discovery into an employee's background or performance on the job to resist claims ... is not an insubstantial one." *McKennon*, 513 U.S. at 363. The Court nonetheless recognized the defense because the potential for intrusive discovery could be controlled by "the authority of courts to award attorney's fees ... and to invoke the appropriate provisions of the Federal Rules of Civil Procedure." *Id.*

Heading this warning, courts have quashed subpoenas premised on an after-acquired evidence defense when the employer presents no reason to suppose that the subpoenaed records would reveal any terminable misconduct. As Judge Smith held almost twenty years ago, when a defendant offers "[no] evidence to suggest that the plaintiff may have misrepresented information" and fails to provide "any statements made by the plaintiff during his deposition or in response to interrogatories," the subpoena should be quashed. *Chamberlain*, 2007 WL 2786421, at *3. In *Bernstein*, for instance, the court denied discovery into plaintiff's prior employment records when the only evidence of misconduct was an allegation that he had lied in an unrelated deposition. 2014 WL 3579494, at *3. Similarly, in *Addona v. Parker Hannifin Corp.*, the court concluded that defendant "[fell]

short of a sufficient basis to warrant discovery" when its only reason for believing plaintiff had lied on his employment application was that he claimed to have left his last employer to "seek other opportunities" but took a job with half the pay a few months later. No. 3:13-cv-1616 RNC, 2014 WL 788946, at \*2 (D. Conn. Feb. 25, 2014).

Conversely, courts have allowed discovery when the employer provides some concrete reason to believe that the subpoenaed information will reveal evidence of terminable misconduct. In *Shah v. James P. Purcell Assocs., Inc.,* for example, the employer learned that the plaintiff had been operating a Dunkin' Donuts franchise on the side. No. 3:05-cv-306 (PCD), 2006 WL 1876662, at \*1 (D. Conn. July 5, 2006). It served additional interrogatories to learn more, claiming that the information was relevant to an after-acquired evidence defense because it would have fired the plaintiff if it had known that he was running another business. *Id.* Judge Dorsey agreed, because under the facts of the case, "information regarding Plaintiff's Dunkin' Donuts franchise is relevant to calculating damages." *Id.* Similarly, in *Padilla v. Sacks & Sacks, LLP,* the defendant learned through other discovery that the plaintiff had not actually worked for a law firm that she had listed as a previous employer on her job application. Decl. of L. Horras, *Padilla v. Sacks & Sacks, LLP*, ECF No. 143, No. 1:19-cv-10021 (GBD) (KHP) (S.D.N.Y.). The court declined to quash a subpoena seeking the other firm's records, because those records would "allow Defendants to determine whether Plaintiff lied on her employment application" and "could impact Plaintiff's available remedies at trial." No. 19-cv-10021 (GBD) (KHP), 2021 WL 4429785, at \*3 (S.D.N.Y. Sept. 27, 2021) (citing, *inter alia, McKennon,* 513 U.S. at 360-62). In summary, an after-acquired evidence defense will support a targeted inquiry into the plaintiff's prior employment records when the defendant comes forward with some reason to believe that the inquiry will reveal evidence of terminable misconduct, but not otherwise.

## B. Application to the Defendant's Subpoena

**\*5** The Court will begin its analysis of the Plaintiff's motion to quash by observing that he has the standing to make it. The subpoena seeks his employment records (ECF No. 82-2), and as noted above, it is well established that a party has "a personal right with respect to information contained in his employment records" with his prior employer. *Chamberlain,* 2007 WL 2786421, at \*1. Indeed, Kraft Heinz does not dispute this point. (*See generally* Opp'n, ECF No. 89.) Having

thus addressed the question of standing, the Court will now address each subpoena request in turn.

### *1. Request No. 1*

In Request No. 1, Kraft Heinz asks Pepperidge Farm to produce any "[c]opies of applications for employment, offer letters or employment agreements, compensation records, and termination information relating to Plaintiff." (ECF No. 82-2, at 5.) In the parties' meet and confer session, Kraft Heinz offered to limit this request to "documents that identify when [the Plaintiff's] employment ended." (ECF No. 89, at 6.) It therefore does not argue in its opposition paper that the Plaintiff's Pepperidge Farm application, offer letter, or employment agreement are relevant. (*See generally id.*) But it wants to see Pepperidge Farm's records concerning the date of the Plaintiff's separation, because it suspects that he may have been moonlighting with Pepperidge Farm while employed by Kraft Heinz. (*See id.* at 12.)

In an effort to raise this suspicion above the level of speculation, Kraft Heinz cites three principal pieces of information. First, it notes that the "Plaintiff claims to have worked at Pepperidge Farm for three months in 2020 but his wages were nearly equal to years prior when he worked for a full twelve months." (*Id.*) Second, it says that the Plaintiff "could not explain this discrepancy" at his deposition. (*Id.*) (citing Pl.'s Depo. Tr., at 109-10). Third, through other efforts it has discovered an e-mail in which the Plaintiff "sought to hold multiple employment positions while employed at Kraft Heinz." (*Id.*) In the e-mail, the Plaintiff asked a prospective employer if it would be willing to "allow [him] to work on the side," fueling Kraft Heinz's suspicion that he was doing the same while employed there. (ECF No. 94, at 10.)

Although the Court suspects that there are likelier explanations than moonlighting – the Plaintiff's seemingly excess compensation, for example, may be explained by a separation package (*see* Pl.'s Depo. Tr., ECF No. 89, at 74-75) – it also concludes that Kraft Heinz has come forward with enough information to support a narrow, targeted inquiry into the end date of the Plaintiff's employment at Pepperidge Farm. As noted above, the concept of relevance is given a broad construction at the discovery phase of the case, *Conservation L. Found.,* 2023 WL 5434760, at \*10, and there is nothing particularly intrusive about a limited inquiry into the dates of the Plaintiff's employment. The subpoena is ordered modified so that Request No. 1 will read: "Documents

sufficient to show the end date of the Plaintiff's employment with Pepperidge Farm."

### 2. Request No. 2

In Request No. 2, Kraft Heinz seeks "[d]ocuments that identify Plaintiff's position(s) and a description of his duties for each position with Pepperidge Farm." (ECF No. 82-2, at 5.) Through other discovery, it has obtained a copy of a resumé that the Plaintiff sent out to other, prospective employers. (ECF No. 94, at 4.) In that resumé, the Plaintiff described his position with Kraft Heinz as a "Director of Sales, Metro Division." (*Id.*) Kraft Heinz states that he was never a "Director of Sales," but rather only a "Customer Business Lead and *Associate* Director." (ECF No. 89, at 10.) Concluding that the Plaintiff lied on this resumé, Kraft Heinz wants to know whether he lied on any others – including the one that he submitted to Kraft Heinz when he applied in early 2020. (*Id.* at 10-11.) In particular, it wants to know whether the Plaintiff's claim to have been a "Director of Sales" at Pepperidge Farm is true. (*Id.*) It adds that if the representation was false, it "would likely have terminated Plaintiff for Cause" if it had found out during his term of employment. (*Id.* at 11.)

**\*6** The Plaintiff says that there is an innocuous explanation for the entry on his resumé. (ECF No. 90-1, at 2-3.) He explains that he used the term "Director of Sales" because it was " 'verbiage that outside companies would understand,' whereas 'Kraft Heinz vernacular with positions doesn't necessarily relate to outside organizations.' " (*Id.*) He adds that he is "not aware of anyone at Kraft Heinz whose actual title was 'Director of Sales.' " (*Id.* at 3.)

The Plaintiff's explanation may ultimately prove to be the correct one, but the Court nonetheless concludes that Kraft Heinz has come forward with enough information to support targeted discovery into his job title and duties at Pepperidge Farm. At the same time, Request No. 2 is phrased more broadly than necessary for that narrow inquiry. In seeking *all* documents that identify the Plaintiff's position and job duties, the request may encompass every pay stub that has his job title at the top, every performance review that measures his progress against his job duties, *etc.* (ECF No. 82-2, at 5), and Kraft Heinz has not sufficiently justified so expansive an intrusion into his prior employment records. Accordingly, the subpoena is ordered modified so that Request No. 2 will read: "Documents sufficient to identify the Plaintiff's position(s)

with Pepperidge Farm, and the job description for each such position."

### 3. Request No. 3

In Request No. 3, Kraft Heinz requests "[d]ocuments or communications that reflect the reasons why Plaintiff no longer works for Pepperidge Farm, including but not limited to any separation agreement, severance agreement or reduction in force agreement entered into between Pepperidge Farm and Plaintiff." (*Id.*) It says that this request is relevant to its moonlighting theory because his alleged inability to "recall[ ] why ... his employment with Pepperidge Farm ended raises an inference that he worked at Pepperidge Farm beyond the three months he claims, in violation of Kraft Heinz's policies." (ECF No. 89, at 12.) It adds that the requested information would also be "relevant to ... Plaintiff's character and credibility." (*Id.*)

While the question of *when* the Plaintiff left Pepperidge Farm is relevant to Kraft Heinz's after-acquired evidence defense (*see* discussion, Section II.B.2 *supra*), the Court concludes that the question of *why* he left is not. Kraft Heinz has not identified a consequential fact, material to the success or failure of that defense, that will be rendered more or less likely by the *why* of the Plaintiff's departure, as opposed to the *when*. (*See generally* ECF No. 89, at 12.) The Plaintiff pointed this out in his reply brief (ECF No. 90-1, at 4), and Kraft Heinz did not meaningfully address it in its sur-reply. (ECF No. 95-1, at 4.)

The Court also declines to authorize this request on the strength of Kraft Heinz's desire to make a generalized inquiry into the Plaintiff's "character and credibility." (ECF No. 89, at 12.) Discovery premised on a claimed need to assess credibility is a complex topic, requiring consideration of (among other things) the likelihood that the requested information will lead to material that is admissible under Federal Rule of Evidence 608(b), the relationship between the subject matter of the alleged deception and the subject matter of the case, and whether the requesting party has a foundation for its inquiry. *Davidson Pipe Co. v. Laventhol & Horwath*, 120 F.R.D. 455, 461-63 (S.D.N.Y. 1988). Here, it is enough to observe that Kraft Heinz has not identified any statements by the Plaintiff about the *why* of his departure from Pepperidge Farm that are sufficiently suspect to justify an exploration of his past employment records on credibility grounds. Its lone citations are to pages 86-87 and 109-110

of his deposition transcript, but those passages concerned the *when*, not the *why*. (ECF No. 89, at 12; Pl.'s Depo. Tr., ECF No. 89, at 86:24-87:2, 109-10.) "To justify an inquiry into facts relevant solely to credibility, the party seeking discovery must ... have a factual basis for believing that prior acts of deception will be revealed." *Davidson Pipe Co.*, 120 F.R.D. at 463. Kraft Heinz has not shown such a basis with respect to "[d]ocuments or communications that reflect the reasons why Plaintiff no longer works for Pepperidge Farm," and accordingly the Plaintiff's motion to quash will be granted as to Request No. 3.

### 4. Request No. 4

**\*7** Request No. 4 seeks "[d]ocuments or communications evidencing any stock awards, restricted stock unit (RSU), or long-term incentives that Plaintiff maintained, including any date he may have sold or cashed them out." (ECF No. 82-2, at 5.) Kraft Heinz says that it has an Insider Trading Policy that "prohibits the sale of stock at certain times, including around the time it is announcing its earnings." (ECF No. 89, at 10; *see also* ECF No. 95-1, at 23-25.) It also says that it has a Conflict of Interest Policy that prohibits "owning an interest worth more than $25,000 in a Kraft Heinz business partner." (ECF No. 89, at 10; *see also* ECF No. 95-1, at 11-20.) At his deposition, the Plaintiff testified that he had been awarded shares of Pepperidge Farm's corporate parent, the Campbell's Soup Co., and that he had sold shares "between two and four times." (Pl.'s Depo. Tr., ECF No. 89, at 58:12-14.) He could not remember when, however (*id.* at 58:21-23), and Kraft Heinz wants access to Pepperidge Farm's records to determine whether any of his sales constituted termination-worthy violations of the two policies. (ECF No. 89, at 9-10.)

The Plaintiff originally objected on the ground that Kraft Heinz had not produced the policies, and until it did, its "subpoena relie[d] on noting more than impermissible 'speculation.' " (ECF No. 82, at 5) (quoting *Chamberlain*, 2007 WL 2786421, at \*3). Kraft Heinz then provided the policies (ECF No. 95-1, at 11-20, 22-28), and the Plaintiff's objections became more substantive. With respect to the Conflict of Interest Policy, he pointed out that it permitted Kraft Heinz employees to hold positions in other public companies so long as those positions did not exceed one percent of shares, "which Plaintiff's shares in Campbell's did not remotely approach." (ECF No. 90-1, at 2; *see also* ECF No. 95-1, at 11 (defining "Significant Financial Interest" for purposes of the Conflict of Interest Policy).) With respect to

the Insider Trading Policy, he argued that Kraft Heinz had not identified "any material inside information to which someone in Plaintiff's position would have had access." (ECF No. 90-1, at 2.) Nevertheless, he searched his bank records from the 2020-2022 period in which he worked for Kraft Heinz, and he produced the "one statement that reflected the sale of Campbell's shares." (*Id.*)

Unsatisfied, Kraft Heinz continues to press for information about how the Plaintiff's Pepperidge Farm "incentive program worked," "how many shares he had," and "the value of the shares awarded." (ECF No. 95-1, at 2.) It argues that this information would be relevant to an after-acquired evidence defense based on violations of its Conflict of Interest Policy, notwithstanding the one-percent-of-shares provision, because the policy also "prohibits ownership of 'an interest worth more than $25,000 in a privately-owned company.' " (*Id.* at 3) (quoting Conflict of Interest Policy, ECF No. 95-1, at 13.) It also argues that the information would be relevant to a defense based on its Insider Trading Policy, because the share sale documented by the bank record was made "around the end of the quarter when earnings are being prepared and released." (*Id.* at 3.)

The Court concludes that Request No. 4 is unsupported by the after-acquired evidence defense because there are insufficient reasons to suppose that Pepperidge Farm's records of the Plaintiff's stock transactions will yield evidence of termination-worthy misconduct. With respect to the Conflict of Interest Policy, Campbell's is a public rather than a private company, and accordingly the Plaintiff would have had to have held nearly three million shares for there to be even a potential violation. *Cf. In re Fuwei Films Secs. Litig.*, 634 F. Supp. 2d 419, 426-27 n.3 (S.D.N.Y. 2009) (taking judicial notice of a company's SEC filings); Wall St. J., *Market Data: Campbell Soup Co.*, www.wsj.com/market-data/quotes/US/CPB (last viewed Feb. 6, 2024) (reporting that the company has 298,100,000 shares of stock outstanding). The Court will not authorize Kraft Heinz's request on the strength of implausible speculation that he might possess such gargantuan holdings. And with respect to the Insider Trading Policy, the Plaintiff is correct that Kraft Heinz has not "identif[ied] any material inside information to which someone in Plaintiff's position would have had access." (ECF No. 90-1, at 2.) In Kraft Heinz's own telling, the Plaintiff never rose higher than "Customer Business Lead and Associate Director" (ECF No. 89, at 10), and it has not identified any insider information that such a person would possess.

**\*8** Finally, Kraft Heinz argues that the motion is moot with respect to Request No. 4 because the parties agreed on what should be produced, but the Court disagrees. (ECF No. 89, at 10.) The Plaintiff persuasively explains that no such agreement was reached. (ECF No. 90-1, at 1.) Kraft Heinz says that the Plaintiff agreed to produce documents identifying the number of Pepperidge Farm shares he had been awarded and the dates and prices of any sales (ECF No. 89, at 6, 10), but the Plaintiff responds that he merely offered to acquiesce in the subpoenaing of that information if and only if Kraft Heinz correspondingly withdrew the remainder of its requests – an offer that it did not accept. (ECF No. 90-1, at 1.) Had there been a written agreement on this issue, the Court would have enforced it. *E.g., Kalra v. Adler Pollock & Sheehan, P.C.*, No. 3:18-cv-260 (KAD) (TOF), 2020 WL 7828790, at \*4 (D. Conn. Dec. 31, 2020) (noting that Rule 29 authorizes parties to make deals on discovery issues, "[a]nd provided that such agreements are properly memorialized in writing, courts ordinarily enforce them"). But Kraft Heinz has not come forward with such an agreement, and the Court of course cannot enforce an agreement that was never reached. *Wells Fargo Bank, N.A. Trustee v. Konover*, No. 3:05-cv-1924 (CFD) (WIG), 2008 WL 11377755, at \*8-10 (D. Conn. June 26, 2008) (holding that discovery agreements are enforceable, but finding that the parties did not agree; "the requirement of a writing is clear"). Because the information sought by Request No. 4 is neither supported by Kraft Heinz's after-acquired evidence defense nor required to be produced under any written discovery agreement, the Plaintiff's motion will be granted with respect to it.

### 5. Request No. 5

In Request No. 5, Kraft Heinz asks for "[d]ocuments or communications sufficient to determine those components of Plaintiff's gross pay, as reported on his Form W-2 for 2018, 2019 and 2020." (ECF No. 82-2, at 5.) It says that it needs these documents from Pepperidge Farm because "the Plaintiff was not able to identify the components of his compensation" at his deposition, and because he "could not identify any documents within his possession" that would explain why he received nearly a year's worth of compensation for only three months of work. (ECF No. 89, at 12-13.) The Plaintiff responds that he did explain the seeming discrepancy; at his deposition, he testified that he had been given a "separation package" during a corporate restructuring. (ECF No. 90-1, at 3; *see also* Pl.'s Depo. Tr., ECF No. 89, at 74-75.) In its

sur-reply, Kraft Heinz argues that the Plaintiff's testimony was more equivocal, and that it continues to need Pepperidge Farm's documents to get to the bottom of the issue. (ECF No. 95-1, at 4-5.)

Apart from the moonlighting issue, the Court does not observe any relevance in this inquiry. Kraft Heinz says that "the record here is rife with inconsistencies that are potentially violative of [its] policies," and that information about the Plaintiff's Pepperidge Farm compensation package is therefore "relevant to [its] defenses," but it does not explain how. (ECF No. 89, at 13; *see also* ECF No. 95-1, at 4-5) As noted above, Kraft Heinz has not come forward with sufficient reasons to suppose that anything about the Plaintiff's relationship with Pepperidge Farm was violative of its Insider Trading Policy or Conflict of Interest Policy, aside from a possibility that he might have kept working for Pepperidge Farm after he started with Kraft Heinz. And with the Court's ruling on Request No. 1, Kraft Heinz has been permitted sufficient discovery into that possibility. The subpoena will be quashed as to Request No. 5.

### III. CONCLUSION

In closing, the Court notes that the subpoena evidently had not been served on Pepperidge Farm at the time of the Plaintiff's motion. Presumably the Plaintiff objected after receiving the advance notice required by Fed. R. Civ. P. 45(a)(4), and Kraft Heinz refrained from serving the subpoena until the objections had been adjudicated. This ruling and order is therefore without prejudice to any objections that Pepperidge Farm may wish to make once it is served. [1]

[1]    The Court notes that Pepperidge Farm appears to be a Camden, New Jersey company, and the subpoena purports to demand compliance in Stamford, Connecticut. (ECF No. 82-2, at 1, 4.) The distance between those two cities is greater than 100 miles. *See* www.mapquest.com. The Court trusts that in the modified subpoena, Kraft Heinz will either change the production location to comply with Fed. R. Civ. P. 45(c)(2)(A), or will negotiate the method and location of the production in a way that is acceptable to Pepperidge Farm.

**\*9**  For the foregoing reasons, the Plaintiff's Motion to Quash (ECF No. 82) is granted in part and denied in part, and Kraft Heinz's subpoena to Pepperidge Farm is ordered:

Case 6:22-cv-00319-BKS-TWD   Document 123   Filed 09/20/24   Page 19 of 39

A. Modified so that Request No. 1 reads: "Documents sufficient to show the end date of the Plaintiff's employment with Pepperidge Farm";

B. Modified so that Request No. 2 reads: "Documents sufficient to identify the Plaintiff's position(s) with Pepperidge Farm, and the job description for each such position"

C. Quashed as to Request Nos. 3, 4, and 5.

This is not a Recommended Ruling, but rather a "determination of [a] nondispositive motion ... relating to discovery and other matters of procedure." D. Conn. L. Civ. R. 72.1(C)(2). As such, it is reviewable pursuant to the "clearly erroneous" statutory standard of review. *See* 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); D. Conn. L. Civ. R. 72.2. It is an order of the Court unless reversed or modified by the District Judge in response to a timely objection under Local Rule 72.2(a).

**All Citations**

Slip Copy, 2024 WL 552779

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 165159
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

TROOPER 1, Plaintiff,

v.

NEW YORK STATE POLICE
and Andrew Cuomo, Defendants.

22-CV-893 (LDH) (TAM)

|

Signed January 16, 2024

**Attorneys and Law Firms**

John S. Crain, Valdi Licul, Wigdor LLP, New York, NY, for Plaintiff.

Daniel J. Moore, Joshua Steele, Daniel J. Palermo, Harris Beach PLLC, Pittsford, NY, for Defendant New York State Police.

Rita M. Glavin, Katherine Ellen Petrino, Leo Korman, Michaelene Kennedy Wright, Glavin PLLC, New York, NY, Allegra Noonan, Theresa Trzaskoma, Sher Tremonte LLP, New York, NY, for Defendant Andrew Cuomo.

## DISCOVERY/PROTECTIVE ORDER

TARYN A. MERKL, United States Magistrate Judge:

 **\*1** On February 17, 2022, Trooper 1 ("Plaintiff"), a member of former New York Governor Andrew Cuomo's Protective Service Unit ("PSU"), initiated this action alleging that former Governor Cuomo sexually harassed her and other state employees. (Compl., ECF No. 1.) The amended complaints named as Defendants the New York State Police ("NYSP"), former Governor Andrew Cuomo ("Cuomo"), Melissa DeRosa ("DeRosa"), and Richard Azzopardi ("Azzopardi") (collectively referred to as "Defendants". (*See* First Am. Compl. ("FAC"), ECF No. 7; Second Am. Compl. ("SAC"), ECF No. 71.) Plaintiff is claiming, among other things, discrimination and retaliation in violation of the federal Equal Protection Clause, the New York State Human Rights Law, and the New York City Human Rights Law. (*See* SAC, ECF No. 71.) On September 29, 2023, the Honorable LaShann DeArcy Hall granted motions to dismiss filed by Defendants Azzopardi and DeRosa as to Plaintiff's claims of discrimination and retaliation, alleged in violation of the New York State Human Rights Law and the New York City Human Rights Law. (Sept. 29, 2023 ECF Order.)

This Order assumes familiarity with the factual and procedural history of this case and that the New York State Office of the Attorney General ("OAG") and New York State Assembly Judiciary Committee ("AJC") conducted investigations and issued reports in 2021 concluding that Cuomo engaged in sexual harassment while in office.

## RELEVANT FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Discovery in this case commenced following the initial conference, which was held on June 6, 2022, and has been fraught with discovery disputes large and small. Since June 30, 2023, myriad motions and letters regarding discovery have been filed by the parties, potential non-party witnesses, and various non-party complainants (the "Complainants"), who have made sexual harassment allegations against Cuomo, and from whom he now seeks discovery in this case. [1]

1

(*See, e.g.*, Trooper 1 Mot. to Quash, ECF No. 82; Charlotte Bennett Mot. to Quash, ECF No. 83; Lindsey Boylan Mot. to Quash, ECF No. 86; Cross-Mot. to Compel Non-Party Charlotte Bennett, ECF No. 95; Mot. to Compel Def. Cuomo's Dep., ECF No. 122; Mot. for a Pre-Mot. Conference, ECF No. 136; Mot. to Compel Non-Party Kaitlin, ECF No. 140; Limmiatis and McGrath Mot. for a Pre-Mot. Conference, ECF No. 149; Non-Party Kaitlin's Cross-Mot. to Quash, ECF No. 159; Mot. to be Heard by Non-Party Karen Hinton, ECF No. 165; Mot. to be Heard by Non-Party Alessandra Biaggi, ECF No. 167; Ltr. Mot. for Discovery re Non-Party Lindsey Boylan, ECF No. 177; Ltr. from Non-Parties Proposing Discovery Solution, ECF No. 179; Ltr. from State Entity Employee #2, ECF No. 180; Ltr. Mot. for Discovery, ECF No. 189; Ltr. Mot. for Discovery from State Entity Employee #2, ECF No. 194; Ltr. Mot. for Discovery re Karen Hinton, ECF No. 196.) The Court notes that the motions, and portions of those motions, concerning Ms. Boylan and Ms. Bennett are addressed separately in two discovery orders issued simultaneously with this Order.

**\*2** The subpoenas concerning the Complainants have common themes, including, by way of example, requests for (1) non-privileged communications with or about other Complainants (including Ms. Boylan and Ms. Bennett), and other witnesses, such as Ms. Hinton; (2) documents and communications concerning any allegations by the witnesses of sexual harassment or misconduct against Cuomo, including communications with the OAG or AJC and any documents or other materials provided by them to the OAG or AJC; and (3) communications by the witnesses regarding the work environment in the Executive Chamber.[2] In addition, Cuomo has sought the phone records of some of the Complainants, including, for example, Ms. Boylan and Kaitlin. Moreover, Cuomo has not just issued subpoenas to Complainants, but has issued many subpoenas to witnesses who *know* the Complainants, in an apparent effort to develop impeachment evidence to use against them, and to undercut the reliability of the OAG report. Counsel have described the efforts as seeking discovery in "concentric circles" around certain witnesses. (*See, e.g.*, Biaggi Joint Ltr., ECF No. 193, at 2.) In a nutshell, Cuomo is attempting to conduct extremely robust discovery in an effort to uncover impeachment material for Trooper 1, the non-party Complainants, and other witnesses. Certain witnesses and the Complainants have provided some discovery; some have provided none or almost none; many object to Cuomo's requests.

[2]     (*See, e.g.*, Subpoena to Alessandra Biaggi, ECF No. 193-1 (seeking, for the time period of December 1, 2020, through November 30, 2021, (1) all non-privileged communications "with or about Lindsey Boylan [or her representatives] ..., Karen Hinton, Charlotte Bennett, or Kaitlin concerning allegations of sexual harassment or misconduct against Cuomo"; and (2) all non-privileged "Documents or Communications concerning any allegations by You of sexual harassment or misconduct against Governor Cuomo, including communications with OAG and any documents or other materials provided by You to OAG," and, as to the time period from January 1, 2017, through November 20, 2021, all non-privileged communications "by You concerning the work environment in the New York State Executive Chamber under Governor Cuomo").) At oral argument on December 12, 2023, counsel for Cuomo represented that the Biaggi subpoena is a representative example of the subpoenas they have issued to the Complainants. (Tr., ECF No. 197,

at 87:19–22.) Notably, Ms. Biaggi is not herself a complaining witness in that she has not filed any charges or made any allegations that Cuomo harassed her personally. (*See* Biaggi Joint Ltr., ECF No. 193, at 1.)

In the meantime, as an apparent flurry of subpoenas was going out, Trooper 1 filed a pre-motion conference letter, in anticipation of seeking entry of a protective order. (*See* Mot. for Pre-Mot. Conference, ECF No. 136.) In the motion, Trooper 1 averred that, as of August 25, 2023, Cuomo had issued over 48 subpoenas, including over 20 deposition subpoenas without any agreement with Plaintiff Trooper 1, or approval by the Court, in contravention of Fed. R. Civ. P. 30(a)(2)(A)(i). (*See id.* at 2.) Trooper 1 argues that this is not proper discovery, but rather a concerted effort to intimidate witnesses. (*Id.*) Accordingly, Trooper 1 requested that the Court issue a protective order:

> (1) precluding Cuomo from engaging in non-party discovery until he has completed his own discovery obligations, including sitting for his deposition; (2) requiring Cuomo to first seek information from parties before burdening non-parties; (3) requiring Cuomo to notify non-parties of any subpoenas he intends to serve seeking information about them so that they can object, if necessary; [and] (4) setting a final end date for service of subpoenas, with Cuomo required to show the Court good cause for any subpoenas served thereafter.

(*See id.* at 3.)

In response, Cuomo argues that their discovery effort is, comparatively, restrained given the breadth of Trooper 1's case, which itself includes allegations regarding 10 Complainants, and considering the fact that the OAG investigation served over 70 subpoenas, interviewed 179 witnesses, and took testimony from 41 of them. (*Id.* at 4 n.7.) Cuomo further argues that, although "it is true that we have noticed subpoenas to 36 witnesses, the vast majority are either the other complainants referenced in Trooper 1's lawsuit or witnesses Trooper 1 identified," with two notable exceptions: Alessandra Biaggi and Karen Hinton. (*Id.* at 4 &

n.6.) [3]  In addition, the Court notes that Plaintiff has repeatedly indicated her intention to seek to introduce the OAG report into evidence, and that Cuomo seeks discovery to argue that the report is unreliable and should be precluded.

[3]      In addition to a discussion regarding the scope and breadth of Cuomo's discovery efforts, in the joint filing discussing Trooper 1's anticipated motion for a protective order, Cuomo raised various concerns related to witnesses Diane Parrotta and Stephen Nevins. (*See* Mot. for Pre-Mot. Conference, ECF No. 136, at 4–5.) The Court notes that the issues related to these witnesses have been discussed at various conferences separately, and in connection with litigation surrounding the production of Trooper 1's phone records. (*See id.*; Ltr. Mot. for Discovery, ECF No. 189.) Accordingly, they are not addressed herein.

**\*3**  In an effort to narrow the disputes and to develop a viable approach to non-party discovery, the Court held a lengthy oral argument on September 26, 2023, at which all interested parties were invited to appear. (Sept. 26, 2023 Min. Entry & Order.) At and after the conference, the Court strongly encouraged the parties to meet and confer in an effort to meaningfully narrow the scope of discovery in this case, and directed the parties to file a joint status report. (*Id.*) On October 31, 2023, after the Court extended the parties' deadline for their joint status report providing an update as to the outcome of their meet and confer, the parties indicated that they were unable "to reach any agreement on narrowing the scope of Plaintiff's case, Governor Cuomo's defenses, or narrowing any discovery issues related to nonparty complainants." (Joint Status Report, ECF No. 173.)

Following that, the Court directed the parties and any interested parties to provide an update and directed the parties to file their Rule 26(a)(1) initial disclosures and any supplemental or corrective Rule 26(a) disclosures. (Nov. 3, 2023 ECF Order.) On November 10, 2023, the parties filed their Rule 26 disclosures. (*See* Cuomo's Disclosures, ECF No. 174; Pl.'s Disclosures, ECF No. 175; and NYSP Disclosures, ECF No. 176.)

In addition, several non-parties filed a letter proposing a two-phased approach to discovery. (*See* Non-Party Proposal re Discovery Solution, ECF No. 179.) First, the non-parties proposed that non-party discovery be reserved until closer to trial, and that Cuomo be directed to file his

anticipated motion to strike all allegations concerning the non-parties from the complaint. (*Id.* at 2.) Second, the non-parties proposed that the Court limit the scope and burden of any non-party discovery by (1) limiting documentary discovery to the documents each non-party produced to the Attorney General and any communications that the non-parties had with one another "concerning their allegations against Defendant Cuomo," (*id.*); and (2) permitting non-parties to be deposed by Zoom, for no more than half of a day, and perhaps less depending upon their anticipated level of knowledge regarding the case, and the amount of their exposure to Cuomo, considering criteria such as the length of time they worked in the Executive Chamber and whether they interacted with Cuomo for a "single incident or interaction." (*Id.* at 3.) The non-party proposal also argues that "[a]ny deposition opportunity Defendant Cuomo is afforded in this case should be strictly limited to the few questions to which the Attorney General's interviewers did not obtain answers." (*Id.*)

The Court held additional hearings on December 12, 2023, and January 11, 2024, to discuss the status of the pending motions for discovery related to the non-party Complainants with the parties as well as counsel for Ms. Boylan and Ms. Bennett. (*See* Dec. 12, 2023 ECF Min. Entry & Order; Jan. 11, 2024 ECF Min. Entry & Order.)

The Court notes that Ms. Bennett is the sole plaintiff in a separate lawsuit she initiated in the Southern District of New York against Cuomo, *Bennett v. Cuomo, et al.*, No. 22-CV-7846 (VSB) (SLC). Of relevance to the Court's findings below, on January 8, 2024, while motions were pending in this case regarding the propriety of a third-party subpoena for Plaintiff's phone records, the Court learned that Cuomo had already obtained the phone records of Plaintiff Trooper 1 via a third-party subpoena issued in *Bennett* to Plaintiff's phone carrier. (*See* Jan. 8, 2024 ECF Min. Entry & Order.) At oral argument in this case on January 11, 2024, counsel for Cuomo essentially suggested that they had issued so many subpoenas in *Bennett*, that they had not focused on the subpoena, and that they were surprised that the phone company did not provide notice to Trooper 1. This episode is gravely troubling.

## DISCUSSION AND FINDINGS

**\*4**  Against this backdrop, and as set forth in this Order, discovery in this case shall proceed in stages with a higher level of judicial oversight than is typically necessary. Should

progress continue to falter, additional discovery oversights may be implemented. For the reasons discussed herein, the Court concludes that discovery in this case shall be staged, with documentary discovery, including such discovery from non-party Complainants, Ms. Biaggi, and Ms. Hinton, proceeding first (absent an agreement among the parties to take specific steps as to non-parties in a different order), followed by party depositions.

After non-party documentary discovery and party depositions are complete, depositions of Complainants may proceed. In addition, the following limits are placed on third-party discovery, which limits are also applicable to any efforts to acquire discovery regarding the non-party Complainants from additional third parties, such as former employers, colleges, romantic partners, and phone companies, or via discovery in *Bennett*. [4]

[4] Although the Court does not have any authority over the discovery in *Bennett*, the Court notes that any efforts to take discovery of non-parties relevant to both *Bennett* and *Trooper 1* without prior notice to the affected non-party and/or Trooper 1's counsel shall be deemed a violation of this Order, and any such discovery will be summarily precluded from use in *Trooper 1*. *See* Fed. R. Civ. P. 37(2)(a)(ii) (in circumstances where a party fails to obey a Court discovery order, permitting the court to "prohibit[ ] the disobedient party ... from introducing designated matters in evidence").

## I. Legal Standard: Relevance & Proportionality

Federal Rule of Civil Procedure 26(b)(1), as amended on December 1, 2015, recognizes that "[i]nformation is discoverable ... if it is relevant to any party's claim or defense and is proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1) advisory committee's note to 2015 amendment; *see Sibley v. Choice Hotels Int'l*, No. 14-CV-634 (JS) (AYS), 2015 WL 9413101, at *2 (E.D.N.Y. Dec. 22, 2015) (observing that "the current version of Rule 26 defines permissible discovery to consist of information that is, in addition to being relevant 'to any party's claim or defense,' also 'proportional to the needs of the case' ") (citation omitted); *see also Robertson v. People Magazine*, No. 14-CV-6759 (PAC), 2015 WL 9077111, at *2 (S.D.N.Y. Dec. 16, 2015) ("[T]he 2015 amendment [to Rule 26] does not create a new standard; rather it serves to exhort judges to exercise their preexisting control over discovery more exactingly."). The Court has "broad discretion" in determining relevance for discovery

purposes. *Michael Kors, L.L.C. v. Su Yan Ye*, No. 18-CV-2684 (KHP), 2019 WL 1517552, at *2 (S.D.N.Y. Apr. 8, 2019). The Court also "has wide latitude to determine the scope of discovery." *Broidy Capital Mgmt. LLC v. Benomar*, 944 F.3d 436, 446 (2d Cir. 2019) (quotation marks omitted); *see In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 982 F.3d 113, 125 (2d Cir. 2020) (recognizing courts have "broad discretion in managing discovery"). "The party seeking discovery must make a *prima facie* showing that the discovery sought is more than merely a fishing expedition." *Perry v. The Margolin & Weinreb Law Group LLP*, No. 14-CV-3511 (JS) (AKT), 2015 WL 4094352, at *2 (E.D.N.Y. July 7, 2015).

Federal Rule of Civil Procedure 45(d)(2)(B)(i) provides, in pertinent part, that "on notice to the commanded person, the serving party may move the court ... for an order compelling production or inspection" pursuant to a subpoena. Subsection B of Rule 45(d)(2) further provides that "[t]hese acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance." Fed. R. Civ. P. 42(d)(2)(B)(ii). At the same time, Rule 45 provides that on a timely motion, "the court for the district where compliance is required must quash or modify a subpoena" if it "subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iv). The movant bears the burden of persuasion in a motion to quash a non-party subpoena. *United States v. Int'l Bus. Mach. Corp.*, 83 F.R.D. 97, 104 (S.D.N.Y. 1979).

*5 Under Rule 45, a subpoena should be quashed where it "requires disclosure of privileged or other protected matter" or "subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iii)–(iv). To determine whether a subpoena imposes an undue burden, "courts weigh the burden to the subpoenaed party against the value of the information to the serving party by considering factors such as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed." *Citizens Union v. Att'y Gen. of New York*, 269 F. Supp. 3d 124, 138 (S.D.N.Y. 2017) (quotation marks omitted). Here, the Court takes special notice of the fact that the Complainants, Ms. Biaggi, and Ms. Hinton are not parties to this case in considering the proportionality of the discovery requests made of and about them. *Cf. Henry v. Bristol Hosp., Inc.*, No. 13-CV-826 (SRU), 2020 WL 1158464, at *1 (D. Conn. Mar. 10, 2020) ("[C]ourts give special weight to the burden

2024 WL 165159

on non-parties of producing documents to parties involved in litigation." (quotation marks and alteration omitted)).

## II. Findings

Based on a thorough review of the parties' submissions to date and further information adduced at argument, the Court finds as follows: [5]

> [5]
>
> Because meritorious arguments were made as to the myriad motions and joint letters requesting relief, the Court declines to provide any fee shifting under Rule 37(a)(5). *See* Fed. R. Civ. P. 37(a)(5).

1) Plaintiff's pre-motion conference letter in anticipation of a motion to compel Cuomo to sit for his deposition (ECF No. 122), is denied as unnecessary, without prejudice to renew. Clearly, as a party, Cuomo must sit for his deposition, and to that extent, Plaintiff's anticipated motion has merit. However, Cuomo has repeatedly represented that he will sit for his deposition; accordingly, the Court agrees that there is "nothing for the Court to do" at this time. (Mot. for Pre-Mot. Conference, ECF No. 122, at 3.) The parties must schedule Cuomo's deposition at an appropriate time, pending substantial completion of documentary discovery, consistent with the Court's rulings on the many pending discovery motions. The Court notes, however, that Cuomo will be required to sit for his deposition before he completes non-party depositions of the Complainants, Ms. Biaggi, and Ms. Hinton, unless a different order of deposition is agreed upon by the parties. [6]

> [6]
>
> Specifically, the Court notes, as discussed in a simultaneously-issued order pertaining to Ms. Bennett, the parties in this case and the *Bennett* case are strongly encouraged to coordinate the deposition of Ms. Bennett given her lack of personal knowledge regarding the allegations in *Trooper 1*. (*See* Discovery Order, ECF No. 219.)

2) Based on the totality of the record before the Court, the discovery parameters Plaintiff requested in the letter motion anticipating a protective order request (ECF No. 136) are granted in part, and denied in part, as are aspects of many other motions and requests filed by Defendants and the non-parties, as detailed below. The parties and non-parties shall proceed with discovery, abiding by the following limitations, to the extent that the party or non-party has not already produced responsive records:

a) documentary discovery, including non-party documentary discovery, must proceed, consistent with the limitations included herein;

b) to the extent Trooper 1 is likely to have discoverable material sought by Cuomo, Cuomo must first seek information from Trooper 1 before requesting it from non-parties;

c) Cuomo must provide notice, at least one week in advance, to Trooper 1 regarding any non-parties about whom he is issuing a subpoena seeking information about Trooper 1 so that she can object, if necessary, including any subpoenas issued in the *Bennett* case;

d) Cuomo must provide notice, at least one week in advance, to any non-parties about whom he is issuing a subpoena so that they can object, if necessary, including but not limited to subpoenas issued to employers, friends, phone companies, co-workers and the like; [7]

**\*6** e) the scope of documentary discovery from non-party Complainants, Ms. Hinton, and Ms. Biaggi, that is permissible as relevant and proportional to this case, based on the record to date, includes:

(i) documents concerning the OAG and AJC investigations, including communications between a non-party and the OAG and AJC, and any statements or documents provided by the non-party to the OAG and/or AJC;

(ii) for the time period from **December 1, 2020, through February 2022**, communications between a non-party Complainant and other Complainants, including Ms. Bennett and Ms. Boylan, and other potential witnesses, including, for example, Ms. Hinton, concerning allegations of sexual harassment or other misconduct by Cuomo; [8] and

(iii) any videos, images, or photographs of the non-party witness with Cuomo and any documents or communications concerning such videos, images, or photographs, including on social media; [9]

f) at this juncture, Cuomo has not established that phone records subpoenas seeking phone records of non-party witnesses, including Complainants, are proportional given their marginal relevance and the degree of intrusion inherent in broad phone records subpoenas. As set forth

above, the Complainants, Ms. Hinton, and Ms. Biaggi are non-parties, and the Court concludes that "discovery of [their] phone number is an unnecessary intrusion into [their] privacy." *Sapia v. Home Box Off.*, No. 18-CV-1317 (CM), 2022 WL 769798, at \*7 (S.D.N.Y. Mar. 14, 2022) (citing *Hernandez v. Immortal Rise, Inc.*, No. 11-CV-4360 (RRM) (LB), 2012 WL 4369746, at \*9 (E.D.N.Y. Sept. 24, 2012) (discussing the privacy concerns related to disclosure of telephone numbers for non-parties)). Phone records subpoenas for the Complainants, Ms. Hinton, and Ms. Biaggi are therefore prohibited without further leave of Court; and

g) the Court defers ruling on the timing and format of depositions at this time, pending further completion of fact discovery. [10] Party depositions shall precede the depositions of the non-party Complainants, Ms. Biaggi, and Ms. Hinton. [11]

[7] The Court notes that Cuomo has voiced his objection to a requirement that there be notice provided to non-parties. (*See* Mot. to Strike, ECF No. 131, at 2 n.1). His objection is noted and overruled in light of the history of this case, in the interest of ensuring that the non-parties do not suffer unwarranted invasions of their privacy.

[8] The Court notes that this general guidance does not exclude the possibility that Cuomo could establish, on a case-by-case basis, that other categories of information may be relevant and proportional to the needs of the case. Cuomo and any affected non-parties are directed to meet and confer in a good faith effort to narrow any additional requests to an appropriate date range and scope before bringing any such disputes to the Court for resolution.

[9] The Court notes that it has considered another category of documents sought by Cuomo in various subpoenas, namely, documents concerning interactions with *him*, and concluded that, as formulated and based on the present record, these requests are overbroad, vague, and disproportionate. (*See, e.g.*, Boylan Document Subpoena, ECF No. 82-3 (Request 1(a), seeking "[a]ll documents concerning (a) any of Your personal interactions with Governor Cuomo"); Kaitlin Document Subpoena, ECF No. 142-2 (Request 3, demanding "[a]ll documents

or communications concerning your personal interactions with Governor Cuomo, including but not limited to any posts on social media").)

[10] The Court notes that non-party Alyssa McGrath has indicated she would prefer a deposition over Zoom should a deposition be taken. (*See* Limmiatis & McGrath Mot. for Pre-Mot. Conference, ECF No. 149, at 2 n.2.)

[11] With respect to non-party depositions, this ruling does not find or imply that their depositions are necessarily relevant and proportional. However, since many of the Complainants are specifically included in the parties' Rule 26(a) disclosures, it is likely that limited depositions of the Complainants will be relevant and proportional (limited as to time and topics). Ms. Hinton and Ms. Biaggi, however, are somewhat differently situated, as described in their filings. (*See* Biaggi Joint Ltr., ECF No. 193; Ltr. Mot. for Discovery re Karen Hinton, ECF No. 196.) At this time, the Court does not find that Cuomo has established relevance and proportionality as to their depositions, particularly since neither of them has any personal knowledge of the allegations in this case, or Trooper 1, but defers a final ruling on this issue pending further discovery.

**\*7** 3) Non-party Kaitlin's motion to prevent a violation of the confidentiality order (ECF No. 128) is granted. In this motion, Kaitlin raises concerns regarding the disclosure of her identity in court filings; she also objects to Cuomo's subpoena for her phone records. To the extent Kaitlin's last name has been designated as confidential, any publication or disclosure of her name without prior leave of Court is prohibited at this time. [12] In addition, Cuomo is not authorized to seek her phone records via subpoena, for the reasons discussed above. Cuomo's response to Kaitlin's motion, which was docketed as a motion to strike (ECF No. 131), is denied. Finally, Cuomo's motion to compel Kaitlin's compliance with the subpoenas he has issued to her (ECF No. 140), and Kaitlin's cross-motion thereto (ECF No. 159) are granted in part, and denied in part, consistent with the foregoing limitations. To the extent Kaitlin has already produced responsive documents within the above categories, she need not search for or reproduce them.

[12] The Court notes, however, that this finding is made for purposes of discovery at this time and is without prejudice to Cuomo's and the

other Defendants' re-raising this issue as the case proceeds through proper motion practice. (*See* Ltr. in Response by Defs.' DeRosa and Azzopardi, ECF No. 132 (objecting to Kaitlin proceeding semi-anonymously).)

4) The motion for discovery related to State Entity Employee #2 (ECF No. 194) is terminated as unnecessary at this time, as Cuomo notes that he has not sought document discovery from her, (*see* Ltr. Mot. for Discovery, ECF No. 194, at 2 n.1), and the timing and need for her deposition shall be deferred, consistent with the foregoing findings.

5) The motion for discovery related to Karen Hinton (ECF No. 196) is denied as unnecessary at this time, as it appears that she has provided documentary discovery, and the timing and need for her deposition shall be deferred, consistent with the foregoing findings. [13]

[13]    The Court notes that, although not presently the subject of a motion before the Court, Defendants DeRosa and Azzopardi have raised the question of whether Ms. Hinton has, and has not produced, any documents responsive to a subpoena issued to her on behalf of them. (*See* DeRosa & Azzopardi Ltr. re Hinton, ECF No. 166.) The parties are respectfully encouraged to finalize their meet and confer on this

issue and to resolve it, if they have not done so already.

6) The motion filed by Non-parties Virginia Limmiatis and Alyssa McGrath requesting a pre-motion conference regarding subpoenas issued to them (ECF No. 149) is denied, without prejudice. Discovery as to Ms. Limmiatis and Ms. McGrath is directed to proceed, consistent with the foregoing findings.

### CONCLUSION

The parties and non-parties are directed to proceed with discovery, consistent with the foregoing directives. In addition, the parties are directed to meet and confer and submit an agreed-upon proposed case management plan to the Court, including deadlines for (1) Defendant Cuomo to file his answer; (2) the close of party discovery; (3) a deadline for the close of non-party discovery; and (4) an expert discovery schedule, if needed. The parties' proposed schedule must be filed with the Court by **January 30, 2024**.

**SO ORDERED.**

**All Citations**

Slip Copy, 2024 WL 165159

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 1158464

2020 WL 1158464
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Laura HENRY, Plaintiff,

v.

BRISTOL HOSPITAL, INC., et al., Defendants.

No. 3:13-cv-00826 (SRU)
|
Signed 03/10/2020

**Attorneys and Law Firms**

Richard C. Gordon, Law Office, Richard C. Gordon, Esq., Windsor, CT, for Plaintiff.

James F. Shea, Sara R. Simeonidis, Jackson Lewis—P.C., Hartford, CT, for Defendants.

### RULING ON MOTION TO QUASH SUBPOENA

Stefan R. Underhill, United States District Judge

**\*1** Tracy Driscoll & Co., Inc. ("Driscoll") moves to quash a subpoena served by the plaintiff, Laura Henry ("Henry") in advance of a hearing on damages. In the subpoena, Henry seeks "[a]ll Documents related to Dr. Oluwole's Medical Insurance, liability insurance, and all other insurance documents that were in effect from August 17, 2009 through December 31, 2018." Driscoll Subpoena, Doc. No. 365-4 at 2. Driscoll, a non-party witness, argues, *inter alia*, that production of the subpoenaed documents is unduly burdensome and irrelevant to the issues pertinent to the damages hearing.

For the following reasons, Driscoll's motion (doc. no. 365) is **granted**.

### I. Discussion

In its motion, Driscoll argues that the documents Henry seeks are not relevant to the amount of potential damages attributable to Dr. Oluwole. *See* Driscoll's Mem. in Supp. Mot. to Quash, ("Driscoll's Mot."), Doc. No. 365-1 at 5. I agree.

Under Rule 45 of the Federal Rules of Civil Procedure, "[o]n timely motion, the court for the district where compliance is required must quash or modify a subpoena that ... subjects

a person to undue burden." Fed. R. Civ. P. 45. "Whether a subpoena imposes an 'undue burden' depends upon 'such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed.' " *Travelers Indem. Co. v. Metro. Life Ins. Co.*, 228 F.R.D. 111, 113 (D. Conn. 2005) (quoting *United States v. Int'l Bus. Machines Corp.*, 83 F.R.D. 97, 104 (S.D.N.Y. 1979)). When a subpoena is served on a non-party, "courts ... give special weight to the burden on non-parties of producing documents to parties involved in litigation." *Id.* (citing *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998)) ("[C]oncern for the unwanted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs.").

In this case, Henry seeks documents regarding Dr. Oluwole's medical liability coverage. *See generally* Driscoll Subpoena. Driscoll's insurance policies, however, are irrelevant to determining the amount of damages attributable to Dr. Oluwole for his admitted conduct. [1] In her Fourth Amended Complaint, Henry seeks damages from Dr. Oluwole for numerous claims, including false imprisonment (Count Ten), intentional infliction of emotional distress (Count Eleven), negligent infliction of emotional distress (Count Twelve), and negligence (Count Fifteen). *See generally* Fourth Am. Compl., Doc. No. 90.

[1]    "When a default is entered, the defendant is deemed to have admitted all of the well-pleaded factual allegations in the complaint pertaining to liability." *Bravado Int'l Grp. Merch. Servs., Inc. v. Ninna, Inc.*, 655 F. Supp. 2d 177, 188 (E.D.N.Y. 2009) (citing *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992)).

"In response to a motion to quash a subpoena, '[t]he party issuing the subpoena must demonstrate that the information sought is relevant and material to the allegations and claims at issue in the proceedings.' " *Torcasio v. New Canaan Bd. of Ed.*, 2016 WL 312102, at *2 (D. Conn. Jan. 26, 2016) (quoting *Libaire v. Kaplan*, 760 F. Supp. 2d 288, 291 (E.D.N.Y. 2011)). Because the information Henry seeks is neither relevant nor material to the claims asserted in the Fourth Amended Complaint, Driscoll's motion to quash is **granted**. [2]

[2]    Even if the requested documents were somehow relevant, Henry's subpoena request is overbroad. She seeks documents from a period beginning

on August 17, 2009 through December 31, 2018. Driscoll Subpoena at 1. In her Fourth Amended Complaint, she alleges that she was initially harmed by Dr. Oluwole on June 11, 2011. *See* Fourth Am Compl. at ¶ 146. She further alleges that Dr. Oluwole continued to harass her until his termination from Bristol Hospital on October 2, 2012. *See* Doc. No. 237-14 at 3. Thus, the relevant time period is June 11, 2011 through October 2, 2012.

**II. Conclusion**

**\*2** For the reason stated above, Discoll's motion to quash the subpoena (doc. no. 365) is **granted**.

So ordered.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 1158464

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 4861840

KeyCite Yellow Flag - Negative Treatment

Distinguished by   United States ex rel. Ortiz v. Mount Sinai Hospital,
S.D.N.Y.,   March 11, 2016

2008 WL 4861840
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Camille MIRKIN, Plaintiff,

v.

WINSTON RESOURCES, LLC, Defendant.

No. 07 Civ. 02734(JGK)(DF).
|
Nov. 10, 2008.

### OPINION AND ORDER

DEBRA FREEMAN, United States Magistrate Judge.

**\*1** In this employment discrimination action, plaintiff Camille Mirkin ("Plaintiff") claims that her former employer, defendant Winston Resources, LLC ("Defendant") unlawfully terminated her employment for reasons related to, *inter alia,* her gender, her pregnancy, and her age. Currently before this Court is a letter motion by Plaintiff to quash Defendant's deposition subpoena of Christopher Gamble, Plaintiff's supervisor at a subsequent employer, Response Companies, a company for which Plaintiff is also no longer working. (*See* Letter to the Court from Dominique N. Ferrera, Esq ., dated Oct. 10, 2008.) Plaintiff argues that evidence regarding her job performance at Response Companies is irrelevant to the claims asserted in this action and that enforcement of the subpoena would negatively affect her current and future employment prospects and subject her to unnecessary annoyance and embarrassment. (*See id.*) Defendant, on the other hand, argues that Plaintiff lacks standing to challenge the subpoena and that, in any event, the discovery sought is relevant to its defenses in the action and should be allowed. (*See* Letter to the Court from Melissa L. Morais, Esq., dated Oct. 24, 2008.) For the following reasons. Plaintiff's motion to quash is DENIED.

As a threshold matter, a plaintiff has standing to quash a subpoena of a non-party where the plaintiff asserts a legitimate privacy interest in the information sought. *See Chazin v. Lieberman,* 129 F.R.D. 97, 98 (S.D.N.Y.1990).

Here, Plaintiff has a legitimate privacy interest in information regarding her performance at a subsequent employer and, therefore, has standing to bring her motion. *See During v. City Univ. of N.Y.,* No. 05 Civ. 6992(RCC)(RLE), 2006 U.S. Dist. LEXIS 10133, at \*3-4, 2006 WL 618764 (S.D.N.Y. Mar. 9, 2006), *rev'd on other grounds,* 2006 U.S. Dist. LEXIS 53684, 2006 WL 2192843 (S .D.N.Y. Aug. 1, 2006).

As for the merits of Plaintiff s motion, Rule 26(b)(1) of the Federal Rules of Civil Procedure provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." " ' 'Relevance' for purposes of discovery, moreover, is synonymous with 'germane' and ... it should not be read as meaning 'competent' or 'admissible.' " *Johnson v. Nyack Hosp.,* 169 F.R.D. 550, 556 (S.D.N.Y.1996) (citation omitted). As Defendant argues, Mr. Gamble, Plaintiff's former supervisor at Response Companies, may be able to testify as to Plaintiff's lack of certain job skills, providing evidence that would be relevant to a defense that Plaintiff was terminated for legitimate, non-discriminatory reasons.

Even where the discovery sought is relevant, however, this Court must weigh a party's right to obtain that discovery against the burden imposed on the opposing party. *During,* 2006 U.S. Dist. LEXIS 53684, at \* 15, 2006 WL 2192843 (citing Fed.R.Civ.P. 26(b)(2), 26(c)). Thus, the Court may issue an order to protect a party from undue annoyance or embarrassment. Fed.R.Civ.P. 26(c). In the circumstances of this case, the Court finds that the burden imposed on Plaintiff by Defendant's subpoena is slight and docs not outweigh Defendant's right to obtain the information sought. First, Plaintiff could have reasonably expected that matters relating to her employment performance would be disclosed in this litigation. *During,* 2006 U.S. Dist. LEXIS 53684, at \* 16, 2006 WL 2192843 ("A litigant himself must reasonably anticipate that his personal matters will be disclosed, while a non-party having no stake in the litigation retains a greater expectation of privacy.") (citation and internal quotations removed). Second, as Plaintiff is no longer employed by Response Companies, and, as Plaintiff does not claim that Mr. Gamble is currently engaged in a job search on her behalf, the cases on which she relies to demonstrate an undue burden arc distinguishable. Third, although Plaintiff states that she continues to rely on Response Companies for job references, the Confidentiality Agreement already in place in this action could be extended to prevent Mr. Gamble and Response Companies from disclosing confidential information to others, thereby mitigating the burden on Plaintiff. Finally, as

both parties have noted, this litigation and the underlying fact of Plaintiff's termination from Defendant's employ are already known to many in Plaintiff's industry. For this reason, the additional embarrassment caused by Mr. Gamble's deposition would be marginal, at most.

**\*2** The Court notes that, by agreement of the parties, discovery in this case is currently being held in abeyance pending the outcome of a mediation between them. The Court, however, has recently received a letter from Plaintiff's counsel, expressing concern that the scheduling of the anticipated mediation has been delayed and suggesting that, to avoid further delay, discovery and the mediation should now proceed "along parallel paths." (Letter to the Court from Dominique N. Fe rre ra, Esq., dated Nov. 5, 2008.) Under the circumstances, counsel arc directed to confer in good faith regarding a modified discovery schedule and to submit such a schedule to the Court for its consideration. Although the motion to quash the deposition of Mr. Gamble is denied, that deposition should not go forward until the parties have reached agreement on its scheduling, or the Court has issued a revised scheduling order.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 4861840

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by    In re Velo Holdings Inc.,    Bankr.S.D.N.Y.,    June 12,
2012

2008 WL 3166662
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Anthony M. SOKOL, Plaintiff,
v.
WYETH, INC. and Wyeth
Pharmaceuticals, Inc., Defendants.

No. 07 Civ. 8442(SHS)(KNF).
|
Aug. 4, 2008.

**MEMORANDUM AND ORDER**

KEVIN NATHANIEL FOX, United States Magistrate Judge.

**INTRODUCTION**

**\*1** Plaintiff Anthony M. Sokol ("Sokol") brings this action against Wyeth, Inc. and Wyeth Pharmaceuticals, Inc. (collectively "Wyeth") for a violation of Section 806 of the Sarbanes-Oxley Act ("SOA") of 2002, 18 U.S.C § 1514A, and unlawful employment practices under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C §§ 12101-12213, as amended. On March 24, 2008, the defendants made a motion for an order from the Court, pursuant to Fed.R.Civ.P. 37, compelling the plaintiff to disclose documents reflecting communications: (1) between the plaintiff and non-party Mark D. Livingston ("Livingston"); and (2) among the plaintiff, his attorney and Livingston. The defendants' submission included Exhibit 10, the plaintiff's first amended privilege log. On April 8, 2008, the plaintiff opposed the defendants' motion contending: (a) the defendants' request is *"prima facie* overly broad;" (b) the scope of the plaintiff's request is "overly burdensome;" and (c) the communications sought are protected by a common interest privilege. In support of his opposition to the defendants' motion, the plaintiff submitted attachment Nos. 1-8, consisting of certain e-mail messages, for an *in camera* review by the Court, claiming they are privileged.[1]

[1] The Court notes that, in its motion, Wyeth expressed concern that Sokol's first amended privilege log may not be complete. When Sokol submitted attachment Nos. 1-8 to the Court, on April 8, 2008, for an *in camera* review, he argued that "the only fair issue for the Court is to determine if the numerous emails contained in Exhibits 1-8 are covered by the common interest privilege," despite knowing that Exhibits 1-8 were not included in his first amended privilege log, based on which Wyeth's motion was made, and without advising the Court of its plan to serve Wyeth with its second amended privilege log that includes the list of items contained in Exhibits 1-8 the following day. Sokol's submission to the Court, of the items claimed to be privileged, but not included in his privilege log that was in effect at the time of Sokol's response to Wyeth's motion, and his failure to advise the Court about his plan to serve Wyeth with his second amended privilege log the day following his response to the motion, is disconcerting.

To assist the Court in determining the defendants' motion and because of a discrepancy between the documents listed on the plaintiff's first amended privilege log and the attachment Nos. 1-8, submitted to the Court for its *in camera* review, the Court directed the plaintiff, by an order, dated May 9, 2008, to submit for its *in camera* review, all the documents listed on his first amended privilege log, and inform it whether another privilege log exists, reconciling the discrepancy, and if so, to submit that comprehensive privilege log to the Court. On May 15, 2008, the plaintiff submitted to the Court, for its *in camera* review, his second amended privilege log, which included attachment Nos. 1-8, previously submitted, and the "packet of emails" stamped with page Nos. 1-201 ("e-mails packet"). The plaintiff's second amended privilege log was deficient.

On May 22, 2008, the Court directed: (i) the plaintiff to conform his second amended privilege log to Fed.R.Civ.P. 26(b)(5) and Local Civil Rule 26.2 of this court, serve it on the defendants and file it with the court; and (ii) the defendants to advise the Court what impact, if any, the conformed second amended privilege log has on their outstanding motion to compel. The Court also provided an opportunity for the plaintiff to submit any response deemed warranted and the defendants to submit any reply. On June 2, 2008, the plaintiff submitted his third amended privilege log, pursuant to the May 22, 2008 order. The defendants advised the Court about

the impact of the plaintiff's third amended privilege log on their motion to compel disclosure. The plaintiff filed his response and the defendants their reply.

## BACKGROUND

**\*2** Sokol was employed by Wyeth as a manufacturing scientist. Wyeth manufactured and distributed Prevnar, a vaccine for prevention of childhood diseases. Sokol alleges, in his complaint, that, in 2005, he raised concerns with Wyeth about Prevnar's lack of compliance with the regulatory requirements of the Food and Drug Administration ("FDA"), but Wyeth failed to report incidents related to its lack of compliance to FDA or to investigate its conduct at issue. Sokol alleges that his complaints to Wyeth, concerning Prevnar's compliance issues, involved "misrepresentation and omission about the quality of products and processes, contradictions in the statements [made] to shareholders and consumers on [Wyeth's] website and [Securities and Exchange Commission] filings, and failures to report or concealments from [FDA]." Sokol alleges that, as a result of his complaints concerning Prevnar, Wyeth retaliated against him by: (i) creating a hostile work environment for him; (ii) reducing his duties and research opportunities; (iii) suspending him from employment; and (iv) terminating his employment. Additionally, Sokol alleges, Wyeth terminated him on the pretext of its concern with Sokol's disability, in violation of ADA. Wyeth denies Sokol's allegations and asserts numerous affirmative defenses.

Sokol is represented in this action by Thad M. Guyer, Esq. of T.M. Guyer and Ayers & Friends, P.C. On December 24, 2007, Wyeth served the plaintiff with its first request for the production of documents, seeking all documents that evidence communications between Sokol and Livingston from 2003 to the present relating to Wyeth or any allegations in the complaint or any defenses to the allegations in the complaint. Without producing any documents in response to Wyeth's request, Sokol objected that Wyeth's request was "overly broad, unduly burdensome" and "it requests documents outside of the possession and control of Plaintiff. Additionally, Plaintiff objects to Defendant seeking information protected by the common claims privilege." On February 29, 2008, Sokol submitted a privilege log, containing 25 items, to Wyeth, claiming common interest privilege for all the items listed. On March 19, 2008, after Sokol testified at his deposition during the administrative proceeding, conducted in connection with the underlying

SOA claim, that he exchanged hundreds of communications with Livingston, Sokol presented a first amended privilege log, containing 72 items, to Wyeth. In his first amended privilege log Sokol asserted the common interest privilege for all items listed there, attorney-client privilege for some items and the attorney work-product doctrine protection for some items. On March 19, 2008, Sokol informed Wyeth that he and Livingston had filed jointly, on November 20, 2006, a false claim action against Wyeth and that they are represented by counsel from the law firm Davis, Cowell & Bowe LLP. On April 9, 2008, Sokol disclosed to Wyeth its second amended privilege log, containing 102 items, claiming the common interest privilege for most items, attorney-client privilege for some items and the attorney work-product doctrine protection for some items. This motion followed.

## DISCUSSION

**\*3** The scope of discovery in a federal action is broad providing that, unless otherwise limited by court order, a party may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense. See Fed.R.Civ.P. 26(b)(1). At the pretrial discovery stage of a litigation, relevancy, as it relates to information sought to be disclosed, is broadly construed and incorporates information which is not admissible at trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence. See Fed.R.Civ.P. 26(b) (1); Hickman v. Taylor, 329 U.S. 495, 507, 67 S.Ct. 385, 392 (1947) ("discovery rules are to be accorded a broad and liberal treatment"), However, "[o] motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by [the Federal Rules of Civil Procedure] or by local rule if it determines that:

(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;

(ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or

(iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of discovery in resolving the issues.

Fed.R.Civ.P. 26(b)(2)(C).

2008 WL 3166662

"When a party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial-preparation material, the party must: (i) expressly make the claim; and (ii) describe the nature of the documents, communications, or tangible things not produced or disclosed-and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Fed.R.Civ.P. 26(b)(5)(A); *see also* Local Civil Rule 26.2 of this court. A party may move for an order compelling disclosure or discovery, after a good faith attempt to resolve the issue with the party making disclosure or discovery, without court action, fails. *See* Fed.R.Civ.P. 37(a)(1). To prevail on a motion to compel, a party objecting to a discovery request on the grounds that the information sought is irrelevant, overly broad or unduly burdensome, must do more than ' "simply inton[e][the] familiar litany' that [requests] are burdensome, oppressive or overly broad." *Compagnie Francaise D' Assurance Pour Le Commerce Exterieur v. Phillips Petroleum,* 105 F.R.D. 16, 42 (S.D.N.Y.1984). The resisting party "must show specifically how, despite the broad and liberal construction afforded the federal discovery rules, each [request] is not relevant or how each [request] is overly broad, burdensome or oppressive, ... by submitting affidavits or offering evidence revealing the nature of the burden" *Id.* (internal citations omitted). A district court has broad discretion in deciding discovery issues. *See Wills v. Amerada Hess Corp.,* 379 F.3d 32, 41 (2d Cir.2004).

*Relevancy and Scope*

 **\*4**  Wyeth contends Sokol's communications with Livingston, from 2003 to the present, relating to Wyeth, Prevnar or any of Sokol's allegations or Wyeth's defenses, are relevant because a "critical issue in this case is whether, in making his complaints, Sokol reasonably and in good faith believed that he was providing information that constituted securities fraud or violation of a law relating to fraud against shareholders." According to Wyeth, that Sokol discussed with Livingston what language was necessary to have his complaint be deemed protected activity, for the purposes of SOA, demonstrates he was not genuinely interested in raising concerns about securities fraud. Furthermore, Wyeth contends, Sokol's contemporaneous communication with Livingston concerning his complaints is "highly relevant to Sokol's state of mind, credibility, and other issues in this action." Wyeth asserts its document request is reasonable because it is "limited in timeframe, limited to communications between Plaintiff and one other individual, and limited in scope to elicit documents relating to the subject matter of this case." Moreover, Wyeth maintains, the production of documents requested does not impose an undue burden on Sokol because "there are no more than a few dozen emails at issue and they have already been gathered by Plaintiff in preparing his log."

Sokol contends "[t]o demand all emails between Sokol and Livingston 'relating to Wyeth' is *prima facie* overly broad." Additionally, because these two former Wyeth's employees "sent hundreds of pages of emails to each other over the past several years, including in their capacities as co-relators in their *qui tam* action against Wyeth, the unbridled 'relating to Wyeth' scope is also overly burdensome, not just overly broad." According to Sokol, "Wyeth has no fair basis under the relevance standard of Rule 26 to demand all Prevnar 'related' email" because this is the SOA employment case and not the false claim Prevnar case.

The Court finds that Wyeth's request for communications between Sokol and Livingston relating to Wyeth, Prevnar, Sokol's allegations or Wyeth's defense is reasonable because the documents sought appear to be facially relevant. Sokol provides no authority for the proposition that the mere quantity of communication sought, i.e. "[h]undreds of pages of e-mails," is sufficient to demonstrate that Wyeth's discovery request is irrelevant, overly broad or unduly burdensome. His conclusory statements that: (i) Wyeth's request is "*prima facie* overly broad" because Sokol and Livingston exchanged hundreds of pages of e-mails to each other over the past several years; and (ii) "almost anything they would email each other about would be broadly 'related to Wyeth,' " " are not sufficient, by themselves, to establish a lack of relevance or that the discovery request is overly broad or unduly burdensome. Similarly, absent evidentiary support, Sokol's contention that "almost anything" Sokol and Livingston sent to each other via e-mail would be related to Wyeth is speculative. The Court finds that Sokol failed in establishing that Wyeth's request is irrelevant, overly broad or unduly burdensome. Therefore, Sokol must disclose all documents, erroneously listed in his privilege log, to which no privilege is claimed.

*Attorney-Client Privilege*

 **\*5**  "The attorney-client privilege is one of the oldest recognized privileges for confidential communications." *Swidler & Berlin v. United States,* 524 U.S. 399, 403, 118 S.Ct. 2081, 2084 (1998). The privilege, designed to facilitate openness and full disclosure between the attorney and the client, shields from discovery advice given by the attorney as well as communications from the client to the attorney. *See*

*Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 682 (1981). The attorney-client privilege also protects from disclosure "communications made to ceratin agents of an attorney, including accountants hired to assist in the rendition of legal services." *United States v. Schwimmer,* 892 F.2d 237, 243 (2d Cir.1989). "A document is not privileged merely because it was sent or received between an attorney and client. The document must contain confidential communication relating to legal advice." *Dep't of Econ. Dev. v. Arthur Andersen & Co.,* 139 F.R.D. 295, 300 (S.D.N.Y.1991). A party invoking the attorney-client privilege has the burden of establishing: "(1) a communication between client and counsel, which (2) was intended to be and was in fact kept confidential, and (3) made for the purpose of obtaining or providing legal advice." *United States v. Constr. Products Research, Inc.,* 73 F.3d 464, 473 (2d Cir.1996). The client's or the attorney's communications with the persons who act as the attorney's agents and whose assistance is indispensable to the attorney's work, are protected by the attorney-client privilege. *See United States v. Kovel,* 296 F.2d 918, 921 (2d Cir.1961); New York Civil Practice Law and Rules § 4548.

The attorney-client privilege may be waived by the voluntary disclosure of otherwise privileged material to a third party, unless the third party is the client's agent. *See In re Application Pursuant to 28 U.S.C. § 1782,* 249 F.R.D. 96, 2008 WL 919707, at *4 (S.D.N.Y.2008). "To avoid waiver, the proponent of the privilege must show, first, that the client had a reasonable expectation of confidentiality in the disclosure of the material to the third party, and second, that 'disclosure to the third party was necessary for the client to obtain informed legal advice.' " *Id.* Moreover, "the inclusion of a third party in attorney-client communications does not destroy the privilege if the purpose of the third party's participation is to improve the comprehension of the communication between attorney and client." *United States v. Ackert,* 169 F.3d 136, 139 (2d Cir.1999). Nonetheless, "[w]hat is vital to the privilege is that the communication be made in confidence for the purpose of obtaining legal advice from the lawyer." *Kovel,* 296 F.2d at 922. If what is sought is not legal advice but the services a third party offers or if the advice sought is the third party's and not the attorney's, the attorney-client privilege does not apply. *See id.*

A "common interest" doctrine, erroneously called "common interest privilege" or "joint defense privilege," is an exception to the general rule that voluntary disclosure of confidential, privileged material to a third party waives any applicable privilege. *See In re Commercial Money*

*Ctr., Inc., Equipment Lease Litig.,* 248 F.R.D. 532, 536 (N.D.Ohio 2008). The common interest doctrine precludes a waiver of the underlying privilege concerning confidential communications between the parties "made in the course of an ongoing common enterprise and intended to further the enterprise," irrespective of whether an actual litigation is in progress. *Schwimmer,* 892 F.2d at 243; *see Griffith v. Davis,* 161 F.R.D. 687, 692 (C.D.Cal.1995). Thus, the common interest doctrine permits the disclosure of a privileged communication without waiver of the privilege provided the party claiming an exception to waiver demonstrates that the parties communicating: (1) have a common legal, rather than commercial, interest; and (2) the disclosures are made in the course of formulating a common legal strategy. *See Bank Brussels Lambert v. Credit Lyonnais,* 160 F.R.D. 437, 447 (S.D.N.Y.1995). "The need to protect the free flow of information from client to attorney logically exists whenever multiple clients share a common interest about a legal matter." *Schwimmer,* 892 F.2d at 243-44 (citation omitted). The common interest doctrine "is not an independent source of privilege or confidentiality." *In re Commercial Money Ctr., Inc., Equipment Lease Litig.* 248 F.R.D. at 536. If a communication is not protected by the attorney-client privilege or the attorney work-product doctrine, the common interest doctrine does not apply. *See id.*

**\*6** Wyeth contends Sokol did not demonstrate that the attorney-client privilege applies to each of the documents claimed to be privileged. According to Wyeth, Sokol's assertion that Livingston was his counsel's "consultant" should be rejected because "[i]t is insufficient for an attorney to simply name one of his clients as a 'consultant' to another client and thereby invoke the attorney-client privilege with respect to all of their communications." Wyeth contends "this is not a situation where [Sokol's counsel] has retained Livingston as an expert to assist him in understanding complex information his client is conveying to him that he would not otherwise be able to understand." Wyeth further contends: (i) Sokol did not provide evidence of an agreement between him and Livingston to pursue a joint legal strategy and keep their communications confidential; (ii) Sokol and Livingston did not share a "common legal interest" because their interests are not "identical" and their sharing a desire to succeed in an action does not create common interest; (iii) Sokol cannot establish that his communications with Livingston were in furtherance of a common legal enterprise; and (iv) Sokol waived his attorney-client privilege when he voluntarily disclosed the allegedly privileged communication with Livingston to nurse Sheila Burke at Wyeth.

In advising the Court about the impact of the plaintiff's third amended privilege log on its motion, Wyeth contends: (a) it already received from Sokol document page Nos. 43-54; (b) all documents listed in Sokol's third amended privilege log that are non-privileged must be produced, to the extent they are responsive to its discovery requests; (c) Sokol failed to establish privilege for e-mail communications between Livingston and an unidentified individual who was a "potential" co-relator in the *qui tam* action and between Livingston and David Graham ("Graham"), a former client of the Government Accountability Project; (d) Sokol failed to establish the common interest doctrine applies to protect Livingston's communication with Dan Donovan, Senior Investigative Counsel for the Senate; (e) all e-mail communications between Sokol and Livingston that do not contain privileged information must be produced; and (f) Sokol failed to establish that the common interest doctrine applies to his communications with Livingston. Wyeth also contends that certain documents from Sokol's third amended privilege log appear to be privileged and asks the Court to review them and determine whether they are indeed privileged.

Sokol contends that he retained counsel in the first week of August 2005 and that, during his first telephone conversation with counsel, counsel explained that his client Livingston had become experienced with how SOA applies to their common employer, Wyeth, concerning their common assignments to Wyeth's Prevnar vaccine production departments. According to Sokol, counsel explained that Sokol and Livingston "had common issues, including regarding the 'reasonable belief' requirements of [SOA]" and asked Sokol if he "would be willing to help or even to testify in [ ] Livingston's case." Sokol contends that both cases involved "our reports of quality control issues in the manufacturing of Prevnar vaccine" and Wyeth's "compliance with the same federal court Consent Decree." Since both Sokol and Livingston could testify in the other's case and share the evidence gathered through depositions and discovery, Sokol agreed to counsel's proposition. According to Sokol, pursuant to counsel's arrangement, he and Livingston started communicating about their respective cases in the second week of August 2005. Sokol maintains that: (a) he and Livingston intended their "communications to be protected by attorney-client privilege;" (b) his counsel "explained this to [him];" and (c) Livingston reiterated what counsel explained to Sokol when Livingston asked him: "Would you include [counsel's] e-mail address in all of our e-mail

correspondence? This will ensure that all of our conversations by e-mail will be protected by client-attorney privilege." Sokol contends that, after his counsel reviewed his grievances and Livingston's comments on them, he engaged Livingston as a "consultant" to his law firm 'for the purposes of helping me re-write my complaint as to the technical and legal issues." Subsequently, Sokol maintains, upon his counsel's instruction, Livingston provided him with further "consulting" and "advice" and, in December 2005, he and Livingston "began talking with attorneys about representing us in a qui tam False Claims Act case." Livingston submitted a declaration [2] in opposition to Wyeth's motion, making almost identical contentions.

[2]      The copy of Livingston's declaration submitted to the Court appeared to be incomplete. It contained pages numbered 1 and 2 and a last, unnumbered page, which started with an incomplete sentence. It appeared that paragraph No. 7 was not included or was included partially. After the Court made an inquiry with counsel to the plaintiff about the missing portion of the document, counsel explained that a portion of paragraph No. 7 "somehow got off from the top of page 3 in the transmission process from Mr. Livingston.... Consequently, I do not have a declaration with Mr. Livingston's signature on the full page 3, as the page 3 on the declaration I filed and served on counsel is indeed cut off at the top." Inasmuch as the document, as executed, was not served in its entirety on the defendant or submitted to the Court, the Court will disregard the missing portion of paragraph No. 7, and will consider Livingston's declaration in the incomplete form in which it was served on the defendant and submitted to the Court.

**\*7** In his response to Wyeth's advising the Court of the impact of Sokol's third amended privilege log on the defendants' motion to compel, Sokol concedes he included non-privileged documents on his third amended privilege log. However, according to Sokol, he only did so because those non-privileged documents "are implicated in the dispute because they have been withheld based on relevance as well." Additionally, Sokol argues, "[s]ome documents previously and rightly withheld on the basis of relevance have now been migrated over on to the privilege log since our timely objections on relevance await ruling."

The Court has reviewed Sokol's third amended privilege log as well as the parties' submissions, in connection with the defendants' motion to compel disclosure of documents. As noted above, the common interest doctrine is not an independent source of privilege or confidentiality and applies only to a communication that is already protected by a privilege. In his third amended privilege log, Sokol asserted "[c]ommon interest privilege" for numerous items, without indicating the nature of the privilege with respect to which the common interest doctrine is asserted. For a significant number of items Sokol asserted "[c]ommon interest privilege and attorney client privilege." The Court will assume, for the purpose of the instant motion, that Sokol's common interest doctrine assertions, where alone, are based on the attorney-client privilege and will analyze them accordingly.

Sokol's communications with Livingston are not communications between a client and his counsel. Generally, Sokol's communications with Livingston, a third party, are not protected by the attorney-client privilege, unless Livingston acted as Sokol's agent, at the time communications were made. Sokol does not claim and the record does not demonstrate that Livingston acted as Sokol's agent. Sokol also does not claim and the record does not demonstrate that Livingston was an agent of his counsel whose assistance was indispensable for the attorney's work. Rather, Sokol maintains: (i) Livingston was his counsel's "consultant;" and (ii) by including his counsel's e-mail address in his communications with Livingston he intended that his communications with Livingston "be protected by attorney-client privilege."

Sokol misunderstands the burden imposed on him in establishing the attorney-client privilege. It is the intent that the communication be and is in fact kept confidential, not the intent that the communication be protected by the attorney-client privilege, that Sokol must demonstrate. Sokol does not make citation to any authority, and the Court finds none, for the proposition that copying of the communications between a client and a third party to the client's attorney triggers, by itself, the attorney-client privilege. Moreover, while Sokol contends he intended his communications with Livingston to be confidential by assuring he included his counsel's e-mail address in those communications, e-mail communication contained in e-mails packet page Nos. 1-201, spanning from August 31, 2005, through July 2006, that were directly sent to or received by Sokol and Livingston, were not copied to Sokol's counsel and no explanation was provided by Sokol of the reason for omitting his counsel's e-mail address from

those communications. As noted above, the vital element in establishing that the attorney-client privilege applies is that the communication is made in confidence for the purposes of obtaining legal advice from the attorney and if what is sought is not legal advice but "consultant's" services, or if the advice sought is not that of the attorney but that of the "consultant," the attorney-client privilege does not apply.

**\*8** Sokol and Livingston were represented by the same attorney in their separate SOA litigations against Wyeth. On August 18, 2005, Sokol's counsel engaged Livingston as a "consultant" to provide "technical expertise" in Sokol's case. Since Livingston was not an agent for Sokol or his counsel, prior to August 18, 2005, the Court finds that the communications between Sokol and Livingston, prior to August 18, 2005, are not protected by the attorney-client privilege. The Court also finds that the attorney-client privilege was waived with respect to the communications between Sokol and his counsel, prior to August 18, 2005, because Sokol's counsel disclosed these communications to another client, and that client was neither Sokol's nor his counsel's agent at the time the communications were made.

That Sokol's counsel engaged Livingston as a "consultant," who will provide "technical expertise," demonstrates that the purpose of the engagement was to assist Sokol's counsel with rendering legal advice to Sokol, not to formulate legal strategy that would be common to Sokol and Livingston in their respective litigations, which would further their common enterprise. The *in camera* review of the e-mail communications, listed in Sokol's third amended privilege log, demonstrates that no common interest arrangement existed at any time between Sokol and Livingston, with respect to the instant litigation, and no common purpose existed to benefit from the guidance of their common counsel with respect to their independent SOA litigations. The communications between Livingston and Sokol were focused almost entirely on Sokol's case and Livingston's case- which was in an advanced stage at the time communications were made, was mentioned by Livingston occasionally, for the purpose of updating Sokol on its status, not to develop a common legal strategy. In fact, it does not appear, from the communications before the Court, that Sokol ever inquired on his own about the status of Livingston's SOA litigation or the legal strategy employed in that action. Accordingly, the Court finds that the common interest doctrine does not protect the communications between Sokol and his counsel, disclosed to Livingston prior to August 18, 2005.

2008 WL 3166662

The *in camera* review also shows that Livingston acted as a direct advisor to Sokol, as he explained in his communication to Graham, dated October 1, 2005, 8:35 p.m., e-mails packet page No. 41: "I've been communicating with and advising Anthony, along with legal counsel Thad Guyer." In his e-mail to Sokol, dated December 5, 2005, 4: 56 a.m., e-mails packet page No. 32, Livingston demonstrated his role of direct advisor to Sokol when he stated: "I would advise you to do what you want to do.... I would at a minimum make sure that ...." However, for a communication to be protected by the attorney-client privilege, its purpose must be seeking or rendering legal advice from an attorney, not from a consultant. Legal advice cannot be given by one who is not an attorney and no attorney-client privilege is afforded to any advice purporting to be legal from one who is not an attorney, even if that person was engaged by an attorney as a "consultant" to provide "technical expertise." Additionally, although Sokol's counsel claimed to have engaged Livingston as a "consultant" to provide him with "technical expertise" in Sokol's case, except for counsel's e-mail communications to Sokol, dated August 30, 2005, Attachment No. 6, page Nos. 1-5, no evidence exists in other e-mail communications before the Court that Sokol's counsel: (i) was aware of the communications between Sokol and Livingston that are not copied to him; (ii) read the communications that are copied to him; or (iii) acted on any communications between Sokol and Livingston. Therefore, the attorney-client privilege does not protect any confidential communications between Sokol and Livingston, the purpose of which is not obtaining legal advice from Sokol's counsel.

**\*9** Sokol claims the attorney-client privilege applies to numerous e-mail communications with Livingston, the bodies of which consist of the text "FYI," accompanied by a document to which no privilege is claimed. One example of this is found on the e-mails packet page Nos. 178-182. The body of that e-mail communication from Livingston to Sokol, dated March 7, 2006, 8:26 p.m., states: "FYI Anthony. Mark." This text announces that another e-mail, consisting of a certain report, is being forwarded for which no privilege is claimed. The Court finds that asserting the attorney-client privilege in this manner is frivolous, because no basis exists for asserting the attorney-client privilege for this type of communication. Accordingly, any communication consisting of the text "FYI," or a similar announcement indicating that a document is being forwarded with or included in that communication, and accompanied by that document, for which no privilege is claimed, must be disclosed to Wyeth.

Sokol also asserts a common interest privilege with respect to certain e-mail messages between Livingston and an unidentified person, who was invited to join and allegedly "agreed to be co-realtor" in a separate false claims action Livingston and Sokol pursued jointly. However, in order for the common interest doctrine to apply to a communication, the attorney-client privilege must exist first. While the attorney-client privilege applies to communications that are in furtherance of the common objective, between Livingston and Sokol, as joint clients in their common false claims action, Sokol makes no citation to any authority that extends the attorney-client privilege and the common interest doctrine to unidentified potential litigants. Therefore, the Court finds that the communications involving unidentified persons are not protected by the attorney-client privilege.

Sokol asserts the attorney-client privilege with respect to certain e-mail communications between Livingston and Livingston's counsel in his SOA action. One example is the e-mail communication from counsel to Livingston, dated March 8, 2006, 10:14 a.m., entitled "Oral Argument," which summarizes for Livingston the oral argument conducted in Livingston's action in his absence. Although this communication is between the counsel and his client, its content does not demonstrate that legal advice was sought or rendered. A summary by counsel of a public court proceeding for a client, without more, is not protected by the attorney-client privilege. While such a summary could arguably fall within the scope of the work-product doctrine, no such protection was claimed by Sokol. The Court finds that e-mail communications between counsel and Livingston, the content of which does not evidence that legal advice was sought or rendered, are not protected by the attorney-client privilege, and that, if not asserted to shield such communications from disclosure, the work-product doctrine protection, as regards them, is waived.

**\*10** Certain e-mail communications between Sokol and Livingston, alleged to be shielded from disclosure by the attorney-client privilege, pertain to their joint litigation in which they were represented by another attorney. Those confidential communications, as indicated in the Conclusion section of this Memorandum and Order, which were generated for the purpose of seeking or rendering legal advice through their common counsel, are protected by the attorney-client privilege.

*Work-Product Doctrine*

The work-product doctrine prohibits a litigant from making unwarranted inquiries into the files and the mental impressions of an adverse party's legal counsel. *See Hickman,* 329 U.S. at 510-511, 67 S.Ct. at 393. The doctrine is set forth in Rule 26 of the Federal Rules of Civil Procedure:

> Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But, subject to Rule 26(b)(4), those materials may be discovered if: (i) they are otherwise discoverable under Rule 26(b)(1); and (ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain its substantial equivalent by other means.

> Fed.R.Civ.P. 26(b)(3)(A).

A document is created in anticipation of litigation "if 'in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained *because of* the prospect of litigation." *United States v. Adlman,* 134 F.3d 1194, 1202 (2d Cir.1998). The work-product doctrine does not protect "documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation." *Id.* "Even if such documents might also help in preparation for litigation, they do not qualify for protection because it could not fairly be said that they were created 'because of' actual or impending litigation." *Id.* The burden is on the party claiming protection to establish that the work-product doctrine applies. *See Constr. Products Research,* 73 F.3d at 473. The work-product doctrine protection is qualified and may be overcome if the party seeking disclosure makes "an adequate showing of substantial need for the document and an inability to obtain its contents elsewhere without undue hardship." *Adlman,* 134 F.3d at 1202-03.

Generally, the voluntary production of a document that is shielded from disclosure by the work-product doctrine waives any claim by a litigant that the document may be withheld from disclosure under that doctrine. *See U.S. v. Rigas,* 281 F.Supp.2d 733, 737 (S.D.N.Y.2003). However, the common interest doctrine, which provides an exemption to a waiver, also applies to communications protected by the work-product doctrine. *See Pucket v. Hot Springs School Dist. No. 23-2,* 239 F.R.D. 572, 583 (D.S.D.2006); *In re Steinhardt Partners,* 9 F.3d 230, 234-36 (2d Cir.1993); *Transmirra Products Corp. v. Monsanto Chemical Co.,* 26 F.R.D. 572, 578 (S.D.N.Y.1960). If a communication is not protected by the work-product doctrine, the common interest doctrine does not apply. *In re Commercial Money Ctr., Inc., Equipment Lease Litig.* 248 F.R.D. at 536.

**\*11** Sokol asserted the work-product doctrine with respect to two communications: (1) e-mails packet page Nos. 73-127, consisting of an e-mail message from Sokol to Livingston, dated July 29, 2006, 5:37 a.m., the body of which consists of a forwarded e-mail message with an attached draft of the complaint in their common *qui tam* action, from the law clerk for their attorney to Sokol, dated July 28, 2006, 4:07 a.m.; and (2) e-mails packet page No. 169, consisting of an e-mail message from Livingston to Sokol, dated May 21, 2006, 9:01 a.m., the body of which consists of (i) the words "FYI" and (ii) notification to recipient of the e-mail message that various attachments are attached. However, the attachments in connection with the communication on the e-mails packet page No. 169 were not submitted to the Court.

The Court finds that the communication identified as e-mails packet page Nos.73-127 is protected by the work-product doctrine, because it is a communication from Sokol and Livingston's attorney and contains a draft of the complaint, prepared in anticipation of their litigation against Wyeth, pursuant to the False Claims Act. Wyeth failed to show that: (a) the communication is otherwise discoverable; and (ii) it has substantial need for it to prepare its case and cannot, without undue hardship, obtain its substantial equivalent by other means.

Sokol claims, in his third amended privilege log, that the e-mail communication identified as e-mails packet portion of page No. 169, is protected by the work-product doctrine because it consists of "forwarding of research on Prevnar, compiled at request of counsel." The Court finds no support for the contention that the attachments, claimed to contain research on Prevnar, were complied at the request of counsel or that they were prepared because of the litigation. Therefore, the e-mail communication from Livingston to Sokol, identified as the e-mails packet page No. 169, is not protected by the work-product doctrine.

## CONCLUSION

Therefore, as set forth above, the Court finds that the following communications are shielded from disclosure by the attorney-client privilege:

2008 WL 3166662

• Attachment No. 1, page Nos. 1-4;

• Attachment No. 5, e-mail communication from counsel to Sokol, dated August 18, 2005, 1:16 a.m.;

• Attachment No. 6, page Nos. 1-5;

• Attachment No. 8, page Nos. 1-3;

• e-mails packet page Nos. 23-24, 128-132;

• e-mail communication from Livingston to counsel, July 30, 2006, 4:58 p.m., e-mails packet Nos. 137-138 (but not the e-mail communication from an unidentified person to Livingston, dated July 30, 2006, 12:36 p.m., e-mails packet page No. 138);

• e-mail communication from Livingston to counsel, October 17, 2005, 3:11 p.m., e-mails packet page Nos. 141-142 and 144-145;

• e-mail communications from counsel to Livingston, dated July 29, 2006, 7:11pm, and July 28, 2006, 14:01:06-0700(PDT), e-mails packet page Nos. 148-150;

 **\*12**  • e-mail communication from Livingston to counsel, dated March 8, 2006, 10:35 a.m., e-mails packet page Nos. 164-165; and

• e-mail communication from counsel to Sokol, dated August 11, 2006, 11:17 a.m., e-mails packet page No. 185.

The Court also finds that the e-mails packet page Nos. 73-127, are shielded from disclosure by the work-product doctrine. On or before August 8, 2008, the plaintiff shall disclose to the defendants all remaining communications from his third amended privilege log.

SO ORDERED:

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 3166662

---

**End of Document**     © 2024 Thomson Reuters. No claim to original U.S. Government Works.