UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

VLADIMIR JEANTY,

                                    Plaintiff,
                                                        6:22-CV-00319
v.                                                      (BKS/TWD)

DAVID BAGLEY, ESQ.,

                                    Defendant.
_____

APPEARANCES:                              OF COUNSEL:

Vladimir Jeanty
*Plaintiff, pro se*
P.O. Box 921173
Arverne, New York 11692

LIPES MATHIAS, LLP                        LAURA L. SPRING, ESQ.
*Attorneys for Defendant Bagley*
507 Plum Street – Suite 310
Syracuse, New York 13204


**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## DECISION AND ORDER

        Currently before the Court are motions to compel discovery filed by the only remaining

Defendant, David Bagley ("Bagley"), and by the Plaintiff.  Dkt. Nos. 117, 118.  Both parties

have filed opposition to the other party's motion.  Dkt. Nos. 119, 120.  Before permitting the

filing of the motions, the Court held a discovery conference and directed the parties to confer

further in good faith about their discovery disputes.  Dkt. Nos. 109, 114, 115, 116.  At the

conference, the Court also directed Defendant to submit a copy of a disputed document, the Joint

Defense and Confidentiality Agreement ("JDA"), which Defendant claimed was exempt from

discovery under the attorney-client privilege, to the Court for an in camera review.  Dkt. No. 109, 110.  Plaintiff opposes that claimed exemption.  Dkt. No. 111; *see also* Dkt. No. 118.  For the reasons discussed below, the motions to compel are denied in part and granted in part.

## I.    RELEVANT BACKGROUND AND THE CURRENT DISPUTES

Plaintiff brought this action against various Defendants under 42 U.S.C. § 1983 for violations of the First and Fourteenth Amendments arising out of the Defendants' alleged failure to provide photographs sought in a New York Freedom of Information Law ("FOIL") request made by Plaintiff on October 30, 2019, and March 11, 2020.  *See generally* Dkt. No. 32 (amended complaint).[1]  The FOIL requests were related to a previous action brought by Jeanty against various City of Utica ("City") police officers and officials arising out of his arrest in October of 2009 (the "2016 Action") and 22 photographs taken at the time of that arrest.  *See id.* All Defendants moved to dismiss the amended complaint, and the motions were granted entirely, except the motion of Defendant Bagley who was the attorney for a City employee, Sean Dougherty ("Dougherty"), in the 2016 Action.  Dkt. Nos. 69, 84.  Bagley's motion was granted in part.  *Id.*  Thus, the only remaining cause of action is a First Amendment retaliation claim against Defendant Bagley.  *See generally* Dkt. No. 69; *see also* Dkt. No. 32, ¶¶ 62-71.[2]

As relevant here, Plaintiff alleges Defendant Bagley and former Defendants William Borrill ("Borrill") and Zachary Oren ("Oren") directed former Defendant Melissa Sciortino ("Scortino") not to respond to Plaintiff's FOIL requests made during the pendency of the 2016 Action.  *Id.* at 17, 28; *see also* Dkt. No. 32, ¶ 48.  Plaintiff also alleges that "the JDA required

---

[1] *See also generally* Dkt. No. 69 for a detailed overview of the claims and the underlying events.

[2] Paragraph numbers are used where documents identified by the docket number of the Court's electronic filing system contain consecutively numbered paragraphs.  Page references to documents identified by the docket number refer to the page numbers automatically inserted by the Court's electronic filing system.

Bagley to make sure Dougherty did not testify truthfully about the circumstances regarding the taking of photographs on 10/15/2009 involving Jeanty's arrest[;] . . . required Bagley to make sure Dougherty did not testify truthfully about the circumstances regarding how many photographs were taken and when they were uploaded in the UPD RMS[; and] . . . required Bagley not to divulge to Jeanty nor the Court how the photographs on the CDs that He and Oren provided to Jeanty and the Court in 2018 and 2020 were modified." Dkt. No. 32, ¶¶ 35-37. Plaintiff makes further allegations that Bagley and Oren instructed former Defendant Sgt. Eden Selimovic ("Selimovic") to change file names on the subject photographs and to testify falsely at his deposition in the 2016 Action. *Id.* at ¶¶ 41, 43.

Discovery ensued after all Defendants except Bagley were dismissed. Plaintiff served Bagley with discovery demands. *See* Dkt. Nos. 117-5, 117-11.[3] Likewise, Bagley served Plaintiff with discovery demands. *See* Dkt. No. 117-4. Plaintiff served responses to Bagley's demands and supplemented the responses after receiving a deficiency letter from Defendant and after the Court conference. *See* Dkt. Nos. 109, 117-7, 117-9, 117-10, 117-13. Defendant served responses to Plaintiff's demands, and supplemented them after receiving a deficiency letter from Plaintiff and after the Court conference. *See* Dkt. Nos. 117-6, 117-8, 117-12. Plaintiff generally argues that Defendant's responses are improper because Defendant did not provide a privilege log and stated general objections mainly on relevancy. *See* Dkt. No. 118. Plaintiff also questions the veracity of Defendant's statements that he does not have custody or control of various documents demanded. *Id.* Defendant generally argues that Plaintiff's responses are incomplete, non-responsive, and improperly refer to entire documents including deposition

---

[3] Both parties submitted some of the same discovery demands, responses, and letters with their respective motions, but the Court will only reference one of the duplicate submissions.

transcripts from the 2016 Action without identifying the specific information in the documents or transcripts that are responsive to the demands.  Dkt. No. 117.

## II.    LEGAL STANDARD

"In general, a party may obtain discovery of any non-privileged matter that is relevant to a claim or defense of any party and proportional to the needs of the case."  *Johannes v. Lasley*, No. 17-CV-3899 (CBA) (AYS), 2019 WL 1958310, at *3 (E.D.N.Y. May 2, 2019) (citing Fed. R. Civ. P. 26(b)(1)).  "Nonetheless, a court has discretion to circumscribe discovery even of relevant evidence by making any order which justice requires 'to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.'"  *Id.* (citing Fed. R. Civ. P. 26(c)(1) and *Herbert v. Lando*, 441 U.S. 153, 177 (1979)).

Specifically, Rule 26(b) of the Federal Rules of Civil Procedure sets forth the scope and limitations of permissible discovery:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1).  "Relevance" under Rule 26 is "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case."  *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340 (1978); *Barrett v. City of N.Y.*, 237 F.R.D. 39, 40 (E.D.N.Y. 2006) (noting that the information sought "need not be admissible at trial to be discoverable").

However, even if the discovery sought by a party is found to be relevant, this Court must still weigh that party's right to obtain that discovery against the burden imposed on the party from whom the discovery is sought. *See Warnke v. CVS Corp.*, 265 F.R.D. 64, 69 (E.D.N.Y. 2010) (citing *Mirkin v. Winston Res., LLC*, No. 07-CV-02734, 2008 WL 4861840, at *1 (S.D.N.Y. Nov. 10, 2008)). "Because '[t]he trial court is in the best position to weight fairly the competing needs and interest of parties affected by discovery,' Rule 26 confers broad discretion to weigh discovery matters." *Id.* (citations omitted). As of 2015, the Rule is intended to "encourage judges to be more aggressive in identifying and discouraging discovery overuse" by emphasizing the need to analyze proportionality before ordering production of relevant information. Fed. R. Civ. P. 26(b)(1) advisory committee's notes to 2015 amendment. The burden of demonstrating relevance remains on the party seeking discovery, and the newly revised rule "does not place on the party seeking discovery the burden of addressing all proportionality considerations." *Id.* "Once relevance has been shown, it is up to the responding party to justify curtailing discovery." *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of New York*, 284 F.R.D. 132, 135 (S.D.N.Y. 2012). Moreover, a court may issue an order "to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense . . . ." *Id.* (citing Fed. R. Civ. P. 26(c)).

## III.    DISCUSSION

### A.    The Joint Defense and Confidentiality Agreement

At the direction of the Court, Defendant Bagley submitted a copy of the JDA entered into between Bagley, who was tasked with representing Dougherty in the 2016 Action, and counsel for the City of Utica and others in the 2016 Action for an in camera review by the Court. Dkt. No. 109, 110. Plaintiff argues the JDA "is evidence needed to support Plaintiff's claim that

Defendant Bagley is a state actor." Dkt. No. 111 at 2. Defendant claims the attorney-client privilege and the related common interest doctrine apply to exempt the JDA from disclosure. Dkt. No. 110.

The general requirements and the purpose of the attorney-client privilege are well established. "The attorney-client privilege forbids an attorney from disclosing confidential communications that pass in the course of professional employment from client to lawyer. 'The relationship of attorney and client, a communication by the client relating to the subject matter upon which professional advice is sought, and the confidentiality of the expression for which protection is claimed, all must be established in order for the privilege to attach.'" *Carter v. Cornell University*, 173 F.R.D. 92, 94 (S.D.N.Y. 1997) (quoting *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989)). "The privilege is intended to encourage clients to be forthcoming and candid with their attorneys so that the attorney is sufficiently well-informed to provide sound legal advice." *Id.* (citing *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981); *United States v. Adlman*, 68 F.3d 1495, 1499 (2d Cir. 1995)).

"The work-product doctrine, codified for the federal courts in Fed. R. Civ. P. 26(b)(3), is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy with an eye toward litigation, free from unnecessary intrusion by his adversaries." *United States v. Adlman*, 134 F.3d 1194, 1196 (2d Cir. 1998) (citing *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947)) (internal quotation marks omitted). Rule 26(b)(3) states that, subject to limited exceptions: "a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." Fed. R. Civ. P. 26(b)(3)(A).

The "'common interest' doctrine, erroneously called 'common interest privilege' or 'joint defense privilege,' is an exception to the general rule that voluntary disclosure of confidential, privileged material to a third party waives any applicable privilege." *Sokol v. Wyeth, Inc.*, No. 07 Civ. 8442, 2008 WL 3166662, at \*5 (S.D.N.Y. Aug. 4, 2008) (citation omitted). "It serves to protect the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel." *Schwimmer*, 892 F.2d at 243. It exists "to protect the free flow of information from client to attorney . . . whenever multiple clients share a common interest about a legal matter." *Id.* at 243-44. The doctrine "is not an independent source of privilege or confidentiality" so that "[i]f a communication is not protected by the attorney-client privilege or the attorney work-product doctrine, the common interest doctrine does not apply." *Sokol*, 2008 WL 3166662, at \*5 (citations omitted); *see also HSH Nordbank AG New York Branch v. Swerdlow*, 259 F.R.D. 64, 71 (S.D.N.Y. 2009).

The Court reviewed the JDA in camera and finds that it contains attorney-client privileged confidential information relating to the defense of Bagley's client, Dougherty, and other defendants in the 2016 Action. The JDA is also protected under the work-product doctrine since it was created during the pendency of the 2016 Action. It sets forth information about cooperation and coordination of defense efforts among the City defendants, including Dougherty, in the 2016 Action. The JDA was clearly designed to further all of the City defendants' interests in the 2016 Action. Thus, the Court finds that Bagley's client, Dougherty, shared a common legal interest with the defendant City and other City defendants who were all defending Jeanty's constitutional claims in the 2016 Action.

Additionally, upon the Court's complete in camera review of the JDA, the Court finds no relevant or discoverable information contained in it.  There is absolutely no information requiring Bagley to ensure Dougherty did not testify truthfully about the circumstances regarding Jeanty's arrest or about the photographs taken then or any alleged modifications of the photographs.  There is nothing in the JDA about instructing former Defendant Selimovic to change file names on the subject photographs or to testify falsely in the 2016 Action.  There is nothing in the JDA about Bagley instructing Dougherty, former Defendant Scortino, or anyone at the City involved in the 2016 Action not to respond to the subject FOIL requests.  There is nothing in the JDA about the FOIL requests or the photographs at all.  As such, the contents of the JDA are not relevant to the remaining claim against Bagley of retaliation related to the FOIL requests.

However, the Court finds that information about the identity of the parties to the agreement is not confidential.  Therefore, the Court finds that the first paragraph of the JDA should be disclosed, and the signature page of the JDA should be disclosed.  Accordingly, Defendant Bagley is to produce the JDA in redacted form, leaving only the first paragraph that begins "This JOINT DEFENSE AND CONFIDENTIALITY AGREEMENT . . ." and the signature page unredacted.  The redacted JDA shall be produced within 45 days of the date of this Decision and Order.

### B.    Plaintiff's Demands to Defendant Bagley

Plaintiff served Interrogatories and Requests for Production of Documents.  Dkt. No. 117-5.  Defendant Bagley served responses and amended responses.  Dkt. Nos. 117-6, 117-12. Plaintiff generally argues that Defendant has not properly or fully responded to document demands because Defendant asserts general objections and attorney-client based privileges, and

Bagley also indicates that he is not in possession of documents or information requested.  Dkt. No. 118-1 at 3-5.  Plaintiff also argues that the JDA was entered into fraudulently and therefore the privilege claims must fail.  *Id.* at 5-7.  Further, Plaintiff asks the Court to reconsider the directive that "Plaintiff's demand for cell and electronics information is denied."  *Id.* at 2-3; *see also* Dkt. No. 109.  Defendant argues Plaintiff's demands seek information that is irrelevant to the remaining claim of retaliation, wherein Plaintiff alleges the denial of his FOIL requests made during the pendency of the 2016 Action had a chilling effect on his ability to file more FOIL requests.  *See generally* Dkt. No. 119; *see also* Dkt. No. 84 at 4.  Defendant also indicates most of the information sought by Plaintiff's demands is privileged and, in any event, he does not have possession, custody, or control of any documents that may be responsive to Plaintiff's requests, and he cannot produce what he does not have.  Dkt. No. 119 at 5, 7.

Most of Plaintiff's disputed demands request information about verbal or written communications pertaining to his FOIL requests made during the pendency of the 2016 Action between: (1) Defendant Bagley and former Defendants Oren, Borrill, and Charles Brown ("Brown"), all of whom acted as attorneys representing the City of Utica and/or other City employees in the 2016 Action; (2) Defendant Bagley and former Defendants Scortino and Selimovic, who were not parties to the 2016 Action but as City employees were allegedly involved in the denial of the FOIL requests; (3) Defendant Bagley and Dougherty, his client in the 2016 Action; and (4) Defendant Bagley and the other City attorneys concerning the JDA related to Bagley's defense of Dougherty in the 2016 Action.  *See* Dkt. Nos. 117-5 (Interrogatory Nos. 3-6, 8-9, 12, 16-17; Document Requests 1, 3, 5-14, 16-20), 117-11.  These demands as written seek an expansive amount of information, including verbal conversations, documents,

text messages, emails, data from Bagley's computer hard drives, and Bagley's cell phone data and records, all to include information for the period of January 1, 2018, to the present.  *Id.* at 8.

However, Plaintiff has provided absolutely no explanation of how the vast amount of information regarding communications between Defendant Bagley and other City of Utica employees including former parties, some of whom are City attorneys, is relevant to the sole remaining claim of retaliation against Bagley.  *See* Dkt. No. 118-1.  Instead, Plaintiff claims in a conclusory fashion that such information  "must be provided" and documents "would lead to material facts in support" of his remaining claim or the defenses or that the documents "are relevant and within the scope of the remaining claim."  *Id.* at 8, 9, 10.  The burden of demonstrating relevance remains on the party seeking discovery since "[a] party claiming that a request is important to resolve the issues should be able to explain the ways in which the underlying information bears on the issues as that party understands them."  Fed. R. Civ. P. 26 advisory committee's note to 2015 amendment; *see, e.g.*, *Edmar Fin. Co., LLC v. Currenex, Inc.*, 347 F.R.D. 641, 646 (S.D.N.Y. 2024) ("The party seeking discovery bears the initial burden of proving the discovery is relevant.") (citation omitted).  Plaintiff has not met his burden here.  Nor has Plaintiff made any effort to limit the information sought and he has not provided any particularity to describe how this information relates to the remaining claim of retaliation.

Defendant has asserted the information is privileged because it seeks communications between attorneys defending the City and its employees in the 2016 Action, communications between Bagley and his client, Dougherty, in the 2016 Action, and communications between Bagley and other City employees during the 2016 Action.  Dkt. No. 117-6.  Thus, Bagley argues the information sought by Plaintiff involves confidential communications between lawyers and their clients during the course of legal representation related to the 2016 Action and therefore is

subject to attorney-client privilege and the attorney work-product privilege. *Id.* Defendant also argues the materials sought are not relevant to the remaining claim of retaliation against Bagley, and the requests are otherwise overly broad and unduly burdensome. *Id.*

Plaintiff has made no showing that there has been any waiver of attorney-client relationships here, or that the information is not work-product, or that the common interest doctrine should not apply. He argues, without any basis, that Bagley's "claims of privileges all fail because any party in the [2016 Action] . . . that was part of the Joint Defense Agreement, had no privilege claim as that agreement was entered into fraudulently by all involved at the direction of the Defendant Bagley and Non-party Oren." Dkt. No. 118-1 at 6. Plaintiff also argues without any basis that "Bagley directed Dougherty to testify falsely during a deposition[] and later at trial regarding material issues of fact in the [2016 Action]." *Id.* Thus, Plaintiff posits the crime-fraud exception to claims of attorney-client privilege applies thus invalidating the privilege. *Id.* The Court disagrees.

"It is well-established that communications that otherwise would be protected by the attorney-client privilege . . . are not protected if they relate to client communications in furtherance of contemplated or ongoing criminal or fraudulent conduct." *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1038 (2d Cir. 1984) (citations omitted). Proof beyond a reasonable doubt that a crime or fraud has been committed is not required by courts. *See In re Sealed Case*, 676 F.2d 793, 814 (D.C. Cir. 1982). However, mere allegations of a crime or fraud cannot defeat a claim of privilege; prima facie evidence that the crime or fraud has some foundation in fact is required to invoke the exception. *See id.* at 815 n.84 (citation omitted).

Defendant Bagley was defending a City employee, Dougherty, in the 2016 Action when the documents and information Plaintiff seeks were generated, and the City employees who were not parties to the 2016 Action were responding to requests by the attorneys involved in defending the 2016 Action.  The communications, documents, and information sought in Plaintiff's expansive demands clearly were generated to defend the City and its employees who were parties to the 2016 Action and were related to furthering defense interests.  Moreover, a party may not discover information that is prepared "in anticipation of litigation or for trial by or for another party or its representative . . . unless they are otherwise discoverable under Rule 26(b)(1); and . . . the party shows that it has a substantial need for the materials . . . and cannot, without undue hardship, obtain their substantial equivalent by other means."  Fed. R. Civ. P. 26(b)(3)(A)(i), (ii).  Plaintiff has not made any such showing here.

Moreover, Plaintiff's bald assertion that any party that was part of the JDA in the 2016 Action has no claim of privilege because "that agreement was entered into fraudulently by all involved at the direction of the Defendant Bagley and Non-party Oren" is insufficient to overcome the privilege.  Dkt. No. 118-1 at 6.  Plaintiff has not presented any facts upon which he bases his speculative claim that the JDA was "entered into fraudulently" such that there is no prima facie evidence of any crime or fraud to undermine the attorney-client privilege.

For these reasons, the Court finds the attorney-client privilege and work-product privilege apply to the information sought by the subject demands in dispute.  The Court also finds the common interest doctrine applies since the City, the non-party City attorneys and employees, and Defendant Bagley all shared a common interest to defend the City and its employees in the 2016 Action.  Moreover, Plaintiff has not shown the relevancy of the information sought to the remaining claim of retaliation against Defendant Bagley; he has not shown the information is

discoverable and not privileged; and he has not shown any substantial need for the materials to prepare his case. Accordingly, the information Plaintiff requests in his demands is privileged and therefore exempt from disclosure.

However, the Court modifies its prior order, Dkt. No. 109, and directs Defendant Bagley to produce a privilege log for any responsive written documents (e.g., letters, emails, texts, memos) regarding communications between Defendant Bagley and former Defendants Oren, Brown, Borrill, Selimovic, and Scortino and between Defendant Bagley and Dougherty regarding the denial of Plaintiff's FOIL requests made on October 30, 2019, and March 11, 2020. The Court also modifies the timeframe to be addressed for responsive documents, if any, in the privilege log to October 30, 2019, through October 30, 2020. The Court finds the attorney-client privilege applies to any such communications because Defendant Bagley and former Defendants Oren, Borrill, and Brown, all acted as attorneys representing the City of Utica and other City employees in the 2016 Action; Scortino and Selimovic were employees of the City allegedly involved in the FOIL requests; and Dougherty was Bagley's client in the 2016 Action. The privilege log shall be produced no later than 45 days from the date of this Decision and Order. If no responsive documents exist in Defendant Bagley's possession, such that a privilege log is unnecessary, Defendant Bagley shall provide an affidavit stating that he has no such responsive documents no later than 45 days from the date of this Decision and Order.

To be clear, Defendant Bagley is not required to produce documents or a privilege log for documents he does not possess. "The burden of establishing control over the documents being sought rests with the demanding party." *New York ex rel. Boardman v. Nat'l R.R. Passenger Corp.*, 233 F.R.D. 259, 268 (N.D.N.Y. 2006) (citing *DeSmeth v. Samsung Am., Inc.*, No. 92-Civ. 3710(LBS)(RLE), 1998 WL 74297, at *9 (S.D.N.Y. Feb. 20, 1998)). "Generally, a party's good

faith averment that the items sought simply do not exist, or are not in his possession, custody, or control, should resolve the issue of failure of production since one cannot be required to produce the impossible." *Mason Tenders Dist. Council of Greater New York v. Phase Constr. Servs., Inc.*, 318 F.R.D. 28, 42 (S.D.N.Y. 2016) (citation and quotation marks omitted). Plaintiff's averments that Defendant Bagley "is still operating under the Joint Defense Agreement and by that document still has possession, custody, and control of the requested material/record" fail to actually demonstrate that Defendant Bagley is in possession, custody, or control of responsive materials from the City or other City attorneys and employees.

In sum, Defendant Bagley must produce the redacted JDA and the privilege log and/or an affidavit as directed herein within 45 days from the date of this Decision and Order. No other responses are due from Defendant Bagley.

### C.    Defendant Bagley's Demands to Plaintiff

Defendant Bagley moves to compel further responses from Plaintiff to Interrogatories and Requests for Production served by Bagley. Dkt. No. 117; *see also* Dkt. No. 117-4. Plaintiff responded to the demands and Bagley's deficiency notice, then subsequently served a supplemental response. Dkt. Nos. 117-7, 117-10, 117-13. Defendant generally argues that Plaintiff's responses are incomplete and non-responsive, and improperly refer to lengthy documents rather than providing direct responses. *See generally* Dkt. No. 117-1. Defendant specifically avers that Plaintiff should respond more fully to Interrogatory Nos. 1-8, 10, 11, 13-15, and provide documentation that responds to corresponding Requests for Production. Dkt. No. 117-1, ¶¶ 23, 28, 29, 33, 37, 40. Plaintiff asserts that the responses provided, including documents, are sufficient, and that Bagley's counsel is requesting him to "act as her paralegal." Dkt. No. 120, ¶¶ 11, 13.

In the Interrogatories for example, Defendant generally asks for the basis of various claims in the operative First Amended Complaint that allege conduct on the part of Bagley that he told non-party Sciortino not to respond to Plaintiff's FOIL requests and directed Scortino to retaliate against Plaintiff; and that Bagley exerted influence over Scortino about the FOIL requests. Dkt. No. 117-4 at 7-9 (Interrogatory Nos. 1, 3, 4, 5, 6); *see also* Dkt. No. 32, ¶¶ 29, 47-50. Interrogatory No. 2 seeks the factual basis for Plaintiff's claim that Bagley entered into the JDA when defending Dougherty in the 2016 Action which required Bagley to make sure Dougherty did not testify truthfully about the photographs. *Id.* at 7 (Interrogatory No. 2); *see also* Dkt. No. 32, ¶¶ 34-36. Defendant also requests information that forms the basis of Plaintiff's First Amendment retaliation claim against Bagley, and to identify Bagley's specific adverse action against Plaintiff. *Id.* at 8 (Interrogatory Nos. 7, 13); *see also* Dkt. No. 32, ¶¶ 62-71.

In response to these Interrogatories, Plaintiff poses general objections, claims privilege asserting Defendant requests information about how Plaintiff will prosecute his case, and/or avers that the questions were better suited for a deposition. Dkt. No. 117-7 at 3-8 (Interrogatory Responses 1 -7, 13). Plaintiff also refers Defendant to the First Amended Complaint and to the entire deposition transcripts from the 2016 Action of Dougherty and Michael Cerminaro ("Cerminaro"), another City defendant in the 2016 Action. *Id.* In providing amended responses to Defendant's demands, Plaintiff indicated he "had no further facts or information at this time" to these particular Interrogatories. Dkt. No. 117-13. These responses are insufficient. Defendant is entitled to information that forms the basis of Plaintiff's claim of First Amendment retaliation, and to any documentary information that supports the claim. Fed. R. Civ. P. 26(b)(1).

Therefore, Plaintiff is directed to respond more fully to Interrogatory Nos. 1-7, and 13. Plaintiff must also specifically cite to the location in the deposition transcripts of Dougherty and Cerminaro that responds to any particular Interrogatory by referencing the page numbers of their depositions where the information is found.  Plaintiff must provide these updated responses within 45 days from the date of this Decision and Order.  If Plaintiff does not have any facts or information to form the basis of his First Amendment retaliation claim as requested in Interrogatory Nos. 1-7, and 13, then Plaintiff shall provide an affidavit stating that he has no such facts or information responsive to the specific Interrogatory (or Interrogatories) no later than 45 days from the date of this Decision and Order.

The Court finds that Plaintiff has provided sufficient information regarding Interrogatory Nos. 8, 10, 11, 14, and 15 through his responses and supplemental responses.  In several of the responses, Plaintiff has also indicated he is not in possession of the requested information.  As noted above, a party's good faith averment that the items are not in his possession resolves the issue of failure of to produce such information.  *Mason Tenders Dist. Council of Greater New York*, 318 F.R.D. at 42.

To the extent that Plaintiff and Defendant seek to preclude the other party from offering information at trial on any of the issues pertaining to this discovery dispute, those requests are denied without prejudice.

## IV.    CONCLUSION

For the reasons stated, the Court finds both Plaintiff and Defendant must provide further responses to their respective discovery demands as directed in this Decision and Order.

**WHEREFORE, it is hereby**

**ORDERED** that Defendant Bagley's motion (Dkt. No. 117) to compel is **GRANTED** in part and **DENIED** in part consistent with this Decision and Order; and it is further

**ORDERED** that Plaintiff's motion (Dkt. No. 118) to compel is **GRANTED** in part and **DENIED** in part consistent with this Decision and Order; and it is further

**ORDERED** that further responses as directed herein shall be served by Defendant and Plaintiff within 45 days of this Decision and Order; and it is further

**ORDERED** that discovery deadlines are reset as follows: Plaintiff's Expert Disclosure Deadline is 7/14/2025; Defendant's Expert Disclosure Deadline is 8/28/2025; Rebuttal Expert Disclosure Deadline is 9/12/2025; Discovery due by 10/14/2025; Discovery Motions due 10/28/2025; and Dispositive Motions to be filed by 12/12/2025; and it is further

**ORDERED** that the Clerk provide to Plaintiff a copy of this Decision and Order, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam); and it is further

**ORDERED** that no costs or sanctions are awarded to any party.


Dated: March 24, 2025
      Syracuse, New York


Thérèse Wiley Dancks
United States Magistrate Judge

Johannes v. Lasley, Not Reported in Fed. Supp. (2019)

2019 WL 1958310

KeyCite Yellow Flag - Negative Treatment

Distinguished by Brown v. Barnes and Noble, Inc., S.D.N.Y., December 23, 2019

2019 WL 1958310
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Lisa D. JOHANNES, Plaintiff,

v.

Michelle M. LASLEY and United
States Postal Service, Defendants.

17-CV-3899 (CBA)(AYS)
|
Signed 05/02/2019

**Attorneys and Law Firms**

Douglas Adam Milch, Wingate Russotti Shapiro & Halperin, New York, NY, for Plaintiff.

Mary M. Dickman, United States Attorneys Office Eastern District of New York, Central Islip, NY, for Defendants.

**MEMORANDUM & ORDER**

ANNE Y. SHIELDS, United States Magistrate Judge

**\*1** Plaintiff Lisa D. Johannes ("Johannes" or "Plaintiff") commenced this action against Michelle M. Lasley ("Lasley") and the United States Postal Service ("USPS") (collectively "Defendants") pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671 et seq., alleging that Plaintiff sustained serious injury and economic loss as a result of an incident that occurred on January 5, 2016, involving Plaintiff and a Postal truck driven by Lasley, a USPS employee acting in the course of her employment. See generally Complaint, Docket Entry ("DE") [1]. Plaintiff alleges she was hit by the postal truck and the collision was due to Lasley's negligence. Id.

On December 19, 2018, Plaintiff filed a letter-motion to compel production of documents. DE [18]. On February 19, 2019, this Court granted Plaintiff's motion. See Electronic Order dated 2/19/2019. Currently before the Court is Defendants' motion for reconsideration. See DE [19]. For the reasons discussed below, having considered Defendants'

motion for reconsideration, the Court declines to modify its 2/19/2019 Order.

**DISCUSSION**

**I. Legal Principles: Standard Applicable on Motions for Reconsideration**

The standard for granting a motion for reconsideration is strict, and "[r]econsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co., Ltd., 628 F. App'x 793, 796 (2d Cir. 2015)(quoting Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995)); see also Oparah v. New York City Dep't of Educ., 670 F. App'x 25, 26 (2d Cir. 2016) ("The standard for granting a motion to reconsider 'is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked.' "); S.D.N.Y./E.D.N.Y. Local Civ. R. 6.3 (The moving party must "set[ ] forth concisely the matters or controlling decisions which counsel believes the Court has overlooked.").

It is thus well settled that a motion for reconsideration is " 'not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple.' " Salveson v. JP Morgan Chase & Co., 663 F. App'x 71, 75-76 (2d Cir. 2016) (quoting Analytical Surveys, Inc. v. Tonga Partners, L.P., 684 F.3d 36, 52 (2d Cir. 2012)). A motion for reconsideration is " 'neither an occasion for repeating old arguments previously rejected nor an opportunity for making new arguments that could have previously been made.' " Salveson v. JP Morgan Chase & Co., 166 F. Supp. 3d 242, 248 (E.D.N.Y. 2016) (quoting Simon v. Smith & Nephew, Inc., 18 F. Supp. 3d 423, 425 (S.D.N.Y. 2014)), aff'd, 663 F. App'x 71 (2d Cir. 2016). Simply put, in order to prevail on a motion for reconsideration, "the moving party must demonstrate that the Court overlooked controlling decisions or factual matters that were put before the Court on the underlying motion." Lichtenberg v. Besicorp Grp. Inc., 28 F. App'x 73, 75 (2d Cir. 2002) (citations and internal quotation marks omitted); see also Stoner v. Young Concert Artists, Inc., 2013 WL 2425137, at *1 (S.D.N.Y. May 20, 2013) ("A motion for reconsideration is an extraordinary remedy, and this Court will not reconsider issues already examined simply because [a party] is dissatisfied with the outcome of his case.

Johannes v. Lasley, Not Reported in Fed. Supp. (2019)

2019 WL 1958310

To do otherwise would be a waste of judicial resources.") (alteration in original).

## II. The Motion

**\*2** Defendants argue that because Plaintiff's discovery motion was granted as unopposed, this Court should grant the motion for reconsideration. Defendants further argue that the documents in question are indeed protected by privilege and thus are not entitled to production.

### A. Defendants' Failure to Timely Oppose

The Defendants first argue that because the Court granted Plaintiff's application as unopposed and did not base its decision on the merits, the Court should reconsider its Order and excuse Defendants' failure to oppose the motion.

Preliminary, this Court points out that Plaintiff filed her motion on December 19, 2018. While Defendants cite to the lapse of appropriations that began on December 21, 2018 and lasted through January 26, 2019, which prohibited Department of Justice attorneys from working, among the reasons for Defendants' failure to timely respond to the motion, this Court did not issue its Order granting Plaintiff's motion until February 19, 2019. Further, Defendants never sought a stay of the case during the 35-day appropriations lapse, nor sought an extension or time to respond to the motion once appropriations were restored. Recognizing the substantial time-gap between the restoration of appropriations and this Court's Order, namely some three-weeks, defense counsel then cites to "her own administrative error" as the reason for the failure to respond. See Defs' Memo at 5, DE [19-1]. Defendants have not provided a reasonable excuse and thus have failed to show the requisite good cause needed for this Court to vacate its Order.

Under Federal Rule of Civil Procedure 6(b)(1)(B), "[w]hen an act may or must be done within a specified time, the court may, for good cause, extend the time ... on motion made after the time has expired if the party failed to act because of excusable neglect." Fed. R. Civ. P. 6(b) (1)(B). The determination whether a party's neglect is "excusable" is, "at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 395 (1993). In making that determination, the Supreme Court has directed courts to consider the following factors: (1) the danger of prejudice to the opposing party; (2) the length of the delay and its potential impact on judicial proceedings;

(3) the reason for the delay, including whether it was in the reasonable control of the movant, and (4) whether the movant acted in good faith. Id. The Second Circuit has held that the third factor—the reason for the delay, and whether it is within the reasonable control of the movant—is the most important, since the other three factors will often favor the movant. See Silivanch v. Celebrity Cruises, Inc., 333 F.3d 355, 366 (2d Cir. 2003). "The equities will rarely if ever favor a party who 'fail[s] to follow the clear dictates of a court rule.' " Id. at 366–67 (citing Canfield v. Van Atta Buick/GMC Truck Inc., 127 F.3d 248, 249–50 (2d Cir. 1997)). Thus, "[w]here ... the rule is entirely clear ... a party claiming excusable neglect will, in the ordinary course, lose under the Pioneer test." Canfield, 127 F.3d at 249–50 (holding not clearly erroneous the district court's decision that a lawyer's failure to file motion papers within the time limit established by a local rule was not excusable neglect under Rule 60(b)); see Silivanch, 333 F.3d at 367–70 (collecting cases finding no excusable neglect where counsel failed to comply with a clear deadline).

**\*3** Here, the Court finds that Defendants failed to establish that their failure to respond was a product of "excusable neglect." Counsel's excuses for her failure to adhere to the deadline are unconvincing. Counsel cites "her own administrative error" and lapse of approbations from December 21, 2019 to January 26, 2019 as the reason for her failure to respond. However, "her own administrative error" is no excuse for lack of diligence in complying with clearly established deadlines. Moreover, while the lack of appropriations that forced counsel not to work from December 21, 2019 to January 26, 2019 was surely not within her control, upon restoration of the appropriations counsel could and should have made a proper request for an extension of time under Rule 6(b). See Delacruz v. Stern, 166 F.3d 1200 at \*2 (2d Cir. 1998) ("[i]f additional time to replead was needed because of the attorney's marital problems, an application for an extension of time should have been filed."). See Turner v. Hudson Transit Lines, Inc., 1991 WL 123966, at \*3 (S.D.N.Y. July 2, 1991) ("Counsel's excuse for his untimely submission of papers is his own vacation ... counsel could have readily arranged for another attorney to cover for him during that period, or could have made a proper request for an extension of time under Rule 6(b) before leaving for vacation. Further, it would not seem impossible to draft a memorandum of law supporting an objection to a simple discovery ruling in the six days between Judge Francis's ruling and the planned start of defense counsel's vacation.").

As noted by the Second Circuit,

Case 6:22-cv-00319-BKS-TWD   Document 124   Filed 03/24/25   Page 20 of 42

Johannes v. Lasley, Not Reported in Fed. Supp. (2019)

2019 WL 1958310

[w]e operate in an environment ... in which substantial rights may be, and often are, forfeited if they are not asserted within time limits established by law ... We ... have considerable sympathy for those who, through mistakes-counsel's inadvertence or their own-lose substantial rights in that way. And there is, indeed, an institutionalized but limited flexibility at the margin with respect to rights lost because they have been slept on. But the legal system would groan under the weight of a regimen of uncertainty if which time limitations were not rigorously enforced—where every missed deadline was the occasion for the embarkation on extensive trial and appellate litigation to determine the equities of enforcing the bar.

Silivanch, 333 F.3d at 367-68. Accordingly, Defendants' motion for reconsideration of this Court's Order granting Plaintiff's discovery application due to Defense counsel's failure to respond is denied.

B. The Production Is Not Privileged

Defendants claim that the prevention of manifest injustice warrants reconsideration of this Court's decision to grant Plaintiff's motion to compel production of the unredacted documents. Defendants claim the self-critical analysis privilege applies to the redactions at issue as well as the work-product privilege. However, Defendants have not cited to any controlling case law to dissuade this Court from ordering the production of the unredacted documents.

In general, a party may obtain discovery of any non-privileged matter that is relevant to a claim or defense of any party and proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1). Nonetheless, a court has discretion to circumscribe discovery even of relevant evidence by making any order which justice requires "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1); see Herbert v. Lando, 441 U.S. 153, 177 (1979).

The self-critical analysis privilege concerns situations where " 'an intrusion into the self-evaluative analysis of an institution would have an adverse effect on the [evaluative] process, with a net detriment to a cognizable public interest.' " Troupin v. Metro. Life Ins. Co., 169 F.R.D. 546, 548 (S.D.N.Y. 1996) (citations and quotation omitted). Put another way, "if a party has conducted a confidential analysis of its own performance in a matter implicating a substantial public interest, with a view towards correction of errors, the disclosure of that analysis in the context of litigation may deter the party from conducting such a candid review in the future." Wimer v. Sealand Serv., Inc., 1997 WL 375661 at *1 (S.D.N.Y. July 3, 1997).

Whether the self-critical analysis privilege should be recognized in federal courts has yet to be decided by the Supreme Court or the Second Circuit. One court observed that "this particular privilege has led to a checkered existence in the federal courts." Wimer, 1997 WL 375661 at *1.

*4  In Robinson v. Untied States, 205 F.R.D. 104 (N.D.N.Y. 2001), the same redactions at issue here, namely the Postal Service redacted the same sections to the same 1769 forms, were examined. The court held that such redaction was improper and ordered the Post Office to produce unredacted copies. Id. at 109. (Statements as to how the accident occurred, why it occurred, management factors that contributed to the accident, the root causes of the accident, and actions that have been or will be taken to prevent recurrence of each factor and cause are not covered by the privilege.) The Robinson court went on to find that the Form 1769 sections entitled "What actions have or will be taken to prevent recurrence of each factor and cause? Expected completion date of each?" and "explain how the preventive action will eliminate or reduce cause(s) and prevent similar accidents" were also not privileged. Id. at 109-110. The Robinson court concluded that the accident reports are prepared in the course of the Post Office's business for the purpose of preventing future accidents. Robinson held that it would be implausible to believe that the Post Office would cease its practice of investigating accidents and writing up the results, in order to the prevent future accidents, on the basis that such reports could be discoverable, ultimately finding that producing the information would not cause the Post Office injury, "thwart desirable social policies, or affect a substantial public interest." Id. at 110.

Case 6:22-cv-00319-BKS-TWD    Document 124    Filed 03/24/25    Page 21 of 42

Johannes v. Lasley, Not Reported in Fed. Supp. (2019)

2019 WL 1958310

Where, as here, a party raises privilege as a basis for withholding otherwise discoverable materials, "the burden is on a party claiming the protection of a privilege to provide evidence sufficient to establish the essential elements of the privileged relationship." S.E.C. v. NIR Grp., LLC, 283 F.R.D. 127, 131 (E.D.N.Y. 2012) (citations omitted). "This burden cannot be discharged by mere conclusory or ipse dixit assertions." Id.

Waiver of privilege may occur where a party fails to list withheld documents on its privilege log. Pursuant to Federal Rule of Civil Procedure 26(b)(5)(A), a party who withholds documents on the account of privilege must "describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5)(A). Consistent with that Federal Rule, courts typically require that parties provide a detailed privilege log for all documents withheld. See Trudeau v. N.Y. State Consumer Prot. Bd., 237 F.R.D. 325, 334 (N.D.N.Y. 2006) ("In this respect, and in order to evaluate and facilitate the determination of whether a privilege exists, courts generally require compliance with th[e] statutory mandate [of Fed. R. Civ. P. 26(b)(5)] that an adequately detailed privilege log be provided."). Fed. R. Civ. P. 26 is further supplemented by Local Civil Rule 26.2, which requires that a party withholding documents on the grounds of privilege set forth: "(i) the type of document, e.g., letter or memorandum; (ii) the general subject matter of the document; (iii) the date of the document; and (iv) the author of the document, the addressees of the document, and any other recipients, and, where not apparent, the relationship of the author, addressees, and recipients to each other...." Local Civil Rule 26.2(a)(2)(A); see also Go v. Rockefeller Univ., 280 F.R.D. 165, 174 (S.D.N.Y. 2012) (citing Fed. R. Civ. P. 26(b)(5) and Local Civil Rule 26.2 in analyzing the sufficiency of a privilege log). In assessing the adequacy of a privilege log, courts must also ask whether it "suffice[s] to establish each element of the privilege or immunity that is claimed." A.I.A. Holdings, S.A. v. Lehman Bros., 2000 WL 1538003, at *2 (S.D.N.Y. Oct. 17, 2000) (quoting Golden Trade, S.r.L. v. Lee Apparel Co., 1992 WL 367070, at *5 (S.D.N.Y. Nov. 20, 1992)); see also Bowne of N.Y. City, Inc. v. AmBase Corp., 150 F.R.D. 465, 474 (S.D.N.Y. 1993) (explaining that a privilege log should "identify each document and the individuals who were parties to the communications, providing sufficient detail to permit a judgment as to whether the document is at least potentially protected from disclosure").

Consistent with these principles, courts in the Second Circuit have uniformly concluded that "[t]he failure of a party to list a document withheld during the course of discovery on a privileged log ... ordinarily results in a finding that the privilege otherwise asserted has been waived." Feacher v. Intercontinental Hotels Grp.,2007 WL 3104329, at *5 (N.D.N.Y. Oct. 22, 2007); see FG Hemisphere Associates, L.L.C. v. Republique Du Congo, 2005 WL 545218, at *6 (S.D.N.Y. Mar. 8, 2005) ("As other judges in this District and I have repeatedly held, the unjustified failure to list privileged documents on the required log of withheld documents in a timely and proper manner operates as a waiver of any applicable privilege.") (citations omitted); accord Kogut v. Cty. of Nassau, No. 06-cv-6695, 2011 WL 13284714, at *4 (E.D.N.Y. Nov. 14, 2011) ("The failure of defendants to list the ... documents [in question] on a privilege log constitutes a waiver of any applicable privilege.").

**\*5** In the instant action, Defendants failed to serve a privilege log. Therefore, any potential privilege has now been waived.

In support of their claim of privilege, Defendants cite, inter alia, to Warner v. United States, a Rhode Island case for the assertion that the materials should not be disclosed. 2009 WL 3698018, *4 (D. R. I Nov. 2, 2009). However, while Defendants are correct that court found that the United States could not be compelled to produce the unredacted forms to a plaintiff in an action brought pursuant to the FCTA, the court upheld the redaction only after finding that the redacted materials were after-the-fact opinions and recommendations of an investigator." Id. at *4. Here, the Defendants failed to serve a privilege log and use the instant motion as their initial attempt to justify the claim of privilege. Defendants improperly utilize the instant motion for reconsideration to take a "second bite of the apple." Therefore, unlike the circumstances in Warner, whether the materials in question are factual, opinion or mixed motive cannot be determined. Accordingly, this Court declines to reconsider its Order granting the production of the unredacted documents.

## CONCLUSION

For the foregoing reasons, Defendants' motion for reconsideration as set forth in Docket Entry No. [19] is denied. Defendants are directed to produce the unredacted documents to Plaintiff's counsel forthwith.

Case 6:22-cv-00319-BKS-TWD    Document 124    Filed 03/24/25    Page 22 of 42
**Johannes v. Lasley, Not Reported in Fed. Supp. (2019)**
2019 WL 1958310

**All Citations**

Not Reported in Fed. Supp., 2019 WL 1958310

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by   United States ex rel. Ortiz v. Mount Sinai Hospital,
S.D.N.Y.,   March 11, 2016

2008 WL 4861840
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Camille MIRKIN, Plaintiff,

v.

WINSTON RESOURCES, LLC, Defendant.

No. 07 Civ. 02734(JGK)(DF).
|
Nov. 10, 2008.

### OPINION AND ORDER

DEBRA FREEMAN, United States Magistrate Judge.

 **\*1**  In this employment discrimination action, plaintiff Camille Mirkin ("Plaintiff") claims that her former employer, defendant Winston Resources, LLC ("Defendant") unlawfully terminated her employment for reasons related to, *inter alia,* her gender, her pregnancy, and her age. Currently before this Court is a letter motion by Plaintiff to quash Defendant's deposition subpoena of Christopher Gamble, Plaintiff's supervisor at a subsequent employer, Response Companies, a company for which Plaintiff is also no longer working. (*See* Letter to the Court from Dominique N. Ferrera, Esq ., dated Oct. 10, 2008.) Plaintiff argues that evidence regarding her job performance at Response Companies is irrelevant to the claims asserted in this action and that enforcement of the subpoena would negatively affect her current and future employment prospects and subject her to unnecessary annoyance and embarrassment. (*See id.*) Defendant, on the other hand, argues that Plaintiff lacks standing to challenge the subpoena and that, in any event, the discovery sought is relevant to its defenses in the action and should be allowed. (*See* Letter to the Court from Melissa L. Morais, Esq., dated Oct. 24, 2008.) For the following reasons, Plaintiff's motion to quash is DENIED.

As a threshold matter, a plaintiff has standing to quash a subpoena of a non-party where the plaintiff asserts a legitimate privacy interest in the information sought. *See Chazin v. Lieberman,* 129 F.R.D. 97, 98 (S.D.N.Y.1990).

Here, Plaintiff has a legitimate privacy interest in information regarding her performance at a subsequent employer and, therefore, has standing to bring her motion. *See During v. City Univ. of N.Y.,* No. 05 Civ. 6992(RCC)(RLE), 2006 U.S. Dist. LEXIS 10133, at \*3-4, 2006 WL 618764 (S.D.N.Y. Mar. 9, 2006), *rev'd on other grounds,* 2006 U.S. Dist. LEXIS 53684, 2006 WL 2192843 (S .D.N.Y. Aug. 1, 2006).

As for the merits of Plaintiff s motion, Rule 26(b)(1) of the Federal Rules of Civil Procedure provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." " ' 'Relevance' for purposes of discovery, moreover, is synonymous with 'germane' and ... it should not be read as meaning 'competent' or 'admissible.' " *Johnson v. Nyack Hosp.,* 169 F.R.D. 550, 556 (S.D.N.Y.1996) (citation omitted). As Defendant argues, Mr. Gamble, Plaintiff's former supervisor at Response Companies, may be able to testify as to Plaintiff's lack of certain job skills, providing evidence that would be relevant to a defense that Plaintiff was terminated for legitimate, non-discriminatory reasons.

Even where the discovery sought is relevant, however, this Court must weigh a party's right to obtain that discovery against the burden imposed on the opposing party. *During,* 2006 U.S. Dist. LEXIS 53684, at \* 15, 2006 WL 2192843 (citing Fed.R.Civ.P. 26(b)(2), 26(c)). Further, the Court may issue an order to protect a party from undue annoyance or embarrassment. Fed.R.Civ.P. 26(c). In the circumstances of this case, the Court finds that the burden imposed on Plaintiff by Defendant's subpoena is slight and docs not outweigh Defendant's right to obtain the information sought. First, Plaintiff could have reasonably expected that matters relating to her employment performance would be disclosed in this litigation. *During,* 2006 U.S. Dist. LEXIS 53684, at \* 16, 2006 WL 2192843 ("A litigant himself must reasonably anticipate that his personal matters will be disclosed, while a non-party having no stake in the litigation retains a greater expectation of privacy.") (citation and internal quotations removed). Second, as Plaintiff is no longer employed by Response Companies, and, as Plaintiff does not claim that Mr. Gamble is currently engaged in a job search on her behalf, the cases on which she relies to demonstrate an undue burden arc distinguishable. Third, although Plaintiff states that she continues to rely on Response Companies for job references, the Confidentiality Agreement already in place in this action could be extended to prevent Mr. Gamble and Response Companies from disclosing confidential information to others, thereby mitigating the burden on Plaintiff. Finally, as

2008 WL 4861840

both parties have noted, this litigation and the underlying fact of Plaintiff's termination from Defendant's employ are already known to many in Plaintiff's industry. For this reason, the additional embarrassment caused by Mr. Gamble's deposition would be marginal, at most.

**\*2** The Court notes that, by agreement of the parties, discovery in this case is currently being held in abeyance pending the outcome of a mediation between them. The Court, however, has recently received a letter from Plaintiff's counsel, expressing concern that the scheduling of the anticipated mediation has been delayed and suggesting that, to avoid further delay, discovery and the mediation should now proceed "along parallel paths." (Letter to the Court from Dominique N. Fe rre ra, Esq., dated Nov. 5, 2008.) Under the circumstances, counsel arc directed to confer in good faith regarding a modified discovery schedule and to submit such a schedule to the Court for its consideration. Although the motion to quash the deposition of Mr. Gamble is denied, that deposition should not go forward until the parties have reached agreement on its scheduling, or the Court has issued a revised scheduling order.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 4861840

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Sokol v. Wyeth, Inc., Not Reported in F.Supp.2d (2008)

2008 WL 3166662

KeyCite Yellow Flag - Negative Treatment
Distinguished by   In re Velo Holdings Inc.,   Bankr.S.D.N.Y.,   June 12, 2012

2008 WL 3166662
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Anthony M. SOKOL, Plaintiff,
v.
WYETH, INC. and Wyeth
Pharmaceuticals, Inc., Defendants.

No. 07 Civ. 8442(SHS)(KNF).
|
Aug. 4, 2008.

### MEMORANDUM AND ORDER

KEVIN NATHANIEL FOX, United States Magistrate Judge.

### INTRODUCTION

**\*1** Plaintiff Anthony M. Sokol ("Sokol") brings this action against Wyeth, Inc. and Wyeth Pharmaceuticals, Inc. (collectively "Wyeth") for a violation of Section 806 of the Sarbanes-Oxley Act ("SOA") of 2002, 18 U.S.C § 1514A, and unlawful employment practices under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C §§ 12101-12213, as amended. On March 24, 2008, the defendants made a motion for an order from the Court, pursuant to Fed.R.Civ.P. 37, compelling the plaintiff to disclose documents reflecting communications: (1) between the plaintiff and non-party Mark D. Livingston ("Livingston"); and (2) among the plaintiff, his attorney and Livingston. The defendants' submission included Exhibit 10, the plaintiff's first amended privilege log. On April 8, 2008, the plaintiff opposed the defendants' motion contending: (a) the defendants' request is *"prima facie* overly broad;" (b) the scope of the plaintiff's request is "overly burdensome;" and (c) the communications sought are protected by a common interest privilege. In support of his opposition to the defendants' motion, the plaintiff submitted attachment Nos. 1-8, consisting of certain e-mail messages, for an *in camera* review by the Court, claiming they are privileged.[1]

[1] The Court notes that, in its motion, Wyeth expressed concern that Sokol's first amended privilege log may not be complete. When Sokol submitted attachment Nos. 1-8 to the Court, on April 8, 2008, for an *in camera* review, he argued that "the only fair issue for the Court is to determine if the numerous emails contained in Exhibits 1-8 are covered by the common interest privilege," despite knowing that Exhibits 1-8 were not included in his first amended privilege log, based on which Wyeth's motion was made, and without advising the Court of its plan to serve Wyeth with its second amended privilege log that includes the list of items contained in Exhibits 1-8 the following day. Sokol's submission to the Court, of the items claimed to be privileged, but not included in his privilege log that was in effect at the time of Sokol's response to Wyeth's motion, and his failure to advise the Court about his plan to serve Wyeth with its second amended privilege log the day following his response to the motion, is disconcerting.

To assist the Court in determining the defendants' motion and because of a discrepancy between the documents listed on the plaintiff's first amended privilege log and the attachment Nos. 1-8, submitted to the Court for its *in camera* review, the Court directed the plaintiff, by an order, dated May 9, 2008, to submit for its *in camera* review, all the documents listed on his first amended privilege log, and inform it whether another privilege log exists, reconciling the discrepancy, and if so, to submit that comprehensive privilege log to the Court. On May 15, 2008, the plaintiff submitted to the Court, for its *in camera* review, his second amended privilege log, which included attachment Nos. 1-8, previously submitted, and the "packet of emails" stamped with page Nos. 1-201 ("e-mails packet"). The plaintiff's second amended privilege log was deficient.

On May 22, 2008, the Court directed: (i) the plaintiff to conform his second amended privilege log to Fed.R.Civ.P. 26(b)(5) and Local Civil Rule 26.2 of this court, serve it on the defendants and file it with the court; and (ii) the defendants to advise the Court what impact, if any, the conformed second amended privilege log has on their outstanding motion to compel. The Court also provided an opportunity for the plaintiff to submit any response deemed warranted and the defendants to submit any reply. On June 2, 2008, the plaintiff submitted his third amended privilege log, pursuant to the May 22, 2008 order. The defendants advised the Court about

Case 6:22-cv-00319-BKS-TWD   Document 124   Filed 03/24/25   Page 26 of 42
Sokol v. Wyeth, Inc., Not Reported in F.Supp.2d (2008)
2008 WL 3166662

the impact of the plaintiff's third amended privilege log on their motion to compel disclosure. The plaintiff filed his response and the defendants their reply.


**BACKGROUND**

 **\*2** Sokol was employed by Wyeth as a manufacturing scientist. Wyeth manufactured and distributed Prevnar, a vaccine for prevention of childhood diseases. Sokol alleges, in his complaint, that, in 2005, he raised concerns with Wyeth about Prevnar's lack of compliance with the regulatory requirements of the Food and Drug Administration ("FDA"), but Wyeth failed to report incidents related to its lack of compliance to FDA or to investigate its conduct at issue. Sokol alleges that his complaints to Wyeth, concerning Prevnar's compliance issues, involved "misrepresentation and omission about the quality of products and processes, contradictions in the statements [made] to shareholders and consumers on [Wyeth's] website and [Securities and Exchange Commission] filings, and failures to report or concealments from [FDA]." Sokol alleges that, as a result of his complaints concerning Prevnar, Wyeth retaliated against him by: (i) creating a hostile work environment for him; (ii) reducing his duties and research opportunities; (iii) suspending him from employment; and (iv) terminating his employment. Additionally, Sokol alleges, Wyeth terminated him on the pretext of its concern with Sokol's disability, in violation of ADA. Wyeth denies Sokol's allegations and asserts numerous affirmative defenses.

Sokol is represented in this action by Thad M. Guyer, Esq. of T.M. Guyer and Ayers & Friends, P.C. On December 24, 2007, Wyeth served the plaintiff with its first request for the production of documents, seeking all documents that evidence communications between Sokol and Livingston from 2003 to the present relating to Wyeth or any allegations in the complaint or any defenses to the allegations in the complaint. Without producing any documents in response to Wyeth's request, Sokol objected that Wyeth's request was "overly broad, unduly burdensome" and "it requests documents outside of the possession and control of Plaintiff. Additionally, Plaintiff objects to Defendant seeking information protected by the common claims privilege." On February 29, 2008, Sokol submitted a privilege log, containing 25 items, to Wyeth, claiming common interest privilege for all the items listed. On March 19, 2008, after Sokol testified at his deposition during the administrative proceeding, conducted in connection with the underlying

SOA claim, that he exchanged hundreds of communications with Livingston, Sokol presented a first amended privilege log, containing 72 items, to Wyeth. In his first amended privilege log Sokol asserted the common interest privilege for all items listed there, attorney-client privilege for some items and the attorney work-product doctrine protection for some items. On March 19, 2008, Sokol informed Wyeth that he and Livingston had filed jointly, on November 20, 2006, a false claim action against Wyeth and that they are represented by counsel from the law firm Davis, Cowell & Bowe LLP. On April 9, 2008, Sokol disclosed to Wyeth its second amended privilege log, containing 102 items, claiming the common interest privilege for most items, attorney-client privilege for some items and the attorney work-product doctrine protection for some items. This motion followed.


**DISCUSSION**

 **\*3** The scope of discovery in a federal action is broad providing that, unless otherwise limited by court order, a party may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense. See Fed.R.Civ.P. 26(b)(1). At the pretrial discovery stage of a litigation, relevancy, as it relates to information sought to be disclosed, is broadly construed and incorporates information which is not admissible at trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence. See Fed.R.Civ.P. 26(b) (1); *Hickman v. Taylor,* 329 U.S. 495, 507, 67 S.Ct. 385, 392 (1947) ("discovery rules are to be accorded a broad and liberal treatment"), However, "[o]motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by [the Federal Rules of Civil Procedure] or by local rule if it determines that:

> (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;

> (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or

> (iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of discovery in resolving the issues.

Fed.R.Civ.P. 26(b)(2)(C).

2008 WL 3166662

"When a party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial-preparation material, the party must: (i) expressly make the claim; and (ii) describe the nature of the documents, communications, or tangible things not produced or disclosed-and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Fed.R.Civ.P. 26(b)(5)(A); *see also* Local Civil Rule 26.2 of this court. A party may move for an order compelling disclosure or discovery, after a good faith attempt to resolve the issue with the party making disclosure or discovery, without court action, fails. *See* Fed.R.Civ.P. 37(a)(1). To prevail on a motion to compel, a party objecting to a discovery request on the grounds that the information sought is irrelevant, overly broad or unduly burdensome, must do more than ' "simply inton[e][the] familiar litany' that [requests] are burdensome, oppressive or overly broad." *Compagnie Francaise D' Assurance Pour Le Commerce Exterieur v. Phillips Petroleum,* 105 F.R.D. 16, 42 (S.D.N.Y.1984). The resisting party "must show specifically how, despite the broad and liberal construction afforded the federal discovery rules, each [request] is not relevant or how each [request] is overly broad, burdensome or oppressive, ... by submitting affidavits or offering evidence revealing the nature of the burden" *Id.* (internal citations omitted). A district court has broad discretion in deciding discovery issues. *See Wills v. Amerada Hess Corp.,* 379 F.3d 32, 41 (2d Cir.2004).

*Relevancy and Scope*

**\*4** Wyeth contends Sokol's communications with Livingston, from 2003 to the present, relating to Wyeth, Prevnar or any of Sokol's allegations or Wyeth's defenses, are relevant because a "critical issue in this case is whether, in making his complaints, Sokol reasonably and in good faith believed that he was providing information that constituted securities fraud or violation of a law relating to fraud against shareholders." According to Wyeth, that Sokol discussed with Livingston what language was necessary to have his complaint be deemed protected activity, for the purposes of SOA, demonstrates he was not genuinely interested in raising concerns about securities fraud. Furthermore, Wyeth contends, Sokol's contemporaneous communication with Livingston concerning his complaints is "highly relevant to Sokol's state of mind, credibility, and other issues in this action." Wyeth asserts its document request is reasonable because it is "limited in timeframe, limited to communications between Plaintiff and one other individual, and limited in scope to elicit documents relating to the subject matter of this case." Moreover, Wyeth maintains, the production of documents requested does not impose an undue burden on Sokol because "there are no more than a few dozen emails at issue and they have already been gathered by Plaintiff in preparing his log."

Sokol contends "[t]o demand all emails between Sokol and Livingston 'relating to Wyeth' is *prima facie* overly broad." Additionally, because these two former Wyeth's employees "sent hundreds of pages of emails to each other over the past several years, including in their capacities as co-relators in their *qui tam* action against Wyeth, the unbridled 'relating to Wyeth' scope is also overly burdensome, not just overly broad." According to Sokol, "Wyeth has no fair basis under the relevance standard of Rule 26 to demand all Prevnar 'related' email" because this is the SOA employment case and not the false claim Prevnar case."

The Court finds that Wyeth's request for communications between Sokol and Livingston relating to Wyeth, Prevnar, Sokol's allegations or Wyeth's defense is reasonable because the documents sought appear to be facially relevant. Sokol provides no authority for the proposition that the mere quantity of communication sought, i.e. "[h]undreds of pages of e-mails," is sufficient to demonstrate that Wyeth's discovery request is irrelevant, overly broad or unduly burdensome. His conclusory statements that: (i) Wyeth's request is "*prima facie* overly broad" because Sokol and Livingston exchanged hundreds of pages of e-mails to each other over the past several years; and (ii) "almost anything they would email each other about would be broadly 'related to Wyeth,' " are not sufficient, by themselves, to establish a lack of relevance or that the discovery request is overly broad or unduly burdensome. Similarly, absent evidentiary support, Sokol's contention that "almost anything" Sokol and Livingston sent to each other via e-mail would be related to Wyeth is speculative. The Court finds that Sokol failed in establishing that Wyeth's request is irrelevant, overly broad or unduly burdensome. Therefore, Sokol must disclose all documents, erroneously listed in his privilege log, to which no privilege is claimed.

*Attorney-Client Privilege*

**\*5** "The attorney-client privilege is one of the oldest recognized privileges for confidential communications." *Swidler & Berlin v. United States,* 524 U.S. 399, 403, 118 S.Ct. 2081, 2084 (1998). The privilege, designed to facilitate openness and full disclosure between the attorney and the client, shields from discovery advice given by the attorney as well as communications from the client to the attorney. *See*

Case 6:22-cv-00319-BKS-TWD    Document 124    Filed 03/24/25    Page 28 of 42
Sokol v. Wyeth, Inc., Not Reported in F.Supp.2d (2008)
2008 WL 3166662

*Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 682 (1981). The attorney-client privilege also protects from disclosure "communications made to ceratin agents of an attorney, including accountants hired to assist in the rendition of legal services." *United States v. Schwimmer,* 892 F.2d 237, 243 (2d Cir.1989). "A document is not privileged merely because it was sent or received between an attorney and client. The document must contain confidential communication relating to legal advice." *Dep't of Econ. Dev. v. Arthur Andersen & Co.,* 139 F.R.D. 295, 300 (S.D.N.Y.1991). A party invoking the attorney-client privilege has the burden of establishing: "(1) a communication between client and counsel, which (2) was intended to be and was in fact kept confidential, and (3) made for the purpose of obtaining or providing legal advice." *United States v. Constr. Products Research, Inc.,* 73 F.3d 464, 473 (2d Cir.1996). The client's or the attorney's communications with the persons who act as the attorney's agents and whose assistance is indispensable to the attorney's work, are protected by the attorney-client privilege. *See United States v. Kovel,* 296 F.2d 918, 921 (2d Cir.1961); New York Civil Practice Law and Rules § 4548.

The attorney-client privilege may be waived by the voluntary disclosure of otherwise privileged material to a third party, unless the third party is the client's agent. *See In re Application Pursuant to 28 U.S.C. § 1782,* 249 F.R.D. 96, 2008 WL 919707, at *4 (S.D.N.Y.2008).* "To avoid waiver, the proponent of the privilege must show, first, that the client had a reasonable expectation of confidentiality in the disclosure of the material to the third party, and second, that 'disclosure to the third party was necessary for the client to obtain informed legal advice.' " *Id.* Moreover, "the inclusion of a third party in attorney-client communications does not destroy the privilege if the purpose of the third party's participation is to improve the comprehension of the communication between attorney and client." *United States v. Ackert,* 169 F.3d 136, 139 (2d Cir.1999). Nonetheless, "[w]hat is vital to the privilege is that the communication be made in confidence for the purpose of obtaining legal advice from the lawyer." *Kovel,* 296 F.2d at 922. If what is sought is not legal advice but the services a third party offers or if the advice sought is the third party's and not the attorney's, the attorney-client privilege does not apply. *See id.*

A "common interest" doctrine, erroneously called "common interest privilege" or "joint defense privilege," is an exception to the general rule that voluntary disclosure of confidential, privileged material to a third party waives any applicable privilege. *See In re Commercial Money*

*Ctr., Inc., Equipment Lease Litig.,* 248 F.R.D. 532, 536 (N.D.Ohio 2008). The common interest doctrine precludes a waiver of the underlying privilege concerning confidential communications between the parties "made in the course of an ongoing common enterprise and intended to further the enterprise," irrespective of whether an actual litigation is in progress. *Schwimmer,* 892 F.2d at 243; *see Griffith v. Davis,* 161 F.R.D. 687, 692 (C.D.Cal.1995). Thus, the common interest doctrine permits the disclosure of a privileged communication without waiver of the privilege provided the party claiming an exception to waiver demonstrates that the parties communicating: (1) have a common legal, rather than commercial, interest; and (2) the disclosures are made in the course of formulating a common legal strategy. *See Bank Brussels Lambert v. Credit Lyonnais,* 160 F.R.D. 437, 447 (S.D.N.Y.1995). "The need to protect the free flow of information from client to attorney logically exists whenever multiple clients share a common interest about a legal matter." *Schwimmer,* 892 F.2d at 243-44 (citation omitted). The common interest doctrine "is not an independent source of privilege or confidentiality." *In re Commercial Money Ctr., Inc., Equipment Lease Litig.* 248 F.R.D. at 536. If a communication is not protected by the attorney-client privilege or the attorney work-product doctrine, the common interest doctrine does not apply. *See id.*

**\*6** Wyeth contends Sokol did not demonstrate that the attorney-client privilege applies to each of the documents claimed to be privileged. According to Wyeth, Sokol's assertion that Livingston was his counsel's "consultant" should be rejected because "[i]t is insufficient for an attorney to simply name one of his clients as a 'consultant' to another client and thereby invoke the attorney-client privilege with respect to all of their communications." Wyeth contends "this is not a situation where [Sokol's counsel] has retained Livingston as an expert to assist him in understanding complex information his client is conveying to him that he would not otherwise be able to understand." Wyeth further contends: (i) Sokol did not provide evidence of an agreement between him and Livingston to pursue a joint legal strategy and keep their communications confidential; (ii) Sokol and Livingston did not share a "common legal interest" because their interests are not "identical" and their sharing a desire to succeed in an action does not create common interest; (iii) Sokol cannot establish that his communications with Livingston were in furtherance of a common legal enterprise; and (iv) Sokol waived his attorney-client privilege when he voluntarily disclosed the allegedly privileged communication with Livingston to nurse Sheila Burke at Wyeth.

2008 WL 3166662

In advising the Court about the impact of the plaintiff's third amended privilege log on its motion, Wyeth contends: (a) it already received from Sokol document page Nos. 43-54; (b) all documents listed in Sokol's third amended privilege log that are non-privileged must be produced, to the extent they are responsive to its discovery requests; (c) Sokol failed to establish privilege for e-mail communications between Livingston and an unidentified individual who was a "potential" co-relator in the *qui tam* action and between Livingston and David Graham ("Graham"), a former client of the Government Accountability Project; (d) Sokol failed to establish the common interest doctrine applies to protect Livingston's communication with Dan Donovan, Senior Investigative Counsel for the Senate; (e) all e-mail communications between Sokol and Livingston that do not contain privileged information must be produced; and (f) Sokol failed to establish that the common interest doctrine applies to his communications with Livingston. Wyeth also contends that certain documents from Sokol's third amended privilege log appear to be privileged and asks the Court to review them and determine whether they are indeed privileged.

Sokol contends that he retained counsel in the first week of August 2005 and that, during his first telephone conversation with counsel, counsel explained that his client Livingston had become experienced with how SOA applies to their common employer, Wyeth, concerning their common assignments to Wyeth's Prevnar vaccine production departments. According to Sokol, counsel explained that Sokol and Livingston "had common issues, including regarding the 'reasonable belief' requirements of [SOA]" and asked Sokol if he "would be willing to help or even to testify in [ ] Livingston's case." Sokol contends that both cases involved "our reports of quality control issues in the manufacturing of Prevnar vaccine" and Wyeth's "compliance with the same federal court Consent Decree." Since both Sokol and Livingston could testify in the other's case and share the evidence gathered through depositions and discovery, Sokol agreed to counsel's proposition. According to Sokol, pursuant to counsel's arrangement, he and Livingston started communicating about their respective cases in the second week of August 2005. Sokol maintains that: (a) he and Livingston intended their "communications to be protected by attorney-client privilege;" (b) his counsel "explained this to [him];" and (c) Livingston reiterated what counsel explained to Sokol when Livingston asked him: "Would you include [counsel's] e-mail address in all of our e-mail

correspondence? This will ensure that all of our conversations by e-mail will be protected by client-attorney privilege." Sokol contends that, after his counsel reviewed his grievances and Livingston's comments on them, he engaged Livingston as a "consultant" to his law firm 'for the purposes of helping me re-write my complaint as to the technical and legal issues." Subsequently, Sokol maintains, upon his counsel's instruction, Livingston provided him with further "consulting" and "advice" and, in December 2005, he and Livingston "began talking with attorneys about representing us in a qui tam False Claimes Act case." Livingston submitted a declaration [2] in opposition to Wyeth's motion, making almost identical contentions.

[2]    The copy of Livingston's declaration submitted to the Court appeared to be incomplete. It contained pages numbered 1 and 2 and a last, unnumbered page, which started with an incomplete sentence. It appeared that paragraph No. 7 was not included or was included partially. After the Court made an inquiry with counsel to the plaintiff about the missing portion of the document, counsel explained that a portion of paragraph No. 7 "somehow got off from the top of page 3 in the transmission process from Mr. Livingston.... Consequently, I do not have a declaration with Mr. Livingston's signature on the full page 3, as the page 3 on the declaration I filed and served on counsel is indeed cut off at the top." Inasmuch as the document, as executed, was not served in its entirety on the defendant or submitted to the Court, the Court will disregard the missing portion of paragraph No. 7, and will consider Livingston's declaration in the incomplete form in which it was served on the defendant and submitted to the Court.

**\*7** In his response to Wyeth's advising the Court of the impact of Sokol's third amended privilege log on the defendants' motion to compel, Sokol concedes he included non-privileged documents on his third amended privilege log. However, according to Sokol, he only did so because those non-privileged documents "are implicated in the dispute because they have been withheld based on relevance as well." Additionally, Sokol argues, "[s]ome documents previously and rightly withheld on the basis of relevance have now been migrated over on to the privilege log since our timely objections on relevance await ruling."

The Court has reviewed Sokol's third amended privilege log as well as the parties' submissions, in connection with the defendants' motion to compel disclosure of documents. As noted above, the common interest doctrine is not an independent source of privilege or confidentiality and applies only to a communication that is already protected by a privilege. In his third amended privilege log, Sokol asserted "[c]ommon interest privilege" for numerous items, without indicating the nature of the privilege with respect to which the common interest doctrine is asserted. For a significant number of items Sokol asserted "[c]ommon interest privilege and attorney client privilege." The Court will assume, for the purpose of the instant motion, that Sokol's common interest doctrine assertions, where alone, are based on the attorney-client privilege and will analyze them accordingly.

Sokol's communications with Livingston are not communications between a client and his counsel. Generally, Sokol's communications with Livingston, a third party, are not protected by the attorney-client privilege, unless Livingston acted as Sokol's agent, at the time communications were made. Sokol does not claim and the record does not demonstrate that Livingston acted as Sokol's agent. Sokol also does not claim and the record does not demonstrate that Livingston was an agent of his counsel whose assistance was indispensable for the attorney's work. Rather, Sokol maintains (i) Livingston was his counsel's "consultant;" and (ii) by including his counsel's e-mail address in his communications with Livingston he intended that his communications with Livingston "be protected by attorney-client privilege."

Sokol misunderstands the burden imposed on him in establishing the attorney-client privilege. It is the intent that the communication be and is in fact kept confidential, not the intent that the communication be protected by the attorney-client privilege, that Sokol must demonstrate. Sokol does not make citation to any authority, and the Court finds none, for the proposition that copying of the communications between a client and a third party to the client's attorney triggers, by itself, the attorney-client privilege. Moreover, while Sokol contends he intended his communications with Livingston to be confidential by assuring he included his counsel's e-mail address in those communications, e-mail communication contained in e-mails packet page Nos. 1-201, spanning from August 31, 2005, through July 2006, that were directly sent to or received by Sokol and Livingston, were not copied to Sokol's counsel and no explanation was provided by Sokol of the reason for omitting his counsel's e-mail address from

those communications. As noted above, the vital element in establishing that the attorney-client privilege applies is that the communication is made in confidence for the purposes of obtaining legal advice from the attorney and if what is sought is not legal advice but "consultant's" services, or if the advice sought is not that of the attorney but that of the "consultant," the attorney-client privilege does not apply.

**\*8** Sokol and Livingston were represented by the same attorney in their separate SOA litigations against Wyeth. On August 18, 2005, Sokol's counsel engaged Livingston as a "consultant" to provide "technical expertise" in Sokol's case. Since Livingston was not an agent for Sokol or his counsel, prior to August 18, 2005, the Court finds that the communications between Sokol and Livingston, prior to August 18, 2005, are not protected by the attorney-client privilege. The Court also finds that the attorney-client privilege was waived with respect to the communications between Sokol and his counsel, prior to August 18, 2005, because Sokol's counsel disclosed these communications to another client, and that client was neither Sokol's nor his counsel's agent at the time the communications were made.

That Sokol's counsel engaged Livingston as a "consultant," who will provide "technical expertise," demonstrates that the purpose of the engagement was to assist Sokol's counsel with rendering legal advice to Sokol, not to formulate legal strategy that would be common to Sokol and Livingston in their respective litigations, which would further their common enterprise. The *in camera* review of the e-mail communications, listed in Sokol's third amended privilege log, demonstrates that no common interest arrangement existed at any time between Sokol and Livingston, with respect to the instant litigation, and no common purpose existed to benefit from the guidance of their common counsel with respect to their independent SOA litigations. The communications between Livingston and Sokol were focused almost entirely on Sokol's case and Livingston's case- which was in an advanced stage at the time communications were made, was mentioned by Livingston occasionally, for the purpose of updating Sokol on its status, not to develop a common legal strategy. In fact, it does not appear, from the communications before the Court, that Sokol ever inquired on his own about the status of Livingston's SOA litigation or the legal strategy employed in that action. Accordingly, the Court finds that the common interest doctrine does not protect the communications between Sokol and his counsel, disclosed to Livingston prior to August 18, 2005.

The *in camera* review also shows that Livingston acted as a direct advisor to Sokol, as he explained in his communication to Graham, dated October 1, 2005, 8:35 p.m., e-mails packet page No. 41: "I've been communicating with and advising Anthony, along with legal counsel Thad Guyer." In his e-mail to Sokol, dated December 5, 2005, 4: 56 a.m., e-mails packet page No. 32, Livingston demonstrated his role of direct advisor to Sokol when he stated: "I would advise you to do what you want to do.... I would at a minimum make sure that ...." However, for a communication to be protected by the attorney-client privilege, its purpose must be seeking or rendering legal advice from an attorney, not from a consultant. Legal advice cannot be given by one who is not an attorney and no attorney-client privilege is afforded to any advice purporting to be legal from one who is not an attorney, even if that person was engaged by an attorney as a "consultant" to provide "technical expertise." Additionally, although Sokol's counsel claimed to have engaged Livingston as a "consultant" to provide him with "technical expertise" in Sokol's case, except for counsel's e-mail communications to Sokol, dated August 30, 2005, Attachment No. 6, page Nos. 1-5, no evidence exists in other e-mail communications before the Court that Sokol's counsel: (i) was aware of the communications between Sokol and Livingston that are not copied to him; (ii) read the communications that are copied to him; or (iii) acted on any communications between Sokol and Livingston. Therefore, the attorney-client privilege does not protect any confidential communications between Sokol and Livingston, the purpose of which is not obtaining legal advice from Sokol's counsel.

**\*9** Sokol claims the attorney-client privilege applies to numerous e-mail communications with Livingston, the bodies of which consist of the text "FYI," accompanied by a document to which no privilege is claimed. One example of this is found on the e-mails packet page Nos. 178-182. The body of that e-mail communication from Livingston to Sokol, dated March 7, 2006, 8:26 p.m., states: "FYI Anthony. Mark." This text announces that another e-mail, consisting of a certain report, is being forwarded for which no privilege is claimed. The Court finds that asserting the attorney-client privilege in this manner is frivolous, because no basis exists for asserting the attorney-client privilege for this type of communication. Accordingly, any communication consisting of the text "FYI," or a similar announcement indicating that a document is being forwarded with or included in that communication, and accompanied by that document, for which no privilege is claimed, must be disclosed to Wyeth.

Sokol also asserts a common interest privilege with respect to certain e-mail messages between Livingston and an unidentified person, who was invited to join and allegedly "agreed to be co-realtor" in a separate false claims action Livingston and Sokol pursued jointly. However, in order for the common interest doctrine to apply to a communication, the attorney-client privilege must exist first. While the attorney-client privilege applies to communications that are in furtherance of the common objective, between Livingston and Sokol, as joint clients in their common false claims action, Sokol makes no citation to any authority that extends the attorney-client privilege and the common interest doctrine to unidentified potential litigants. Therefore, the Court finds that the communications involving unidentified persons are not protected by the attorney-client privilege.

Sokol asserts the attorney-client privilege with respect to certain e-mail communications between Livingston and Livingston's counsel in his SOA action. One example is the e-mail communication from counsel to Livingston, dated March 8, 2006, 10:14 a.m., entitled "Oral Argument," which summarizes for Livingston the oral argument conducted in Livingston's action in his absence. Although this communication is between the counsel and his client, its content does not demonstrate that legal advice was sought or rendered. A summary by counsel of a public court proceeding for a client, without more, is not protected by the attorney-client privilege. While such a summary could arguably fall within the scope of the work-product doctrine, no such protection was claimed by Sokol. The Court finds that e-mail communications between counsel and Livingston, the content of which does not evidence that legal advice was sought or rendered, are not protected by the attorney-client privilege, and that, if not asserted to shield such communications from disclosure, the work-product doctrine protection, as regards them, is waived.

**\*10** Certain e-mail communications between Sokol and Livingston, alleged to be shielded from disclosure by the attorney-client privilege, pertain to their joint litigation in which they were represented by another attorney. Those confidential communications, as indicated in the Conclusion section of this Memorandum and Order, which were generated for the purpose of seeking or rendering legal advice through their common counsel, are protected by the attorney-client privilege.

*Work-Product Doctrine*

The work-product doctrine prohibits a litigant from making unwarranted inquiries into the files and the mental impressions of an adverse party's legal counsel. *See Hickman,* 329 U.S. at 510-511, 67 S.Ct. at 393. The doctrine is set forth in Rule 26 of the Federal Rules of Civil Procedure:

> Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But, subject to Rule 26(b)(4), those materials may be discovered if: (i) they are otherwise discoverable under Rule 26(b)(1); and (ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain its substantial equivalent by other means.

> Fed.R.Civ.P. 26(b)(3)(A).

A document is created in anticipation of litigation "if 'in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained *because of* the prospect of litigation." *United States v. Adlman,* 134 F.3d 1194, 1202 (2d Cir.1998). The work-product doctrine does not protect "documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation." *Id.* "Even if such documents might also help in preparation for litigation, they do not qualify for protection because it could not fairly be said that they were created 'because of' actual or impending litigation." *Id.* The burden is on the party claiming protection to establish that the work-product doctrine applies. *See Constr. Products Research,* 73 F.3d at 473. The work-product doctrine protection is qualified and may be overcome if the party seeking disclosure makes "an adequate showing of substantial need for the document and an inability to obtain its contents elsewhere without undue hardship." *Adlman,* 134 F.3d at 1202-03.

Generally, the voluntary production of a document that is shielded from disclosure by the work-product doctrine waives any claim by a litigant that the document may be withheld from disclosure under that doctrine. *See U.S. v. Rigas,* 281 F.Supp.2d 733, 737 (S.D.N.Y.2003). However, the common interest doctrine, which provides an exemption to a waiver, also applies to communications protected by the work-product doctrine. *See Pucket v. Hot Springs School Dist. No. 23-2,* 239 F.R.D. 572, 583 (D.S.D.2006); *In re Steinhardt Partners,* 9 F.3d 230, 234-36 (2d Cir.1993); *Transmirra Products Corp. v. Monsanto Chemical Co.,* 26 F.R.D. 572,

578 (S.D.N.Y.1960). If a communication is not protected by the work-product doctrine, the common interest doctrine does not apply. *In re Commercial Money Ctr., Inc., Equipment Lease Litig.* 248 F.R.D. at 536.

**\*11**  Sokol asserted the work-product doctrine with respect to two communications: (1) e-mails packet page Nos. 73-127, consisting of an e-mail message from Sokol to Livingston, dated July 29, 2006, 5:37 a.m., the body of which consists of a forwarded e-mail message with an attached draft of the complaint in their common *qui tam* action, from the law clerk for their attorney to Sokol, dated July 28, 2006, 4:07 a.m.; and (2) e-mails packet page No. 169, consisting of an e-mail message from Livingston to Sokol, dated May 21, 2006, 9:01 a.m., the body of which consists of (i) the words "FYI" and (ii) notification to recipient of the e-mail message that various attachments are attached. However, the attachments in connection with the communication on the e-mails packet page No. 169 were not submitted to the Court.

The Court finds that the communication identified as e-mails packet page Nos.73-127 is protected by the work-product doctrine, because it is a communication from Sokol and Livingston's attorney and contains a draft of the complaint, prepared in anticipation of their litigation against Wyeth, pursuant to the False Claims Act. Wyeth failed to show that: (a) the communication is otherwise discoverable; and (ii) it has substantial need for it to prepare its case and cannot, without undue hardship, obtain its substantial equivalent by other means.

Sokol claims, in his third amended privilege log, that the e-mail communication identified as e-mails packet portion of page No. 169, is protected by the work-product doctrine because it consists of "forwarding of research on Prevnar, compiled at request of counsel." The Court finds no support for the contention that the attachments, claimed to contain research on Prevnar, were complied at the request of counsel or that they were prepared because of the litigation. Therefore, the e-mail communication from Livingston to Sokol, identified as the e-mails packet page No. 169, is not protected by the work-product doctrine.

## CONCLUSION

Therefore, as set forth above, the Court finds that the following communications are shielded from disclosure by the attorney-client privilege:

2008 WL 3166662

• Attachment No. 1, page Nos. 1-4;

• Attachment No. 5, e-mail communication from counsel to Sokol, dated August 18, 2005, 1:16 a.m.;

• Attachment No. 6, page Nos. 1-5;

• Attachment No. 8, page Nos. 1-3;

• e-mails packet page Nos. 23-24, 128-132;

• e-mail communication from Livingston to counsel, July 30, 2006, 4:58 p.m., e-mails packet Nos. 137-138 (but not the e-mail communication from an unidentified person to Livingston, dated July 30, 2006, 12:36 p.m., e-mails packet page No. 138);

• e-mail communication from Livingston to counsel, October 17, 2005, 3:11 p.m., e-mails packet page Nos. 141-142 and 144-145;

• e-mail communications from counsel to Livingston, dated July 29, 2006, 7:11pm, and July 28, 2006, 14:01:06-0700(PDT), e-mails packet page Nos. 148-150;

**\*12** • e-mail communication from Livingston to counsel, dated March 8, 2006, 10:35 a.m., e-mails packet page Nos. 164-165; and

• e-mail communication from counsel to Sokol, dated August 11, 2006, 11:17 a.m., e-mails packet page No. 185.

The Court also finds that the e-mails packet page Nos. 73-127, are shielded from disclosure by the work-product doctrine. On or before August 8, 2008, the plaintiff shall disclose to the defendants all remaining communications from his third amended privilege log.

SO ORDERED:

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 3166662

---

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

1998 WL 74297

1998 WL 74297
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Anne DESMETH, Curator of
Dikarpa N.V.S.A., et. al., Plaintiffs,

v.

SAMSUNG AMERICA, INC. and NADJA
INTERNATIONAL TRADING CORP., Defendants.

No. 92 CIV. 3710(LBS)RLE.
|
Feb. 20, 1998.

OPINION & ORDER

ELLIS, Magistrate J.

 **\*1**  This matter was referred to the undersigned by Leonard
B. Sand, U . S.D.J. for general pretrial purposes on
July 29, 1997. Before the court is plaintiffs' motion to
compel discovery from defendant, Samsung America, Inc.[1]
Specifically, plaintiffs move pursuant to Federal Rules of
Civil Procedure 26, 33, 34 and 37 for an order: (1) compelling
Samsung America to answer interrogatories and to produce
documents in response to requests propounded by plaintiffs;
(2) requiring that Samsung America supplement its responses
to all discovery requests propounded to date by plaintiffs
to include documents within the possession, custody or
control of Samsung Corporation Group[2] and its Korean
subsidiary Samsung Company Limited[3], and to include
information available to those entities[4]; (3) striking the
objections of Samsung America to said interrogatories and
requests for production of documents; (4) requiring Samsung
America to produce full, unredacted copies of documents
that it has produced in redacted form; (5) requiring Samsung
America to supplement its responses to discovery requests
to include modifications thereto made by its attorneys in
correspondence; and (6) requiring Samsung America to pay
plaintiffs' expenses of this motion, including attorneys' fees.

[1]     Hereinafter referred to as "Samsung America."

[2]     Hereinafter referred to as "Samsung Corp."

[3]     Hereinafter referred to as "Samsung Co. Ltd."

[4]     Samsung America and Samsung Co. Ltd. are fully
        owned subsidiaries of the Samsung Corp., which is
        headquartered in Seoul, Korea. Samsung Co. Ltd.
        and the Samsung Corp. are collectively referred to
        as "Samsung Korea."

For the reasons set forth below, the motion is GRANTED, IN
PART, with instructions to proceed in accordance with this
opinion.

I. BACKGROUND

In this action, plaintiffs, collectively Dikarpa N.V.S.A.[5],
a company in bankruptcy liquidation pursuant to Belgian
law, Henri Karp and Myriam Karp–Majer, seek to
recover damages based upon the alleged breach of the
February 2, 1989 agreement[6] for the purchase of leather
garments manufactured by Dikarpa, breach of certain
royalty agreements and alleged acts of fraud against the
plaintiffs. Plaintiffs allege that Samsung America is liable
for damages because of the nature of its relationship with
Nadja International Trading Corporation[7], the company
with which Dikarpa contracted for the sale and distribution
of leather garments .[8] Establishing a longstanding and
involved relationship between the various entities of Samsung
America, the Samsung Korea entities and Nadja is a central
component of plaintiffs' motion to compel discovery.

[5]     Hereinafter referred to as "Dikarpa."

[6]     Hereinafter referred to as "the 1989 agreement."

[7]     Hereinafter referred to as "Nadja."

[8]     Default judgment was entered against Nadja as to
        all claims in the amended complaint on the issue of
        liability on June 20, 1996.

Samsung America has maintained that it is not liable to the
plaintiffs because it was not a party to the agreement between
Dikarpa and Nadja. Samsung America maintains that its role
was solely that of Nadja's financier. However, plaintiffs allege
that discovery to date has revealed that Nadja and Samsung
America were actually joint venturers or partners, and that
they acted together in damaging the interests of Dikarpa.

A second major component of this motion is establishing the
close relationship between Samsung America and its parent

DeSmeth v. Samsung America, Inc., Not Reported in F.Supp. (1998)

1998 WL 74297

entity, Samsung Corp., as well as other Korean affiliates, such as Samsung Co. Ltd. This nexus is the basis upon which Dikarpa seeks the production of documents from Samsung Korea by serving Samsung America in this action.

## II. DISCUSSION

A. Outstanding Discovery

**\*2** Plaintiffs allege that many responses to interrogatories and document requests propounded to the defendant Samsung America are incomplete. The first set of interrogatories and requests for production of documents was served on June 30, 1995. Procedural Declaration of Plaintiffs' Attorney Ted G. Semaya, ¶ 3. [9] Several adjournments were agreed to through 1995, during which time Jaffe & Asher, who had been representing both Samsung America and Nadja, withdrew as counsel. Further agreements were made with Coudert Brothers, counsel presently representing Samsung America. Proc. Decl. ¶¶ 6–10; Declaration of Ted G. Semaya executed May 22, 1997, ¶ 5. [10] Since the time this motion was noticed, Samsung America claims it has produced documents and supplemented answers to interrogatories. Declaration of Samsung Attorney Richard A. DePalma executed on June 25, 1997, ¶ 21. [11] Samsung America does not dispute that its first responses to plaintiffs' first set of interrogatories were served on February 23, 1996, several weeks after February 8, 1996, the last date either represented by Samsung America or agreed to by plaintiffs. Nor does Samsung America contest that documents were not produced until April 19, 1996, two months later still. Semaya Decl., ¶ 6. While Samsung America has represented that no documents were withheld on the basis of privilege or confidentiality, DePalma Decl. ¶ 10, it has in fact asserted one or both of these grounds in response to various discovery requests. *See* DePalma Decl., Exhs. D, E & F.

[9] Hereinafter referred to as "Proc. Decl."

[10] Hereinafter referred to as "Semaya Decl."

[11] Hereinafter referred to as "DePalma Decl."

In responding to this motion, Samsung America has grouped the requests to which it continues to object into three broad categories:

1. Documents in the care, custody and control of non-party Samsung–Korea;

2. Documents and information regarding business transactions between Samsung America and Nadja which are wholly unrelated to the business that Nadja did with plaintiffs; and

3. Documents and information regarding Samsung America's business which are wholly unrelated to the business that Samsung America did with Nadja.

Defendant Memorandum of Law in Opposition to Plaintiffs' Motion to Compel at 2. [12] However, these categories as defined by Samsung America are conclusory, in that they suggest that the responses sought are wholly unrelated to the instant action. This court finds Samsung's characterizations of the requests erroneous, and finds that the documents, when properly defined, are discoverable.

[12] Hereinafter referred to as "Opp. Mem."

The first category of disputed discovery consists of requests of the Samsung Korea entities regarding any transactions with Nadja (or other companies which Lucien Padawer, Nadja's President was the principal operator), and/or Dikarpa related to this action. [13] This would include correspondence between any or all of the parties to this action.

[13] Companies for which Padawer acted as the principle operator are hereinafter referred to as "Padawer related companies/entities."

The second category of disputed discovery includes requests of Samsung America regarding its relationship over many years with Nadja, Padawer, and other Padawer related companies in order to discern the extent of their relationship in the instant action. This category of discovery bears on the disputed issue of Samsung America's liability in this case.

**\*3** The third disputed discovery category consists of requests geared toward illuminating the extent of the alleged knockoffs of Dikarpa styles, alleged to have been produced by Samsung America, Nadja and/or Samsung Korea during and after the period in which the 1989 agreement between Nadja and Dikarpa was in effect. [14] This category would include any documents in the custody of the Samsung Korea entities. Since the basis for this action is the alleged breach of the 1989 agreement, the issue of knockoffs may bear directly on a motive for the breach.

DeSmeth v. Samsung America, Inc., Not Reported in F.Supp. (1998)

1998 WL 74297

14    Dikarpa alleges that discovery has revealed that
      Nadja and Samsung America sold more Dikarpa
      styles to retail stores than they actually accepted
      from Dikarpa pursuant to the 1989 agreement.
      Dikarpa was the only authorized manufacturer of
      its leather garments. Discovery has revealed that
      garments allegedly manufactured elsewhere were
      labeled and sold as Dikarpa styles.

Under the Federal Rules of Civil Procedure, the scope of
discovery extends to "any matter not privileged which is
relevant to the subject matter in the pending action, whether it
relates to the claim or defense of the party seeking discovery
or the claim or defense of any other party..." Fed.R.Civ.P. 26.
The phrase "relevant to the subject matter involved in the
pending action" has been construed broadly to encompass any
matter that bears on, or that reasonably could lead to other
matters that could bear on, any issue that is or may be in the
case." Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351,
98 S.Ct. 2380, 57 L.Ed.2d 253 (1978). The party receiving
a request must not only produce information which is
admissible as evidence, but also information which "appears
reasonably calculated to lead to the discovery of admissible
evidence." Martin v. Valley National Bank of Arizona, 140
F.R.D. 291, 300 (S.D.N.Y.1991). "Reasonably calculated" in
Rule 26 means "any possibility that the information sought
may be relevant to the subject matter of the action." Morse/
Diesel, Inc. v. Fidelity & Deposit Co., 122 F.R.D. 477, 449
(S.D.N.Y.1988). The contents of the discovery sought by the
plaintiffs meets the liberal standard of Rule 26 and must be
produced.

B. The Nadja/Samsung Relationship
Samsung America contends that its involvement with Nadja
was only that of financier for the purchase of leather garments
per the 1989 agreement with Dikarpa. Samsung America
has therefore limited its discovery responses to documents
and information related to its financing agreement with
Nadja as Samsung America perceives they relate to the
1989 agreement. However, a key issue in this action is the
general nature of the relationship between Samsung America
and Nadja. It bears on the basic, disputed issue of whether
Samsung America can be held liable on the claims against
it in this action. Plaintiffs allege that discovery thus far
has disclosed that a primary function of Nadja was to be
a joint venturer or partner with Samsung America to do
business with Dikarpa. Plaintiffs allege that Dikarpa's entire
experience with the defendants, Nadja and Samsung America,
is the subject of this action.

Plaintiffs further allege that discovery has revealed that Nadja
was only the latest of several companies owned and controlled
by Lucien Padawer, Nadja's president, that had entered into
agreements with and done business with Samsung America
and Samsung Korea for many years. Semaya Decl., ¶ 22.
A document executed by these companies near the time of
the apparent conclusion of their relationship, a "Settlement
and Release Agreement," defined the "Samsung Releasees"
to include Samsung America and Samsung Co. Ltd ., and
define the "Padawer Releasees" to include "Padawer, Foxrun,
Tiger Fox, Jadine, Nadja and Nadja II." Semaya Decl., Exh.
5. Plaintiffs seek further discovery to determine the extent and
complexity of the relationship between these companies, in
order to hold Samsung America liable on the 1989 agreement.

*4  Samsung America has been doing business with Lucien
Padawer, Nadja's President, since as early as 1982, and with
Samsung–Korea since the 1970's. Declaration of Henri Karp
executed on July 24, 1997, ¶ 4; 15 Reply Declaration of Ted
G. Semaya, executed on July 28, 1997, ¶ 7. 16 Information
regarding the relationship of the Padawer entities in the
years prior to the 1989 agreement may provide a clearer
picture of the true extent of the relationship between Nadja
and Samsung America in this action. Henri Karp, Dikarpa's
principal, claims that Padawer represented to him throughout
their negotiations that Nadja and Samsung America were
partners or joint venturers. See Semaya Decl. ¶¶ 35–46.

15    Hereinafter referred to as "Karp Decl."

16    Hereinafter referred to as "Semaya Reply Decl."

While this motion was pending, plaintiffs' attorney came
across copies of some documents that were in the custody
of Nadja's present attorney. Plaintiffs' attorney supplemented
this motion with some of these newly discovered documents
in an attempt to strengthen Dikarpa's argument that Samsung
America had withheld documents responsive to discovery
requests. In response, S.K. Lee, who asserts that he was
personally responsible for directing the search of documents
relative to Samsung America's production of documents to
plaintiffs in this case claims he is "able to say that I do not
recall ever seeing, prior to production by Mr. Semaya, the
documents marked as Exhibits 1(C), (D), (E), (F), (G), (H),
& (I) ... None of these documents were contained in any
of the Samsung files I located during my search relative to
plaintiffs' document requests in this case." Declaration of S.K.
Lee, executed on January 14, 1998, ¶¶ 1, 11. 17 ; See also

DeSmeth v. Samsung America, Inc., Not Reported in F.Supp. (1998)

1998 WL 74297

Supplemental Declaration of Ted G. Semaya, executed on December 18, 1997, Exhs. C–I.[18] Lee further asserts that he "personally conducted a reasonable search of Samsung's files for documents responsive to plaintiffs' discovery requests." Also that he "caused Samsung employees to make reasonable searches for all documents responsive to plaintiffs' requests." Supp. Lee Decl., ¶ 4. While Lee protests, "[q]uite simply, the documents marked as Exhibits 1(C), (D), (E), (F), (G), (H), & (I) to Mr. Semaya's Declaration have not been found in any of Samsung files we have located to date, " he goes on to assert that "Samsung has made clear at all times that it objects to producing certain categories of documents which it believes has no bearing on the issues in this case." *Id.* at ¶¶ 25, 26.

17    Hereinafter referred to as "Supp. Lee Decl."

18    Hereinafter referred to as "Supp. Semaya Decl."

In support of their position, plaintiffs submit letters addressed to J.S. Lee, H.J. Kang, and Bruce Bloom at Samsung America from the accounting firm of Rashba & Pokart. Supp. Semaya Decl., Exh. C & D. These letters were written during the period of the 1989 agreement and allude to a "joint venture" between Samsung America and Nadja. Also included is a fax, on Samsung America letterhead, from J.S. Lee at Samsung America in New York to Padawer regarding the work done by the accounting firm on behalf of their joint venture. *Id.* at Exh. E. Lee does not challenge the authenticity of any of these newly discovered documents. *See* Supp. Lee Decl., ¶¶ 18–22. His assertion, therefore, that these documents were unknown to him is highly suspect.

**\*5** Samsung America asserts that while Nadja was continuously referred to either in terms of a "joint venture" or as a "division of Samsung America," these terms carried no legal significance. Supp. Lee Decl., ¶ 8. Lee further asserts that since the documents were recovered by Dikarpa from Nadja's attorney, it was Nadja's and not Samsung America's responsibility to produce them to the plaintiffs. This assertion lacks merit. There is simply no authority under the rules of discovery to withhold responsive documents within a party's custody or control, claiming that someone else should have produced them.

Discovery thus far has revealed that Samsung America kept accounts for Nadja and Foxrun, a Padawer related company. The entities shared offices, facilities and employees. Samsung America maintained Nadja and Foxrun accounts on its computer system, and analyzed the consolidated budgets of Nadja and Foxrun, and before that, for Tiger Fox and Foxrun.

Semaya Decl. ¶ 30, Exhs. 17, 18. All of this evidence compels the further production of documents and information related to Samsung America and Nadja's business dealings both before and during the time the 1989 agreement was in effect.

### 1. The Financing Agreement

Samsung America and Nadja entered into a financing agreement for the purchase of the leather garments from Dikarpa in 1989 and 1990. Semaya Decl., Exh. 4. The agreements contain import financing arrangements, whereby Samsung America would take delivery of the leather clothing and remit payment to Dikarpa upon delivery. Samsung America, however, claims that it did not know of the February 1989 agreement between Dikarpa and Nadja until discovery in the instant case. Lee aff. ¶ 26. The documentary evidence contradicts this assertion. For example, in May of 1989 Samsung America, through Marvin Winston, then Vice President of Samsung America's Textile Division, corresponded directly to Karp regarding shipment dates and letter of credit. Karp Decl., Exh. 3. A letter of credit was issued from Korea Exchange Bank by Samsung America in February 1989 to the order of Dikarpa. *Id.*, Exh. 4. A July 7, 1989 letter of credit describes Nadja as a "div [sic] of Samsung America." *Id.* Exh. 12. There are two shipping invoices from Dikarpa to Samsung America dated May 2, 1989 and March 15, 1990. *Id.,* Exh. 10. Samsung America even admits that it opened an irrevocable letter of credit to the order of Dikarpa at the request of Nadja for purchases pursuant to the 1989 agreement. *See* Lee Aff., ¶ 31. The court concludes that Samsung America's assertion that it knew nothing about the 1989 agreement until discovery is not credible.

Samsung America further claims that it never communicated with Dikarpa directly regarding any transactions pursuant to the 1989 agreement. Lee aff. ¶¶ 29, 30. However, Samsung America was invoiced for royalties payable to Dikarpa, pursuant to the 1989 agreement. Karp Decl., Exh. 11. Discovery has disclosed correspondence from Dikarpa to Samsung America regarding the late opening of the letter of credit scheduled for November 15, 1989. *Id.,* Exh. 13. There are several faxes from Y.S. Lee of Samsung America to Karp regarding problems with the letter of credit. *Id.,* Exh. 14,15. Again, Samsung America's own documents demonstrate their claim to be untrue.

**\*6** Though not explicit, the agreements bear some earmarks of joint venture agreements. Under New York law, a joint venture is an informal partnership among two or more

DeSmeth v. Samsung America, Inc., Not Reported in F.Supp. (1998)

1998 WL 74297

persons for a limited purpose. The legal consequences of a joint venture are tantamount to those of a partnership. *See Gramercy Equities v. Dumont,* 72 N.Y.2d 560, 565, 534 N.Y.S.2d 908, 531 N.E.2d 629 (1988); *Sherrier v. Richard,* 564 F.Supp. 448 (S.D.N.Y.1983). In determining when a joint venture exists, the court has considered these factors: (1) the intent of the parties to form a joint enterprise; (2) joint control of management and business; (3) sharing profits and losses; and (4) a combination of property, skill or knowledge. *Union Carbide Corp. v. Montell N.V.,* 944 F.Supp. 1119, 1132 (S.D.N.Y.1996) (quoting *Sound Video Unlimited, Inc. v. Video Shack, Inc.,* 700 F.Supp. 127, 138 (S.D.N.Y.1988)).

The relationship of Samsung America to Nadja seems closer to that of a partner or joint venturer than simply to that of a financier. The companies shared profits and losses. Semaya Decl. ¶ 46, Exh. 24, ¶ 12; Semaya Reply Decl., ¶ 8. The companies shared joint control and management of business records and required joint agreement for delivery of garments to customers. Semaya Reply Decl., ¶ 13(b). Samsung referred to Nadja as a "Division of Samsung America." Karp Decl. ¶ 12. Nadja was also referred to as a "section within the Textile Department," and as a "Profit Center 98" in a document generated by Samsung America. Semaya Reply Decl. ¶ 13(c), Exh. 6.

Samsung points to a clause in the 1989 Financing Agreement between Samsung America and Nadja which provides:

> It is expressly agreed and understood by both parties that [Nadja] shall not be granted any right or authority to assume or to create any obligation or duty, express or implied, on behalf of or in the name of Samsung or to bind Samsung in any manner whatsoever. Nothing herein shall be construed to place Samsung and [Nadja] in a relationship of partners, joint venture[rs] or principal agent.

Semaya Decl., Exh. 4, ¶ 26. However, this paragraph is not determinative on the partnership issue. Statements that no partnership is intended are not conclusive. If as a whole a contract contemplates an association of two or more persons to carry on as co-owners of a business for profit, a partnership exists. *Union Carbide,* 944 F.Supp. at 1132. Additionally,

such a clause is of no effect with regard to liability to a third party, such as Dikarpa, which had no notice of the existence of the clause. *See Royal Bank v. Weintraub, Gold & Alper,* 68 N.Y.2d 124, 128, 506 N.Y.S.2d 151, 497 N.E.2d 289 (1986) (acts of a partner in apparently carrying on the partnership business in the usual way are binding on the partnership business unless that partner has no authority to act, and the person dealing with that partner knows that fact.).

### 2. Knockoffs

Plaintiffs allege that they have learned through discovery that defendants engaged in the unauthorized manufacture of Dikarpa-style garments without payment of commission for such production or compliance with any of the provisions of the 1989 agreement. *See* Semaya Decl. ¶¶ 48–54. Samsung America has resisted nearly all discovery requests addressed to this knockoff issue, usually objecting to the information as irrelevant or burdensome. *See* Opp. Mem. at 19–20. Given the abundance of documentary evidence which points to such unauthorized manufacture by the defendants and the likelihood that such production could reveal a motive for the breach of contracts at issue in this litigation, the court finds this category of documents discoverable, despite their potential volume.

**\*7** The interaction among Samsung America, Samsung Korea and Nadja related to the unauthorized manufacture of Dikarpa styles is critical to the analysis of whether the defendants acted to the detriment of Dikarpa. Pursuant to the 1989 agreement, Nadja was to be the sole distributor of Dikarpa leather garments in North America. Dikarpa had production factories in Belgium, Turkey and Portugal. While Nadja did have the right to produce Dikarpa styles elsewhere, it had to receive prior approval from Dikarpa. Semaya Decl., Exh. 23 (the 1989 Agreement). Dikarpa claims that many garments were produced and sold without its knowledge or approval. Plaintiffs have discovered invoices, not produced by Samsung America, which reveal that garments labeled "Casual Leather Games," a Dikarpa trademark, were scheduled for delivery to "Foxrun/ Samsung" in New York by June 30, 1989. Supplemental Reply Declaration of Ted Semaya, executed on January 20, 1998, Exh. 3. [19] These garments were to be shipped from the Republic of Korea. *See* Declaration of Jennifer Dowd, executed on January 20, 1998, ¶ 3. Without the knowledge and approval of Dikarpa, such a scenario would be impossible under the 1989 agreement, which was in full force at the time, since Dikarpa had no factories in the

1998 WL 74297

Republic of Korea. Under the agreement, Nadja received specifications of all Dikarpa styles shipped to Nadja and Samsung America. Samples of the garments were also sent to Nadja and Samsung America. Plaintiffs allege that Nadja and/or Samsung America provided these garment specifications to Samsung Korea to create inferior quality knockoffs. Semaya Decl., ¶ 51. Plaintiffs believe that Samsung Korea was producing much, and possibly all, of the garments ordered pursuant to the agreement. *See* Memorandum in Support of this Motion at 24–25.

19      Hereinafter referred to as "Supp. Semaya Reply Decl."

Documents produced by Samsung America reveal that in May 1989, it sold to Limited Stores 15,000 garments of a Dikarpa style named "Wellington" into which it placed labels identifying the garments as genuine Dikarpa garments. Semaya Decl. ¶¶ 49–50, Exh. 25. Nadja had agreed to purchase 40,000 units of Wellington, but ultimately took delivery of only 10,500. Semaya Decl. ¶ 49. Plaintiffs allege that the discrepancy between the number of garments actually purchased from Dikarpa and those sold to Limited Stores was filled with knockoffs produced by Samsung Korea. During his deposition, Padawer admitted a production of Dikarpa-style garments by Samsung Korea, on the order of Samsung America, into which Foxrun labels were placed, and which were sold to Macy's in the United States. Semaya Decl. ¶ 53. Samsung America also produced a Samsung Co. Ltd. garment production schedule disclosing production by Samsung Korea of at least another 27,500 pieces of Wellington, plus substantial amounts of other Dikarpa styles. Semaya Decl. ¶ 54, Exh. 26. Dikarpa claims all of these productions were unauthorized.

This evidence warrants further investigation of Nadja, Samsung America and Samsung Korea's alleged production of knockoffs. Not only would such unauthorized production violate the 1989 agreement, but may also provide a motive for breach of the agreement, specifically the rejection of Dikarpa garments upon delivery to Samsung America. Samsung America's attempt to limit its responses by limiting document production to information regarding Dikarpa is clearly intended to skirt the very discovery intended by the plaintiffs.

*8  While Dikarpa has made specific requests for invoices and other documents related to sales and shipment of garments from various transactions which came to light in previous discovery, they may also inquire into other transactions which they do not know about. Since Dikarpa is unaware of the extent of the alleged knockoff production and Samsung America has limited discovery to only garments manufactured by Dikarpa, Samsung America should produce all relevant documents regarding unauthorized production of Dikarpa garments from 1989 to the present.

C. Objections

Samsung America has interposed various general objections to production of documents. It asserts that the discovery requests (1) seek confidential information, (2) are not relevant, or (3) are overly broad and burdensome. In addition it limits the temporal scope of its responses to the years 1989 to 1992. None of these positions have merit.

It is unclear what supplemental discovery, if any, took place between the parties since the filing of this motion. Some of Samsung America's responses seem to indicate that documents were turned over even though Samsung America objected to their production. For example, regarding request number 60 of Plaintiffs' Second Request for Production of Documents, the exchange between the parties is as follows:

Request # 60:

> All letters of credit and all confirmations thereof concerning garments purchased by Samsung[-]America, Nadja or Foxrun, or any of them.

Response:

> Samsung objects to this request on the grounds that it seeks confidential information. Samsung further objects to this request on the grounds that it seeks information and documents neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Samsung further objects to this request

Case 6:22-cv-00319-BKS-TWD    Document 124    Filed 03/24/25    Page 40 of 42

DeSmeth v. Samsung America, Inc., Not Reported in F.Supp. (1998)

1998 WL 74297

on the grounds that it is overly broad
and unduly burdensome.

Request to Supplement:

> This request seeking letters of
> credit and confirmations concerning
> garments purchased by Samsung
> America, Nadja or Foxrun is relevant
> to the issue of knock [[[-]offs of the
> Dikarpa-style garments as discussed
> above and also relevant to the issue of
> the course of dealing in which these
> entities generally engaged in the use
> of letters of credit for the purchase
> of garments, which bears directly
> on the dispute between defendants
> and plaintiffs regarding the terms of
> the purchase agreements and related
> letters of credit at issue in this action.

Response to Request to Supplement:

You have Samsung's response.

Semaya Decl., Exh. 30 at 22.

In responding to the instant motion, Samsung America
supplements its response only by adding:

> Subject to and without waiving any
> General or Specific Objections, to
> the extent that Request No. 60
> seeks information relating to Dikarpa,
> Samsung has produced all responsive
> documents in its care, custody or
> control. Samsung has not withheld any
> documents on the basis of privilege or
> confidentiality.

DePalma Decl., Exh. E at 18. It is unclear when, if ever,
such responsive production took place. It is equally unclear
whether by its response Samsung America means to indicate
that it has withheld responsive documents based on its

own definition of relevance. If in fact Samsung America
has produced documents responsive to requests, Samsung
America should create a log of such documents with their
Bates numbers. Samsung America may not limit the scope
of its responses to information related only to Dikarpa. Such
limitation foils the production of the very documents intended
by the requests. Any information regarding the relationship
between Samsung America and any Padawer related entity
—previous to, during, or after its involvement with Dikarpa
—is relevant to the issue of Samsung America's liability in
this case, particularly as such information relates to alleged
unauthorized manufacture and sale of Dikarpa styles.

**\*9** The asserted confidentiality of relevant business records
is not a proper basis for refusing production. *See generally
In re Agent Orange Product Liability Litigation,* 821 F.2d
139 (2d Cir.1987). The parties could have entered into a
stipulation of confidentiality, with the burden on Samsung
America, the party claiming confidentiality, to establish
good cause for such treatment in accordance with Rule
26(c) of the Federal Rules of Civil Procedure. *See Litton
Industries v. Lehman Bros. Kuhn Loeb Inc.,* 122 F.R.D. 433,
436 (S.D.N.Y.1988). Similarly, any assertions of privilege
should have been accompanied by a schedule of the withheld
documents, detailing the grounds of privilege asserted
for each document or refusal to respond. Having done
neither, Samsung America must now produce the requested
information or documents. Furthermore, given the liberal
discovery rules, relevance is rarely a legitimate basis to
withhold discovery. Samsung America has not provided any
details regarding its burdensomeness objection, thus the court
will not address these objections.

## D. The Parent/Subsidiary Relationship

Rule 34 (a) of the Federal Rules of Civil Procedure provides
that a party may serve a request for the production of
documents that are in the possession, custody or control of the
party upon whom the request is served. A party seeking the
production bears the burden of establishing control. *Camden
Iron & Metal v. Marubeni America Corp.,* 138 F.R.D. 438,
441 (D.N.J.1991).

In parent/subsidiary situations, the determination of control
turns upon whether the intracorporate relationship establishes
some legal right, authority or ability to obtain requested
documents on demand. Evidence considered by the courts
includes the degree of ownership and control exercised by
the parent over the subsidiary, a showing that the two entities
operate as one, demonstrated access to documents in the

1998 WL 74297

ordinary course of business, and an agency relationship. *Id.* at 442.

Plaintiffs rely on *Kossoff v. Samsung Company, Ltd.,* 123 N.Y. Misc.2d 177 (Sup.Ct.1984), in asserting that Samsung America and Samsung Korea have a sufficient nexus. In that case, the New York court held that it had jurisdiction over Samsung Company Limited based on evidence that Samsung Company Limited did business in New York through Samsung America.[20] Samsung America denies that there is a sufficient nexus and states conclusorily that it has no "legal right, authority or ability to obtain documents or other information from Samsung Corp.," and "it is important to note that the relationship between Samsung Corporation and Samsung America has changed dramatically in the nearly two decades since the evidence in *Kossoff* was produced by the parties." Further, it states, "[t]his court is looking at a far different company from the one *Kossoff* looked at many years ago." Lee Aff., ¶¶ 56–57, 59.

[20]     Samsung Co. Ltd. is the predecessor company to the Samsung Corporation Group.

The facts, however, fail to denote any concrete difference between the relationship of Samsung Corp. and Samsung America at the time of the *Kossoff* case and now. Indeed, some of the alleged differences do not exist. For example, while Lee asserts that Samsung America and Samsung Corp. do not share any officers or employees, J.Y. Chung appears to be both Senior Vice President of Samsung America and General Manager of Samsung Corp. *Compare* Lee Aff., ¶ 48 *with* Semaya Decl., ¶ 23, Exh. 5. In addition, Lee never explains when or how the relationship between Samsung America and Samsung Corp. changed. Samsung Corp.'s most recent annual report and financial statement describe the structure of the company as "numerous companies under common management and control." Semaya Decl., Exh. 6. This language tracks that used by the *Kossoff* court in finding that Samsung Co., Ltd. was subject to the jurisdiction of the New York court. *See Kossoff,* 123 Misc.2d at 178, 474 N.Y.S.2d 180. This court finds *Kossoff* both persuasive and analogous to the present situation.

**\*10** In response to documents requests by the plaintiffs, Samsung America has produced documents that clearly came from Samsung Korea. *See* Semaya Decl., Exh. 26. These documents bear the letterhead of Samsung Co. Ltd. As evidenced by their production, such documents are in the actual possession of Samsung America.

It is unfathomable how Samsung America now asserts that it did not even know about the 1989 agreement until discovery in this case, since it was financing the payments for all of the purchases pursuant to the agreement, as well as took delivery of garments shipped directly from Dikarpa. Further, Samsung America and Nadja prevailed on Dikarpa to use Samsung Corp. as a supplier for materials such as snaps, buttons and hanging tags for the garments that Dikarpa designed and manufactured for sale to Samsung America. Karp Decl., ¶ 17. During this period of time, Samsung Corp. and Nadja were allegedly negotiating a deal with Karp to take over a majority share of Dikarpa. *See* Semaya Decl., Exh. 2 (Complaint), ¶¶ 65–70.

Samsung America argues that control of documents can only be found in situations that warrant piercing the corporate veil. *Gerling Int'l. Ins. Co. v. Commissioner of Internal Revenue,* 839 F.2d 140 (3d Cir.1988); *Glaxo, Inc. v. Boehringer Ingelheim Corp.,* 1996 WL 710836 (D.Conn. Oct.8, 1996), *aff'd* 1997 WL 355339 (Fed. Cir. Jan 4, 1997). However, these cases clearly list additional alternate grounds where control can be established. They include, (1) where there is access to documents when the need arises in the ordinary course of business. *Glaxo,* at \*3, *Camden Iron,* 138 F.R.D. at 442; and (2) where the subsidiary was the marketer and servicer of the parent's product in the United States. *Id.* Other court have found that the control analysis under Rule 34 of the Federal Rules of Civil Procedure does not require that a party have actual managerial power over the foreign corporation, but rather that there be some coordination between them. *Afros, S.P.A. v. Krauss–Maffei Corp.,* 113 F.R.D. 127, 129 (D.Del.1986).

There is much evidence contrary to Samsung America's claim that entities of Samsung Korea were not involved in the transactions between Padawer related companies and Dikarpa. Documents already produced by Samsung America in discovery originate from Samsung Korea. *See* Semaya Decl. Exh. 12, 15. Such a pragmatic approach, based upon common sense notions of control, is employed in many decisions in this area, rather than limiting the analysis to specific facts of preceding decisions. Samsung Corp. holds itself out as one of the world's largest companies comprised of 340 offices and facilities in 66 countries. Semaya reply Decl. ¶ 5, Exh. 1 (page from 1995 Samsung Annual Report). The Samsung companies may not hold themselves out as united for some purposes, but unconnected for others.

1998 WL 74297

While maintaining that Samsung America was under no obligation to have done so, Lee states that he sent plaintiffs' discovery requests to Samsung Korea. He further states that Samsung Corp. has stated that it does not posses any documents or information responsive to plaintiffs' requests. Lee Aff. ¶ 55. Again, this assertion contradicts the documentary evidence discovered in this case thus far.

### III. CONCLUSION

**\*11** IT IS ORDERED that Samsung America reevaluate its discovery responses in view of this opinion, and produce every document responsive to the plaintiffs' discovery requests. Samsung America should also forward a copy of this opinion to the various Samsung Korea entities, along with copies of all discovery requests propounded by plaintiffs to date. Discovery responses and document production should include:

(1) any information and documents withheld on the basis of privilege, confidentiality, burdensomeness or relevance;

(2) documents and information in the possession, custody and control of Samsung Korea entities;

(3) documents and information regarding Samsung America's prior dealings with Nadja and other Padawer related companies, including information regarding suits brought against these companies resulting from their relationship; and

(4) documents and information related to manufacture of Dikarpa style garments, not manufactured by Dikarpa pursuant to the 1989 agreement, from 1989 to the present.

Samsung America should produce the discovery within 20 days of the date of this order. Plaintiffs should submit to the court, within 15 days of receipt of the defendants' responses, a summary report of any outstanding requests. The court will reserve the issue of fees and expenses until that time.

### All Citations

Not Reported in F.Supp., 1998 WL 74297

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.   9